UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

DAVID S.L. PARKS,                         :
        Plaintiff,                     :
                                  :      CASE NO. 3:09cv604(VLB)
      v.                                :
                                  :      March 28, 2012
THERESA C. LANTZ, ET AL.,                 :
        Defendants                     :

RULING GRANTING IN PART AND DENYING IN PART
DEFENDANTS' MOTION TO DISMISS

The plaintiff, David S.L. Parks, filed this action *pro se* under 42 U.S.C. §§

1983 and 1986 and Title II of the Americans with Disabilities Act ("ADA"), 42

U.S.C. § 12101, et seq. against thirty-eight defendants.  On July 6, 2009, the court

informed plaintiff that he should be aware that Rule 8(a)(2) of the Federal Rules of

Civil Procedure only requires that a complaint contain "a short and plain

statement of the claim showing that the pleader is entitled to relief" and that there

is no requirement that plaintiff include detailed factual allegations or submit

exhibits in support of the factual allegations.   (*See* Ruling and Order, Doc. No. 16

at 7.)  Despite this notification from the court, plaintiff chose to file an amended

complaint that fails to comply with Rule 8(a)2, Fed. R. Civ. P., in that it is 218

pages in length and includes a ninety-three page statement of claims and ninety-

eight pages of exhibits.   Because the plaintiff proceeds *pro se* in this action, the

court overlooked the fact that the amended complaint did not comply with Rule 8

of the Federal Rules of Civil Procedure and considered the allegations included in

the statement of claims and reviewed the exhibits attached to the amended

complaint as well as the supplemental exhibits in support of the amended complaint filed on February 22, 2010.

On July 6, 2010, the Court filed an Initial Review Order addressing the claims in the amended complaint and dismissing the section 1985 and 1986 claims, the Fifth and Sixth Amendment claims, the Section 1983 claims against all defendants in their official capacities, the ADA claims against all defendants in their individual capacities and all other claims against defendants Ottolini, Budlong, Burns, Morris, Bona Sepa, McGaughney, Alisberg, Gaynor, Rutledge, Stefan, LaFrance, Pesanti, Silvis, Migliaro, Mendelsohn, Dignam, Luna, Cleaver, Blumenthal and Smith.  The court also declined to exercise supplemental jurisdiction over any state law claims against defendants Ottolini, Budlong, Burns, Morris, Bona Sepa, McGaughney, Alisberg, Gaynor, Rutledge, Stefan, LaFrance, Pesanti, Silvis, Migliaro, Mendelsohn, Dignam, Luna, Cleaver, Blumenthal and Smith.  The court concluded that the Section 1983 claims of deliberate indifference to medical needs, conspiracy, retaliation, denial of access to courts and violations of due process against defendants  Lantz, Choinski, Rell, Brian Murphy, Blanchette, Furey, Peter Murphy, Sieminski, Dzurenda, Semple, Benner, Lasrove, Arrias, Falcone, Berrios, Ralliford and Griffith in their individual capacities, the ADA claims against those same defendants in their official capacities and the various state law claims against those defendants would proceed.  The remaining defendants have moved to dismiss the claims against them.  For the reasons that follow, the motion to dismiss is granted in part and denied in part.

## I.  STANDARD OF REVIEW

When considering a motion to dismiss, the court accepts as true all factual allegations in the complaint and draws inferences from these allegations in the light most favorable to the plaintiff.  *See Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974); *Flores v. Southern Peru Copper Corp.*, 343 F.3d 140, 143 (2d Cir. 2003). The court considers not whether the plaintiff ultimately will prevail, but whether he has stated a claim upon which relief may be granted so that he should be entitled to offer evidence to support his claim.  *See York v. Association of Bar of City of New York*, 286 F.3d 122, 125 (2d Cir.), *cert. denied*, 537 U.S. 1089 (2002).

In reviewing the complaint in response to a motion to dismiss, the court applies "a 'plausibility standard,' which is guided by two working principles." *Ashcroft v. Iqbal*, ___ U.S. ___, 129 S. Ct. 1937, 1949 (2009).  First, the requirement that the court accept as true the allegations in the complaint "'is inapplicable to legal conclusions,' and '[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice.'" *Harris v. Mills*, 572 F.3d 66, 72 (2d Cir. 2009) (quoting *Iqbal*, 129 S. Ct. at 1949).  Second, to survive a motion to dismiss, the complaint must state a plausible claim for relief. Determining whether the complaint states a plausible claim for relief is "'a context-specific task that requires the reviewing court to draw on its judicial experience and common sense.'"  *Id.* (quoting *Iqbal*, 129 S. Ct. at 1950).  Even under this standard, however, the court liberally construes a *pro se* complaint.

*See Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (per curiam); *Boykin v. KeyCorp*, 521 F.3d 202, 213-14, 216 (2d Cir. 2008).

II.      FACTS[1]

In July 2005, plaintiff was confined at MacDougall and was taking medications for HIV and an anxiety disorder and also suffered from Hepatitis C. Plaintiff claims that for a nine month period from July 13, 2005 until April 26, 2006, Dr. Blanchette discontinued his HIV medications and his anxiety medication, refused to treat him for Hepatitis C and placed him on medications for bi-polar disorder, even though he did not suffer from that condition. Plaintiff alleges that these changes in medications compromised his immune system and his mental health. In late April 2006, an infectious disease physician examined plaintiff and re-prescribed HIV medications and a psychiatrist examined plaintiff and re-prescribed a medication for plaintiff's anxiety disorder.

Plaintiff claims that during an eighteen month period beginning on April 19, 2006, Wardens Sieminski, Dzurenda and Peter Murphy and Dr. Blanchette transferred him to and from different prison facilities nine times in retaliation for his filing of grievances and legal actions and his complaints regarding two consent decrees. In January 2008, plaintiff's viral load increased from under 100,000 to almost 200,000.[2] Plaintiff alleges that this increase was due to stress from constant transfers to different prison facilities and changes in his various medications.

---

[2] "Viral load" refers to the amount of HIV in a patient's bloodstream.

