# EXHIBIT 7

# Affidavit of Comm'r. James Dzurenda

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| DAVID S.L. PARKS<br>    Plaintiff,<br><br>v.<br><br>THERESA LANTZ, et al.<br>    Defendants. | :<br>:<br>:<br>:<br>:  3:09-CV-00604-VLB<br>:<br>:<br>:  JUNE 1, 2014<br>:<br>: |

### AFFIDAVIT OF COMMISSIONER JAMES DZURENDA

I, James Dzurenda, hereby depose and say:

1. I am of sound mind and legal age.

2. Since 1987, I have been employed by the Connecticut Department of Correction, advancing in my career through various ranks from correctional officer to my current position of Commissioner.

3. As Commissioner, I am responsible for the administrative oversight of one of the state's largest agencies with over 16,500 incarcerated inmates and 4,000 supervised in the community. The Department encompasses all of the state's long-term correctional facilities, as well as Pretrial Detention Centers, Parole supervision and Community Correction systems.

4. Before becoming Commissioner, I was the Deputy Commissioner of Operations for the Connecticut Department of Correction for 3 years. As the Deputy Commissioner of Operations, I oversaw the custody operations of all 15 Department of Correction facilities in Connecticut. I oversaw the approximately 6,000 DOC employees who manage nearly 20,000 inmates.

Additionally, I oversaw the Department's Emergency Service Units, Security Division, and the Central Transportation Unit. As Deputy Commissioner, I was responsible for maintaining public safety and ensuring that a safe, secure, and humane environment for offenders and employees was maintained throughout every facility within the constraints of fiscal budget allotments.

5. For one year before becoming Deputy Commissioner, I was the South District Administrator. In that role, I supervised the operation of seven Connecticut correctional facilities. I was responsible for ensuring that these facilities operated in compliance with the Department of Correction's Administrative Directives, Connecticut General Statutes, and the American Correctional Association standards.

6. Before that, from April 2005 through July 2009, I was the Warden of Garner Correctional Institution ("Garner") a security level 4 facility, that houses approximately 630 inmates. I was responsible for all staff and operations of the facility which specializes in the management of a High Security Mental Health inmate population.

7. The security challenges posed within a correctional system are complex and multi-faceted. The State of Connecticut houses more than 16,000 inmates on any given day in its various facilities.

8. Between 2004 and 2010, DOC operated approximately eighteen (18) correctional facilities, which housed thousands of inmates.

2

9. The inmate population of the Department of Correction is distributed consistent with security and management considerations, statutory requirements, court orders or other formal agreements, and the classification of the inmate. Accordingly, inmates may be transferred between correctional units within the Department of Correction consistent with DOC's policies and administrative directives. Population management shall not discriminate based on race, creed, religion, color or national origin. See Exhibit 8, AD 9.1, section 1 (Eff. Date 8/3/98) & AD 9.1, section 1 (Eff. Date 7/1/2006) (effective during the time of the events alleged in the Complaint); see also Conn. Gen. Stat. § 18-86.

10. The Director of Offender Classification and Population Management or designee is responsible, in accordance with DOC policy and administrative directives, for all inmate transfers and placement. A transfer may not be refused by a receiving facility. Absent intervention by the Director of Offender Classification and Population Management (OCPM) or designee, the Unit Administrator (i.e. the warden) shall be responsible for inmate management within the unit. See Exhibit 8, AD 9.1, section 4 (Eff. Date 8/3/98) & AD 9.1, section 4 (Eff. Date 7/1/2006).

11. All pre-trial inmates and temporary surrenders shall remain at the admitting facility, which are DOC's county jails, either BCC, Hartford CC, New Haven CC, or Corrigan CC.

12. DOC Population Management and the Director of Offender Classification have the discretion to transfer pre-trial inmates from county jails to various

DOC facilities in order to manage the high volume of pre-trial inmates. Inmates with bonds higher than $500,000 are generally considered "high bond" pre-trial inmates and are often transferred out of county jails to high bond units at various DOC facilities.

13. Per the directive, transfer requests shall be considered in the following priority order: A. Emergency transfers; B. Priority transfers; C. Medical/Mental Health transfers; D. Population control transfers; E. Special needs transfers; F. Regular transfers; and, G. Court transfers. See Exhibit 8, AD 9.1, section 6 (Eff. Date 8/3/98) & AD 9.1, section 6 (Eff. Date 7/1/2006).

14. A "regular transfer" includes reductions for overall risk levels. The Unit Administrator shall normally recommend a transfer placement to a facility with the same classification level as the inmate which best meets the inmate's programmatic needs. See Exhibit 8, AD 9.1, section 7(G)(1) (Eff. Date 8/3/98) & AD 9.1, section 7(G)(1) (Eff. Date 7/1/2006).

15. The Director of Offender Classification and Population Management or designee shall be authorized to transfer an inmate for medical or mental health purposes at the request of medical or mental health personnel. Such a transfer may be considered as an emergency, priority transfer or regular transfer. Upon resolution of the medical or mental health concern, the inmate shall be returned to the sending facility as soon as possible unless reclassification or reassignment is warranted and approved by the Director of Offender Classification and Population Management or designee. See Exhibit 8, AD 9.1, section 7(D) (Eff. Date 8/3/98) & AD 9.1,

section 7(D) (Eff. Date 7/1/2006) (clarifying "medical" to include both medical and mental health needs).