Plaintiff asserts that on April 4, 2006, he learned that his complaint alleging violations of the *Doe, et al. v. Meachum, et al.*, Case No. 2:88cv562 (PCD) consent decree had never reached the Connecticut Superior Court clerk's office.  Plaintiff alleges that Counselor Berrios confiscated the complaint before mailing the envelope to the court.   Plaintiff filed a grievance regarding the alleged improper confiscation of his complaint.  On April 19, 2006, Warden Sieminski transferred plaintiff to Garner Correctional Institution ("Garner") in retaliation for plaintiff's filing of this grievance.  Plaintiff filed an appeal of the grievance, but the appeal was stolen from the Grievance Coordinator at Garner.

On August 11, 2006, Warden Dzurenda transferred plaintiff back to MacDougall.   At MacDougall, plaintiff submitted a written request to Warden Sieminski and his staff about the complaint that Counselor Berrios had allegedly stolen from the legal mailing envelope and the retaliatory prison transfers by Wardens Dzurenda and Sieminski.  In retaliation, Warden Sieminski and his staff moved plaintiff to a suicide cell, despite the fact that he was not suicidal.   In the suicide cell, prison staff ordered plaintiff to submit to a strip-search in front of female nurses.

In mid-August 2006, Drs. Arrias and Blanchette reduced plaintiff's prescription for anti-anxiety medication by half and threatened to discontinue the anti-anxiety medication in the future.  On August 25, 2006, Warden Sieminski transferred plaintiff back to Garner.   Plaintiff did not initially receive all his HIV medications when he arrived at Garner.

In September 2006, plaintiff learned that monitors of the consent decree entered in *Connecticut Office of Protection and Advocacy, et al. v. Warden Wayne Choinski of Northern Correctional Institution, et al.*, Case No. 3:03cv1352 (RNC) ("OPA v. Choinski"), were coming to Garner.  Plaintiff was confined to a cell with a defective cell door that would not close properly.  Plaintiff complained to prison staff regarding the door and other cell conditions.  On September 10, 2006, plaintiff's finger was almost amputated by the defective door in his cell. University of Connecticut Medical Center ("UCONN") surgeons were able to re-attach the finger, but it was deformed and did not function properly after the surgery.   Plaintiff filed grievances regarding the defective cell door.

On October 15, 2006, plaintiff demanded to see the court monitors of the *Choinski* consent decree.  Defendants retaliated against plaintiff for his complaints and grievances regarding the defective cell door and transferred him to MacDougall on October 16, 2006.

On November 30, 2006, plaintiff sent a letter to Commissioner Lantz and Attorney Alisberg of the Office of Protection and Advocacy regarding violations of the *Choinski* consent decree, theft of his legal mail and Dr. Blanchette's interference with his HIV medications.   On February 21, 2007, Patricia Ottolini responded to the letter on behalf of Commissioner Lantz.  She indicated that plaintiff was being followed by Dr. Sied and an infectious disease nurse.  She also stated informed plaintiff that she had his complaints regarding stolen legal mail to Deputy Warden Brian Murphy for review.  Plaintiff received no response from Deputy Warden Murphy.

In November and December 2006, defendants set plaintiff up to be attacked by another inmate.  On December 27, 2006, Inmate Harris assaulted plaintiff causing him to hit his head on the cement floor twice.  As a result of this incident, medical staff transferred him to the prison hospital where he remained for twenty-one days.   Plaintiff asserts that he suffered a permanent head injury as a result of the assault by Inmate Harris.

Plaintiff filed grievances and complaints regarding the assault with the grievance coordinator at MacDougall as well as Warden Sieminski and Commissioner Lantz.  Plaintiff also demanded to see the Connecticut State Police in order to file criminal charges against Inmate Harris.  In retaliation, Warden Sieminski transferred plaintiff back to Garner on January 16, 2007.

At Garner, plaintiff experienced vertigo from his head injury.  Dr. O'Halloran submitted a request for a CT Scan and a neurological consultation and that plaintiff be treated for Hepatitis C.   In February 2007, District Administrator Choinski informed plaintiff that he could write to the Connecticut State Police himself if he wanted to file charges against Inmate Harris.   In early April 2007, plaintiff mailed a letter to the Connecticut State Police regarding the assault, but did not receive a response.

Between January and June 2007, Warden Dzurenda transferred plaintiff to three different cells within Garner causing him to suffer stress and anxiety.   On June 26, 2007, a physician at Garner transferred plaintiff to Corrigan Correctional Institution ("Corrigan") to receive a blood transfusion.  When plaintiff arrived, a

physician at Corrigan told him that he did not need a blood transfusion.  On June 28, 2007, Corrigan prison officials transferred plaintiff back to Garner.

In July 2007, Warden Dzurenda placed an unsentenced detainee in plaintiff's cell.   Plaintiff claimed that the warden had hoped that he would be able to get his cellmate to confess to several murders.  On August 10, 2007, Warden Dzurenda transferred the detainee from plaintiff's cell.  That same day, court monitors for the *Choinski* decree visited Garner and spoke to plaintiff.  Plaintiff told the monitors that he was working out his legal and mental health issues with the Department of Correction.

On September 27, 2007, Warden Dzurenda transferred plaintiff back to MacDougall.  On October 17, 2007, medical personnel transferred plaintiff to UCONN to undergo a biopsy in connection with his Hepatitis C treatment.  On October 18, 2007, a captain issued plaintiff a false disciplinary report.  The disciplinary report was dismissed later the same day for process failure.

On October 26, 2007, Peter Murphy, the new Warden at MacDougall, transferred plaintiff back to Garner.  On November 12, 2007, Nurse Benner and Dr. Lasrove discontinued one anti-anxiety medication and started plaintiff on another anti-anxiety medication, but at a much lower dosage.  Plaintiff demanded to the court monitors for the *Choinski* consent decree over these changes in medication, but defendants failed to grant plaintiff his request.