16. As the former Warden of Garner, I did not have the authority to transfer inmates between various DOC facilities. I would not be personally involved in the decisions to transfer inmates for medical or mental health reasons. I was not personally involved in the decisions to transfer the plaintiff between Garner and MWCI.

17. During the time period relevant to the Complaint, Garner consisted of two separate inmate populations: the mental health population and the general population.

18. The mental health professionals at Garner would assess the mental health population and determine whether to transfer Garner's mental health population based upon their mental health treatment and needs.

19. The plaintiff was admitted to Bridgeport Correctional Center ("BCC") on 10/25/2004. See Exhibit 9, RT 60.

20. Because the plaintiff had a bond of $500,000, he transferred from BCC to the high bond unit at the MacDougal- Walker Correctional Institution ("MWCI") on 11/15/2004. See Exhibit 10, Transfer History Record, 11/15/2004.

21. The plaintiff transferred from Garner to MWCI on 9/27/2007 because of a "profile" with another inmate at Garner. Counselor Supervisor Kim Jones requested the transfer, and then OCPM approved the transfer. See Exhibit 11, Transfer History Record, 9/27/2007.

22. A "profile" is a record specifying the need and reason for keeping two (2) or more individuals apart from each other. See Exhibit 12, AD 9.9 (Eff. Date 12/15/2006). DOC does not keep inmates with profiles at the same housing unit, and therefore, the plaintiff's transfer was necessary.

23. The plaintiff underwent a classification review in November of 2010.

24. The Classification Committee reduced the plaintiff's overall risk level from a 4 to a 3 on 11/15/2010. See Exhibit 13, Reclassification Form; see also Exhibit 14, Plaintiff's RT78 – Risk History.

25. Under AD 9.1, section 7(G), the plaintiff's reduction in risk level necessitated his transfer to a level 3 facility transfer. See Exhibit 8.

26. Therefore, the plaintiff transferred on 11/24/2010 from MWCI, a level 4/5 facility, to Osborn CI ("Osborn"), a level 3 facility. See Exhibit 9, RT60.

27. High Security Monitoring is a designation which provides for increased supervision of inmates who pose a threat to the safety and security of the facility, staff, inmates or the public. The Unit Administrator (i.e. the warden), in consultation with the Director of Offender Classification and Population Management, may consider an inmate as a High Security Inmate if the inmate meets one or more of the criteria listed in Administrative Directive 9.4, which includes any information that indicates inmate may attempt to escape. See Exhibit 15, AD 9.4, section 13 (Eff. Date 10/1/98), AD 9.4, section 14 (Eff. Date 1/1/2008), & AD 9.4, section 14 (Eff. Date1/31/2009).

28. An inmate on High Security Monitoring shall be classified as an overall risk level 4 or above and shall be housed in a level 4 or 5 facility. This

designation would require an inmate to transfer facilities if he/she was housed at a level 3 or lower facility at the time of designation. See Exhibit 15, AD 9.4, section 13 (Eff. Date 10/1/98), AD 9.4, section 14 (Eff. Date 1/1/2008), & AD 9.4, section 14 (Eff. Date1/31/2009). During the time period relevant to the Complaint, there was no DOC policy that required a High Security inmate to transfer facilities based upon his High Security status unless the inmate was at a level 3 or lower facility at the time of designation.

29. AD 9.4 provides that an inmate placed on High Security Monitoring shall be housed in a secured cell. The inmate shall be moved to a new cell at a minimum of every 90 days. See Exhibit 15, AD 9.4, section 13(E) (Eff. Date 10/1/98), AD 9.4, section 14(E) (Eff. Date 1/1/2008), & AD 9.4, section 14 (E) (Eff. Date1/31/2009).

30. The Administrative Directive requires that an inmate's High Security status be reviewed at least every six (6) months. See Exhibit 15, AD 9.4, section 13(H) (Eff. Date 10/1/98), AD 9.4, section 14(H) (Eff. Date 1/1/2008), & AD 9.4, section 14(H) (Eff. Date1/31/2009).

31. On 2/9/2005, the MWCI Warden, Warden Sieminski, wrote a letter to the OCPM Director, Fred Levesque, recommending the plaintiff's placement on High Security monitoring. In the recommendation letter, Warden Sieminski recommended High Security Monitoring because of the plaintiff's history of escape and attempted escape from correctional facilities and because the plaintiff recently wrote a letter detailing security vulnerabilities in the

7

Walker Building. See Exhibit 16; see also Plaintiff's Letter, Doc. No. 17, pp. 30-37.

32. Based upon Warden Sieminski's recommendation, the plaintiff was designated as High Security Monitoring.

33. In his Complaint, the plaintiff states that I "asked him something to the effect of 'how the bus therapy was?'" See Doc. 146, ¶ 67. I never said this to the plaintiff. In fact, I've never heard the term "bus therapy" until I read the plaintiff's Complaint.

34. Finally, I never retaliated against the plaintiff. I hold no ill-will or personal animus toward him. All of my actions were taken in good-faith as the Warden of Garner to oversee the facility and its inmates.

## VERIFICATION

I hereby swear that the foregoing is true and accurate to the best of my knowledge and belief.

_____
James Dzurenda

Subscribed and sworn to before me this 2nd day of June, 2014.

_____
~~Notary~~/ Commissioner of the Court

Juro # 411740