On January 3, 2008, Dr. O'Halloran informed plaintiff that his viral load is almost 200,000.  Dr. O'Halloran allegedly informed plaintiff that the increase in his viral load was due to the multiple prison transfers and the changes in his anti-

anxiety medications.  Dr. O'Halloran re-prescribed the anti-anxiety medication plaintiff had been receiving, but at a higher dosage.

In March 2008, plaintiff filed grievances regarding violations of the *Choinski* consent decree and the refusal of Warden Dzurenda to permit him to see the court monitors.   Plaintiff asserts that in late March 2008, Counselor Migliaro forged his signature on a form seeking to withdraw one of his grievances against Warden Dzurenda.  Plaintiff sent letters regarding this forgery to Commissioner Lantz and Governor Rell.  On April 17, 2008, plaintiff sent a written complaint to the Connecticut State Police seeking to press charges against Counselor Migliaro for forgery, but received no response to his complaint.

On April 18, 2008, Dr. O'Halloran started plaintiff on Hepatitis C treatment. In early May 2008, plaintiff sent letters to Governor Rell, Commissioner Lantz, Deputy Commissioner Brian Murphy and Warden Dzurenda regarding the interference with his legal mail and failure of staff to respond to grievances.  On May 14, 2008, Warden Dzurenda suspended plaintiff's grievance privileges.

On June 20, 2008, plaintiff mailed a criminal complaint to the Connecticut Superior Court for the Judicial District of Danbury.  On July 8, 2008, he received a letter from Danbury Superior Court personnel returning his complaint because a *pro se* litigant is not permitted to file a criminal complaint.

On June 25, 2008, Dr. O'Halloran informed plaintiff that the Hepatitis C treatment is not working.  On August 8, 2008, Dr. O'Halloran discontinued the Hepatitis C treatment.

In July 2008, Counselor Ralliford refused to make copies of legal documents, sign an *in forma pauperis* application form and provide notary services to plaintiff in connection with his attempt to a file civil action in federal court.   On August 4, 2008, Captain Falcone limited plaintiff to 100 copies per week in violation of his right of access to the courts.

On August 21, 2008, Warden Dzurenda and Deputy Warden Semple transferred plaintiff to MacDougall.  Plaintiff claimed that Dr. Blanchette discontinued the order that plaintiff could keep certain medications for medical conditions, other than HIV and anxiety, with him at all times.  In September 2008, Dr. Blanchette and Nurse Margo Griffith switched the times when plaintiff was to receive his HIV medications.  Some days plaintiff did not receive certain HIV medications or received only one-half of the prescribed dosages of medications. Plaintiff filed grievances regarding the medication issues with Health Administrator Furey.

Plaintiff also filed grievances regarding one of five boxes of his legal documents that was missing when he arrived at MacDougall.  The grievance was denied.

On October 15, 2008, correctional officers conducted a shakedown of plaintiff's cell and dumped the contents of his four boxes of legal documents on the floor.  During the search a medication bottle was found that contained pills for a different prescription.   The officers confiscated the bottle and all of plaintiff's other medications, including his HIV medications. The following day, they

returned all of plaintiff's medications and the empty bottle that contained pills for a different prescription.

On October 26, 2008, two correctional officers came to plaintiff's cell and again confiscated all of his medications.  Later that day, when plaintiff went to the medical department to receive his medications, a nurse accused him of spitting out his HIV medications.  Plaintiff denied spitting out the medications.  A search of the trash by medical staff revealed no medications.  Two hours later, correctional officers issued plaintiff a disciplinary report for contraband and place him in a cell in the restrictive housing unit.  Plaintiff claims that this disciplinary report was issued in retaliation for his filing a lawsuit against Commissioner Lantz on October 22, 2008.  Plaintiff filed inmate requests with Warden Murphy and Health Administrator Furey over the false disciplinary report and the confiscation of his medications.  On November 6, 2008, a hearing officer found plaintiff not guilty of the contraband charge.

On October 23, 2008, plaintiff mailed a civil complaint against Commissioner Lantz together with a Mandamus Complaint against Warden Murphy to the Connecticut Superior Court for the Judicial District of Hartford.  In early November 2008, plaintiff received the complaint and mandamus, a summons signed by a court clerk with a return date of December 23, 2008 and a waiver of fees form signed by a judge.  Plaintiff mailed the complaint and mandamus and summons to State Marshal Ragonese for service on November 13, 2008.  Marshal Ragonese refused to serve the complaint.

On December 2, 2008, plaintiff sent the complaint and summons to another Connecticut Marshal for service.  Plaintiff claims that when he called the Hartford Superior Court Clerk's Office on December 23, 2008, the clerk who answered the phone gave him an incorrect docket number for his case against Commissioner Lantz.   When he called the Clerk's Office again on January 5, 2009, the clerk who answered the phone informed plaintiff that no return of service had been filed and there was not docket number for his case.

On January 21, 2009, plaintiff submitted a complaint against Warden Murphy, Connecticut Marshal Ragonese and the Clerk of the Connecticut Superior Court to the Hartford Superior Court clerk's office.  In early February 2009, plaintiff received the complaint, a summons signed by a court clerk with a return date of March 31, 2009 and a waiver of fees form signed by a judge. Plaintiff does not allege that he sent the complaint and summons to a Connecticut Marshal for service.

On February 24, 2009, plaintiff sent a motion to dismiss his complaints against defendant Lantz, Warden Murphy, Marshal Ragonese and the Chief Clerk and his Mandamus Complaint against Warden Murphy to the Hartford Superior Court.  On March 2, 2009, plaintiff sent a new complaint against Warden Murphy, Marshal Ragonese and the Chief Clerk to the Hartford Superior Court Clerk's Office.  On April 1, 2009, a clerk in the Hartford Superior Court Clerk's Office informed plaintiff that neither his motions to dismiss or the new complaint against Marshal Ragonese, Murphy and the Chief Clerk had been received.

On March 20, 2009, plaintiff received a notice from the court showing a docket number for the case that he had filed in October 2008 against defendant Lantz and informing him that an attorney had appeared on her behalf on March 13, 2009.  *See Parks v. Lantz*, Case No. HHD-CV08-4041371-S (filed December 12, 2008).[3]  On April 3, and on April 30, 2009, plaintiff filed a motions to dismiss all of the actions that he attempted to file in the Hartford Superior Court.  On May 12, 2009, plaintiff's motion to dismiss was docketed in *Parks v. Lantz*, Case No. HHD-CV08-4041371-S.  A judgment of dismissal entered in that case on July 27, 2009.

On April 4, 2009, plaintiff mailed a letter to Chief Clerk Robin Smith regarding his allegations that a complaint that he had attempted to file in March 2009, and a motion to dismiss all actions that he had attempted to file in February 2009, had never been received or filed in the Hartford Superior Court.  An unidentified clerk returned the letter to plaintiff with a notice indicating that the papers lacked a case title and case number.   On April 9, 2009, plaintiff commenced this action by filing a civil rights complaint and application to proceed *in forma pauperis*.

On May 9, 2009, plaintiff mailed a complaint naming Warden Murphy, Marshal Ragonese and Clerk Robin Smith as defendants to Hartford Superior Court.  On July 21, 2009, plaintiff filed an amended complaint in this action.

---

[3] The docket sheet for this case may be found at: http://civilinquiry.jud.ct.gov/CaseDetail/PublicCaseDetail.aspx?DocketNo=HHDCV084041 371S (last visited March 27, 2012).  The court takes judicial notice of the docket sheet. *See Kramer v. Time Warner, Inc.*, 937 F.2d 767, 774 (2d Cir.1991) ("[C]ourts routinely take judicial notice of documents filed in other courts"); *In re Enron Corp.*, 379 B.R. 425, 431 n. 18 (S.D.N.Y.2007) ("Judicial notice of public records such as court filings, is clearly appropriate.").

Plaintiff alleges that he sent multiple letters to Governor Rell, Commissioner Lantz, District Administrator Choinski, Deputy Commissioner Brian Murphy, Wardens Peter Murphy, John Sieminski, Dzurenda and Deputy Warden Semple regarding the changes in the prescriptions for HIV and anxiety medications as well as lack of treatment for Hepatitis C and the interference with his legal mail.  Plaintiff claims that these defendants either did not respond to his letters or responded and transferred him to another prison facility in retaliation for sending the letters.  Plaintiff seeks compensatory and punitive damages.

## III.   DISCUSSION

On April 18, 2011, the defendants moved to dismiss the remaining allegations in the amended complaint.  An Order of Notice to *Pro Se* Litigant accompanied the motion to dismiss and informed the plaintiff of his obligation to respond to the motion, the nature of the response to be filed and the rules governing motions to dismiss.   On May 11, 2011, the defendants filed a supplemental memorandum in support of the motion to dismiss.

The defendants have moved to dismiss on seven grounds:  (1) they were not deliberately indifferent to the plaintiff's medical and mental health needs; (2) the plaintiff has failed to allege facts to state a claim of retaliation or conspiracy; (3) the plaintiff has failed to allege that the defendants denied him access to the courts; (4) the plaintiff has failed to allege facts to state a claim of a violation of his due process rights; (5) the plaintiff has failed to allege the personal involvement in the alleged constitutional violations; (6) the plaintiff's allegations

**14**

that the defendants violated the ADA fail to state a claim upon which relief may be granted; and (7) all defendants are protected by qualified immunity.

Local Rule 7(a) requires a response to the motion to dismiss within twenty-one days of the date the motion was filed.  Other than a letter sent to the Court stating his intent to appeal and that he has already challenged the Defendant's Motion to Dismiss in his previous filings [Dkt. #92], the plaintiff has yet to file a direct response to the motion to dismiss.  Each claim raised by the remaining defendants is analyzed without a reply from the plaintiff below.

### A.  Personal Involvement

The plaintiff alleges that he sent written requests, letters, grievances and grievance appeals to defendants Commissioner Lantz, District Administrator Choinski, Governor Rell, Deputy Warden Semple and Deputy Commissioner Brian Murphy.  The defendants argue that the claims against them in their individual capacities should be dismissed because the plaintiff has not alleged their personal involvement in the alleged constitutional violations.

To recover money damages under section 1983, plaintiff must show that these defendants were personally involved in the constitutional violations.  *See Colon v. Coughlin*, 58 F.3d 865, 873 (2d Cir. 1995).  Defendants Choinski, McGill, Rose, Light and Salius are supervisory officials.  They cannot be held liable under section 1983 solely for the acts of their subordinates.  *See Ayers v. Coughlin*, 780 F.2d 205, 210 (2d Cir. 1985).

**15**

The plaintiff may show supervisory liability by demonstrating one or more of the following criteria: (1) the defendant actually and directly participated in the alleged unconstitutional acts; (2) the defendant failed to remedy a wrong after being informed of the wrong through a report or appeal; (3) the defendant created or approved a policy or custom that sanctioned objectionable conduct which rose to the level of a constitutional violation or allowed such a policy or custom to continue; (4) the defendant was grossly negligent in supervising the correctional officers who committed the constitutional violation; and (5) the defendant failed to take action in response to information regarding the occurrence of unconstitutional conduct.  *See Colon v. Coughlin*, 58 F.3d 865, 873 (2d Cir. 1995) (citation omitted).  In addition, plaintiff must demonstrate an affirmative causal link between the inaction of the supervisory official and his injury.  *See Poe v. Leonard*, 282 F.3d 123, 140 (2d Cir. 2002).

In *Ashcroft v. Iqbal*, 556 U.S. 662, 129 S. Ct. 1937 (2009), the Supreme Court found that a supervisor can be held liable only "through the official's own individual actions."  *Id.* at ___, 129 S. Ct. at 1948.  This decision arguably casts doubt on the continued viability of some of the categories for supervisory liability.  The Second Circuit, however, has not revisited the criteria for supervisory liability following *Iqbal*.  *See DeJesus v. Albright*, No. 08 Civ. 5804 (DLC), 2011 WL 814838, at *6 n. 4 (S.D.N.Y. Mar. 9, 2011).  Because it is unclear as to whether *Iqbal* overrules or limits *Colon* the court will continue to apply the categories for supervisory liability set forth in *Colon*.

1.    <u>Defendants Semple, Choinski, Rell, B. Murphy and Lantz</u>

The plaintiff alleges that he sent letters, written requests, grievances and grievance appeals to defendants Semple, Choinski, Rell, B. Murphy and Lantz regarding his mental and medical care, his legal work and cases and the transfers to different correctional facilities.  The plaintiff claims that these defendants failed to respond to or investigate the claims in the letters, requests, grievances and grievance appeals.

The fact that a prisoner sent a letter or written request to a supervisory official does not establish the requisite personal involvement of the supervisory official.  *See Rivera v. Fischer*, 655 F. Supp. 2d 235, (W.D.N.Y. 2009) ("Numerous courts have held that merely writing a letter of complaint does not provide personal involvement necessary to maintain a § 1983 claim.") (quoting *Candelaria v. Higley*, No. 04-CV-277, 2008 WL 478408, at *2 (W.D.N.Y. Feb. 19, 2008) (citing cases).  Furthermore, the law is well established, that "a failure to process, investigate or respond to a prisoner's grievances does not in itself give rise to a constitutional claim."  *Swift v. Tweddell*, 582 F.Supp.2d 437, 445-46 (W.D.N.Y. 2008) (citing cases).  Thus, a supervisory official's mere receipt of a letter complaining about unconstitutional conduct is not enough to give rise to personal involvement on the part of the official.  *See Sealey v. Giltner*, 116 F.3d 47, 51 (2d Cir. 1997) (prison official who received letter from inmate and forwarded it to subordinate for investigation and response was not personally involved in depriving inmate of constitutional right); *Bumpus v. Canfield*, 495 F. Supp. 2d 316, 322 (W.D.N.Y. 2007) (allegation that defendant did not respond to

inmate's letters alleging lack of medical attention was not enough to establish defendant's personal involvement in alleged violations); *Smart v. Goord*, 441 F. Supp. 2d 631, 642-643 (S.D.N.Y. 2006) (failure of supervisory prison official to take action in response to letters complaining of unconstitutional conduct is insufficient to demonstrate personal involvement).

The fact that these defendants failed to respond to Inmate Request Forms and letters is insufficient to demonstrate the personal involvement of these defendants in the alleged deliberate indifference to his mental health condition. The fact that some of these defendants may have failed to respond to or process grievances or the appeals of the denials of grievances does not demonstrate the personal involvement of these defendants in the alleged constitutional violations. *See Sealey*, 116 F.3d at 51; *Bumpus*, 495 F. Supp. 2d at 322; *Smart*, 441 F. Supp. 2d at 642-643.  The motion to dismiss is granted as to all claims against defendants Semple, Choinski, Rell, B. Murphy and Lantz in their individual capacities.

### B.   Access to Courts

The plaintiff alleges that defendants Falcone, Ralliford and Berrios denied him access to the court in various ways.  Specifically, in July 2008, Counselor Ralliford refused to make copies of legal documents, sign an *in forma pauperis* application form and provide notary services to plaintiff in connection with his attempt to a file civil action in federal court.   On August 4, 2008, Captain Falcone limited plaintiff to 100 copies per week in violation of his right of access to the

courts.   The plaintiff asserts that on April 3, 2006, he learned that his complaint alleging violations of the *Doe, et al. v. Meachum, et al.*, Case No. 2:88cv562 (PCD) consent decree had never reached the Connecticut Superior Court clerk's office. The plaintiff claims that Counselor Berrios confiscated the complaint before mailing the envelope to the court.

It is well settled that inmates have a First Amendment right of access to the courts.  *See Bounds v. Smith*, 430 U.S. 817, 828 (1977) *(modified on other grounds by Lewis v. Casey*, 518 U.S. 343, 350 (1996)).  To state a claim for denial of access to the courts, plaintiff is required to demonstrate that the defendants acted deliberately and maliciously and that he suffered an actual injury.  *See Lewis*, 518 U.S. at 353.

To establish an actual injury, plaintiff must allege facts showing that the defendants took or were responsible for actions that hindered his efforts to pursue a legal claim, prejudiced one of his existing actions, or otherwise actually interfered with his access to the courts.  *See Monsky v. Moraghan*, 127 F.3d 243, 247 (2d Cir. 2002)).  For example, plaintiff would have suffered an actual injury if "a complaint he prepared was dismissed for failure to satisfy some technical requirement which, because of the deficiencies in the prison's legal assistance facilities, he could not have known," or he was unable to file a complaint alleging actionable harm because the legal assistance program was so inadequate. *Lewis*, 581 U.S. at 351.

The claim that his complaint did not reach the Connecticut Superior Court is barred by the three year statute of limitations.  *See Lounsbury v. Jeffries*, 25

**19**

F.3d 131, 134 (2d Cir. 1994) (holding that, in Connecticut, the general three-year personal injury statute of limitations period set forth in Connecticut General Statutes § 52-577 is the appropriate limitations period for civil rights actions asserted under 42 U.S.C. § 1983).  The court deems the complaint in this action as having been filed on April 7, 2009, when the plaintiff presumably handed his complaint and *in forma pauperis* application to prison officials for filing.   The plaintiff's claim that Officer Berrios must have confiscated the state court complaint from the mailing envelope at some point prior to April 3, 2006 is beyond the three year statute of limitations and is dismissed on that ground.

The plaintiff has not alleged that he suffered an actual injury as a result of Counselor Ralliford's refusal to make copies of legal documents, sign an *in forma pauperis* application form and provide notary services to plaintiff in connection with his attempt to a file civil action in federal court and Captain Falcone's imposition of a rule limiting the plaintiff to 100 copies per week.  As indicated above, the plaintiff filed an *in forma pauperis* application and page complaint on April 7, 2009.  He has filed numerous documents since this case was filed.  These filings belie the plaintiff's claims that any conduct or rules imposed by defendants Falcone or Ralliford denied him access to the courts.  Because plaintiff has failed to allege that he suffered an actual injury as a result of the actions of defendants Falcone and Ralliford, the motion to dismiss the access to courts claims against these defendants is granted.   The claim against defendant Berrios is dismissed as barred by the statute of limitations.   *See* 28 U.S.C. § 1915A(b)(1).

**C.    Retaliation and Conspiracy Claims**

Prison officials may not retaliate against inmates for exercising their constitutional rights.  To state a retaliation claim, a prisoner must show (1) that he or she engaged in constitutionally protected conduct or speech, (2) that the prison officers or officials took adverse action against him or her, and (3) that a causal connection existed between the protected speech or conduct and the adverse action.  *See Davis v. Goord*, 320 F.3d 346, 352 (2d Cir. 2003) (citations omitted).  Under the second element, adverse action constitutes retaliatory conduct that "deter[s] a similarly situated [inmate] of ordinary firmness from exercising his or her constitutional rights."  *Id.* at 353 (internal quotation marks and citation omitted).  It is not necessary that the plaintiff himself be deterred.  *See Gill v. Pidlypchak*, 389 F.3d 379, 381 (2d Cir. 2004).  In order to meet the third element, the prisoner must allege that the protected conduct or speech "was a substantial or motivating factor for the adverse actions taken by prison officials."  *Bennett v. Goord*, 343 F.3 133, 137(2d Cir. 2003) (citations omitted).

Because claims of retaliation are easily fabricated, the courts consider such claims with skepticism and require that they be supported by specific facts; conclusory statements are not sufficient.  *See Flaherty v. Coughlin*, 713 F.2d 10, 13 (2d Cir. 1983).  If the plaintiff can meet the three elements set forth above, the burden shifts to the defendants to demonstrate that they would have taken the same action "even in the absence of the protected conduct."  *Bennett v. Goord*, 343 F.3d 133, 137 (2d Cir. 2003) (internal quotation marks and citations omitted).

Temporal proximity of an allegedly retaliatory disciplinary report to an inmate's grievance or complaint can be circumstantial evidence of retaliation. *See Gayle v. Gonyea*, 313 F.3d 677, 683 (2d Cir. 2002).  The Second Circuit has found sufficient evidence of retaliation when there is both a short time between protected activity and the retaliatory conduct and direct involvement by the defendant.  *See Morales v. Mackalm*, 278 F.3d 126, 131 (2d Cir. 2002) (overruled on other grounds, i.e. exhaustion requirement) (short time between protected activity and retaliation coupled with defendants' involvement in the decision to transfer is sufficient to support inference of retaliatory motive).

Given the proximity of the alleged incidents of plaintiffs medication denial and transfers to plaintiff's allegation that Counselor Berrios confiscated the *Doe, et al v. Meachum, et al.* consent decree before mailing the envelope to the court and his subsequent grievance alleging the improper confiscation of his complaint, the court finds that, under a liberal construction, plaintiff has alleged sufficient facts for a retaliation claim.  For example, plaintiff alleges the defendant Dr. Blanchette was directly involved in the denial of his medication on numerous occasions following the submission of his complaint. (*See, e.g.* Dkt. #17 p.27, 17-1 p.3, 17).

To the extent plaintiff claims that he was transferred nine times to different prison facilities over a period of eighteen months in retaliation for filing grievances and complaints, the Court finds that he fails to state a claim of retaliation because the plaintiff concedes that he was on high security status during that time period.   Inmates on high security status are subject to prison

transfers every sixty days.  Thus, the plaintiff's transfers were made for a reason other than the retaliatory reasons the plaintiff has asserted were the basis for the transfers.   Because the defendants have demonstrated that they would have transferred the plaintiff "even in the absence of the protected conduct," this allegation of retaliatory conduct fails to state a claim and is dismissed.  *Bennett v. Goord*, 343 F.3d 133, 137 (2d Cir. 2003) (internal quotation marks and citations omitted)(reversing and remanding summary judgment where a genuine issue of material fact existed as to whether retaliation claim against inmate for having successfully settled prior lawsuit against corrections officers was a substantial factor in transfers to maximum security facilities and in the discipline he experienced).  Because the retaliatory transfer claim is the only claim remaining against Defendant Sieminski, he should be dismissed from the case.

However, the parties agree that the plaintiff was removed from the high security designation due to his medical illness on February 28, 2008.  [Dkt. 17-2, p. 37 and Dkt. 86-1 p.18].  After that date, the plaintiff states that he filed several more complaints and that on August 21, 2008, he was again transferred back to MacDougall Correctional Institution.  [Dkt. 17-3, p. 12].  To the extent Defendants Paul Murphy and Dzurenda were respectively Wardens of MacDougall and Garner Correctional Institutions, the motions to dismiss as to these two defendants are denied.  The Court finds that the plaintiff has alleged facts sufficient to survive the motion to dismiss in on these claims.

The Court also notes that the defendant's complaint raises numerous, specious unsupported interjections of "deviousness" and "coincidence" (*See,*

*e.g.* Dkt.17 p.7 & 21), the court finds that these allegations are "nothing more than naked assertion[s] devoid of factual enhancements." *Iqbal* at 1949. Those interjections do not state a claim and are therefore, dismissed.

To state a claim for conspiracy under section 1983, plaintiff must allege facts showing an agreement between two or more state actors to act in concert to inflict an unconstitutional injury on plaintiff and an overt act done in furtherance of the conspiracy that causes damages. *See Pangburn v. Culbertson*, 200 F.3d 65, 72 (2d Cir. 1999). The Second Circuit has consistently held that a claim of conspiracy to violate civil rights requires more than general allegations. "[C]omplaints containing only conclusory, vague, or general allegations that the defendants have engaged in a conspiracy to deprive the plaintiff of his constitutional rights are properly dismissed; diffuse and expansive allegations are insufficient, unless amplified by specific instances of misconduct." *Ciambriello v. County of Nassau*, 292 F.3d 307, 325 (2d Cir. 2002) (quoting *Dwares v. City of N.Y.*, 985 F.2d 94, 100 (2d Cir. 1993) (citations, internal quotation marks, and internal alterations omitted)).

In this case, the plaintiff does not allege any facts supporting his allegation of a conspiracy to deny him access to the courts. For example, the plaintiff claims "blatant attempts at fouling the Grievance procedure" and that various named defendants (some maintained and some already dismissed) "all knew" about it. (Dkt. 17, p.23) He further claims that the actions alleged in his complaint were all an effort to obstruct the plaintiff from filing in a "desperate[] last ditch effort" to avoid "criminal multiple felony counts" in a "politically organized

[supermax (sic.) system] designed to "expose him" to near murder.  (Tr. 28-29).
However, these sweeping statements are without support.  The claims of
conspiracy are therefore dismissed.


### D.   Deliberate Indifference to Medical and Mental Health Needs

The Supreme Court has held that deliberate indifference by prison officials
to a prisoner's serious medical need constitutes cruel and unusual punishment in
violation of the Eighth Amendment.  *See Estelle v. Gamble*, 429 U.S. 97, 104
(1976).  To prevail on such a claim, a plaintiff must provide evidence of
sufficiently harmful acts or omissions and intent to either deny or unreasonably
delay access to needed medical care or the wanton infliction of unnecessary pain
by prison personnel.  *See id.* at 104-06.  Mere negligence will not support a
section 1983 claim; "the Eighth Amendment is not a vehicle for bringing medical
malpractice claims, nor a substitute for state tort law."  *Smith v. Carpenter*, 316
F.3d 178, 184 (2d Cir. 2003).  Thus, "not every lapse in prison medical care will
rise to the level of a constitutional violation," *id.*; rather, the conduct complained
of must "shock the conscience" or constitute a "barbarous act."  *McCloud v.
Delaney*, 677 F. Supp. 230, 232 (S.D.N.Y. 1988) (citing *United States ex rel. Hyde v.
McGinnis*, 429 F.2d 864 (2d Cir. 1970)).

There are both subjective and objective components to the deliberate
indifference standard.  *See Hathaway v. Coughlin*, 37 F.3d 63, 66 (2d Cir. 1994),
*cert. denied sub nom. Foote v. Hathaway*, 513 U.S. 1154 (1995).  Objectively, the
alleged deprivation must be "sufficiently serious."  *Wilson v. Seiter*, 501 U.S. 294,

298 (1991).  The condition must produce death, degeneration or extreme pain.  *See Hathaway v. Coughlin*, 99 F.3d 550, 553 (2d Cir. 1996).  Subjectively, the defendant must have been actually aware of a substantial risk that the inmate would suffer serious harm as a result of his actions or inactions.  *See Salahuddin v. Goord*, 467 F.3d 263, 279-80 (2d Cir. 2006).  Thus, the fact that a prison official did not alleviate a significant risk that he should have but did not perceive does not constitute deliberate indifference.  *See Farmer v. Brennan*, 511 U.S. 825, 834, 838 (1994).

The Second Circuit has identified several factors that are highly relevant to the inquiry into the seriousness of a medical condition.  For example, a medical condition significantly affecting the inmate's daily activities or causing chronic and significant pain or the existence of an injury a reasonable doctor would find important constitutes a serious medical need.  *See Chance*, 143 F.3d at 702.  In addition, where the denial of treatment causes plaintiff to suffer a permanent loss or life-long handicap, the medical need is considered serious.  *See Harrison v. Barkley*, 219 F.3d 132, 136 (2d Cir. 2000).

With regard to the second prong of Deliberate indifference requires the prisoner "to prove that the prison official knew of and disregarded the prisoner's serious medical needs." Chance, 143 F.3d at 702.  Thus, prison officials must be "intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed." Estelle, 429 U.S. at  104.  A difference of opinion between a prisoner and prison officials regarding medical treatment does not, as a matter of law, constitute deliberate indifference.  *Chance*,

143 F.3d at 703.  "Nor does the fact that an inmate feels that he did not get the level of medical attention he deserved, or that he might prefer an alternative treatment, support a constitutional claim."  *Sonds v. St. Barnabas Hosp. Correctional Health Services*, 151 F. Supp. 2d 303, 311 (S.D.N.Y.2001) (citing *Dean v. Coughlin*, 804 F.2d 207, 215 (2d Cir.1986)).

In this case, the plaintiff alleges that defendants Arrias, Benner, Furey, Griffin, Blanchette and Lasrove intentionally denied him access to his medications on many occasions.  *See, e.g.* Dkt. 17, p. 27, Dkt. 17-1 pp.3, 17, 34-35, 44.  The plaintiff also claims that he was transferred frequently and that such relocations adversely affected his health and caused medication mix-ups.  [Dkt. 17-1, p. 10, 17-2, p.35].  Furthermore, he claims that he experienced sleep deprivation and anxiety attacks as a result of medication denial.  [Dkt. #17. P. 44]. Finally, the plaintiff claims that the defendants downplayed his medical needs. [Dkt. #17, pp. 44-45].

Although the defendants do allege that the plaintiff refused to take his medications on several occasions (Def. Mem. 34), the Court finds that the plaintiff has alleged sufficient facts to proceed against defendants Arrias, Benner, Furey, Griffin, Blanchette and Lasrove on the claims of deliberate indifference to medical and mental health needs.


E.    Due Process Claims

While "prisoners do not shed all constitutional rights at the prison gate, lawful incarceration brings about the necessary withdrawal or limitation of many

privileges and rights, a retraction justified by the considerations underlying our penal system." *Sandin v. Conner*, 515 U.S. 472, 485 (1995)(citations omitted). Inmates have no right to be incarcerated at any particular institution. *Meachum v. Fano*, 427 U.S. 215, 224-25 (1976); *See also Prins v. Coughlin*, 76 F.3d 504, 507 (2d Cir. 1996). The Court has held that there is "no due process protection where required upon the discretionary transfer of state prisoners to a substantially less agreeable prison, even where that transfer visited a 'grievous loss' upon the inmate." *Moody v. Daggett*, 429 U.S. 78, 88 n.9 (1976). Without any cognizable property or liberty interest, the plaintiff simply cannot invoke the protections of due process. *See Board of Regents v. Roth*, 408 U.S. 564, 571 (1972); *Dorfmont v. Brown*, 913 F.2d 1399, 1403 (9th Cir. 1990), cert denied, 499 U.S. 905 (1991).

In this case, Mr. Parks claims, in part, that he has a right to be housed in a single cell and in a particular facility. To the extent that his claim is a request for a discretionary housing circumstance, the defendant's motion to dismiss must be granted as to all defendants.


F.   ADA Claims

The plaintiff asserts a violation of rights protected under the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12132. In his complaint, he alleges that he suffers from the following conditions: anxiety, HIV, hepatitis C and a head injury. He claims the defendants Arrias, Benner, Furey, Griffin, Blanchette and Lasrove denied or conspired to deny him proper treatment for these medical conditions.

The State of Connecticut is a public entity within the meaning of the ADA. *See* 42 U.S.C. § 12131(1)(A)(defining public entity to include any state or local government).  The plaintiff has not, however, named the State of Connecticut as a defendant.  The Second Circuit has recognized that a valid ADA claim may be stated against a state official in his official capacity.  *See Henrietta D. v. Bloomberg*, 331 F.3d 261, 289 (2d Cir. 2003).  Specific public employees, however, are not included within the definition of public entity.  Thus, Title II of the ADA does not "provide[] for individual capacity suits against state officials."  *See Garcia v. S.U.N.Y. Health Sciences Center of Brooklyn*, 280 F.3d 98, 107 (2d Cir. 2001).

To state a claim under Title II, which applies to inmates in state prisons, *see United States v. Georgia,* 546 U.S. 151, 153, 126 S.Ct. 877, 163 L.Ed.2d 650 (2006), a prisoner must show: 1) "he is a 'qualified individual' with a disability"; 2) "he was excluded from participation in a public entity's services, programs or activities or was otherwise discriminated against by a public entity"; and 3) "such exclusion or discrimination was due to his disability."  *Phelan v. Thomas,* 439 F. App'x 48, 50 (2d Cir.2011) (citing *Hargrave v. Vermont,* 340 F.3d 27, 34–35 (2d Cir.2003)); *see* 42 U.S.C. § 12132.

Construed liberally, Mr. Parks claims that he is disabled on several accounts and he alleges that the defendants denied him his medications and repeatedly relocated him and, thus exacerbated his ailments.  Furthermore, he alleges that the defendants downplayed his medical needs.  The Court therefore finds that these claims, although in artfully pled, are sufficient to at least provide

Mr. Parks an opportunity to amend. *See Shomo v. City of New York*, 579 F.3d 176 (2d Cir. 2009)(reversing the district court's denial of pro se plaintiff's ADA claims on the grounds that his "disorganized" pleadings were sufficient for him to survive defendant's motion to dismiss). The motion to dismiss is, therefore denied and plaintiff's ADA claims against defendants Arrias, Benner, Furey, Griffin, Blanchette and Lasrove in their official capacities will proceed at this time.

### G.   Qualified Immunity

The doctrine of qualified immunity protects government officials from liability for damages caused by the performance of discretionary official functions if their conduct does not violate a clearly established right of which a reasonable person would have been aware. *See Zellner v. Summerlin*, 494 F.3d 344, 367 (2d Cir. 2007).

When considering a claim of qualified immunity, the Court considers two questions: first, whether, construing the facts in favor of the non-moving party, there is a violation of a constitutionally protected right; and second, whether, considering the facts of the case before it, that right was clearly established at the time of the incident. Qualified immunity is warranted unless the state official's conduct violated a clearly established constitutional right. *See Pearson v. Callahan*, 555 U.S. 223, 129 S. Ct. 808, 813, 815-16 (2009) (setting forth qualified immunity test and holding that a court need not consider the questions in any particular order). To evaluate whether a right is clearly established, the Court must determine whether it would be clear to a reasonable correctional official that

his conduct in these circumstances was unlawful.  *See Saucier v. Katz*, 533 U.S. 194, 202 (2001).  The analysis focuses on cases from the Supreme Court and Second Circuit.  *See Williams v. Greifinger*, 97 F.3d 699, 706 (2d Cir. 1996).

The court finds that the defendants Lantz, Choniski, Rell, B. Murphy, Semple, Berrios, Falcone, and Ralliford are entitled to qualified immunity even under the most liberal construction of the plaintiff's complaint.  Therefore, the claims against these defendants are to be dismissed.  With respect to defendants Arias, Blanchette, Furey, Benner, Lasrove and Griffin, the defendants' motion is denied as plaintiff has alleged facts sufficient for a finding that a constitutionally protected right was violated.

### H.   State Law Claims

Plaintiff also asserts violations of Connecticut statutes and the Connecticut Constitution.  Supplemental or pendent jurisdiction is a matter of discretion, not of right.  *See United Mine Workers v. Gibbs*, 383 U.S. 715, 715-26 (1966). Defendants argue that the court should decline to exercise supplemental jurisdiction over those claims.  Where all federal claims have been dismissed before trial, pendent state claims should be dismissed without prejudice and left for resolution by the state courts.  *See* 28 U.S.C. § 1367(c)(3); *Giordano v. City of New York*, 274 F.3d 740, 754 (2d Cir. 2001) (collecting cases).  Because the court has dismissed all of plaintiff's federal law claims against defendants Lantz, Choinski, Rell, Brian Murphy, Semple, Sieminski, Falcone, Berrios and Ralliford, it

will not exercise supplemental jurisdiction over any state law claims against those defendants.   The motion to dismiss is granted on this ground.


**IV.     CONCLUSION**

Defendant's Motion to Dismiss [Doc. #86] is GRANTED in part and DENIED in part.

IT IS SO ORDERED.
_____/s/_____
Vanessa L. Bryant
United States District Judge

Dated at Hartford Connecticut:  March 28, 2010.