# EXHIBIT 20

## Affidavit of Steven Lazrove, M.D.

## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| DAVID S. L. PARKS | : | NO. 3:09CV604(VLB) |
|    Plaintiff | : | |
| | : | |
| VS. | : | |
| | : | |
| THERESA LANTZ, *et al.* | : | |
|    Defendants | : | JUNE 2, 2014 |

### AFFIDAVIT OF STEVEN LAZROVE, M.D.

I, Steven Lazrove, hereby aver that:

1.     I am a psychiatrist and presently work as a Principal Psychiatrist in the Whiting Forensic Division at Connecticut Valley Hospital, in Middletown, Connecticut.  I have been a psychiatrist for 25 years, and I am board certified in Psychiatry.  I am licensed to practice in California and Connecticut.  *See* Exh. 21, *Curriculum Vitae* of Steven Lazrove, M.D, attached.

2.     I served as statewide Assistant Chief of Psychiatric Services, for the University of Connecticut/Correctional Managed Health Care from December 2007 through October 2012.

3.     From August 2007 through December 2007, I worked as the *Locum Tenens* Psychiatrist at Garner Correctional Institution in Newtown, Connecticut.

4.     I recall David Parks well.  I treated him in the fall of 2007 while he was resident at the Garner C.I.

5.     In fact, Mr. Parks named me, among thirty-seven assorted others, as a defendant in the first two iterations of his Complaint in *Parks v. Lantz*, No. 3:09cv604(VLB).   *See* Doc.'s 1 and 17.

6.     Mr. Parks had alleged in his complaints that I, as a "U-Conn-DOC attack dog" had damaging his immune system when I "attacked" his Xanax," telling him that I was "going to take [him] off Xanax, then reduce the Klonopin, and take [him] off that- then place [him] on Zoloft and Prozac – not even for anxiety/panic attack." *See* Doc. 17-3, pp. 25-26; Doc. 17-4, pp. 6, 7-10, 20, 25-26. Mr. Parks threatened that if I did not reinstate his prescription for Xanax he was going to call the "O.P.A." *See* Doc. 17-3, pp. 25-26.

7.     The Garner C.I. incarcerates both pretrial and sentenced offenders. The Department of Correction has consolidated the care and treatment for adult male offenders with significant mental health issues at this level 4 high-security facility. Based upon their mental health needs, offenders from throughout the Connecticut correctional system are assigned here.

8.     The Garner C.I.'s mental health treatment program is designed to return as many of these offenders as is possible to the ability to function in either a general population prison setting or ultimately to life in the community.

9.     At the outset of my treatment of Mr. Parks, I reviewed Mr. Parks' Department of Correction Medical Record, with particular attention to the psychiatry notes.  *See* Exh. 22, excerpts from DOC Medical Records, pp. 1-23.

10.     I learned from the Medical Record that at various times during the course of Mr. Parks' imprisonment he had been diagnosed with DSM Axis I

2

Bipolar Disorder NOS and Anxiety Disorder NOS, and an Axis II Personality Disorder NOS. *See* Exh. 22, pp. 3-5.

11.    The Medical Record also described Mr. Parks as having a "history of opioid dependence, a "dramatizing type," and always seeking benzodiazepines." *See* Exh. 22, pp. 3, 5.

12.    The Medical Record revealed as well that on October 18, 2007, while at MacDougall-Walker C.I., Mr. Parks had been discovered, and admitted to, hoarding Xanax, a benzodiazepine. *See* Exh. 22, pp. 8, 9. This caused him to be placed in a Restrictive Housing Unit. *See* Exh. 22, p. 8.

13.    It appeared that Mr. Parks had been prescribed Xanax 2mg PO BID since at least as far back as July 2007. *See* Exh. 22, pp. 7, 19.

14.    The July and August 2007 physician orders required that Mr. Parks' Xanax be crushed and suspended in liquid before administration. The requirement that Mr. Parks be administered his Xanax in this manner indicated that there had been issues related to medication diversion before the October 18, 2007 incident.

15.    It is common for inmates to stockpile medications such as Xanax. This can be done through "cheeking" the medications, or even chewing them to a paste, to be regurgitated and formed into a small mass. The product is then sold or bartered for other items.

16.    Alprazolam (brand name Xanax) is the most prescribed and the most misused benzodiazepine on the United States retail market. There is a substantial risk of abuse and dependence in both patients and non-medical users of

3

alprazolam. The pharmacological properties of alprazolam, high-affinity binding, high potency, rapid onset of action, all contribute to the abuse and misuse potential of alprazolam.

17.    Xanax has a rapid onset of action and hence can provide rapid symptomatic relief.  Ninety percent of peak effects are achieved within the first hour for panic disorder, and full peak effects occur in approximately 1.5 hours.

18.    While Xanax is effective in the relief of moderate to severe anxiety and panic attacks, it is not a first-line treatment for anxiety and panic disorder because of  concerns related to tolerance, dependence, and abuse.

19.    All benzodiazepines require particular attention and caution when used in drug-dependent individuals such as Mr. Parks because of the extremely high risk of diversion and abuse, and Mr. Parks identified himself as being "chemically dependent" as early as 1976.  *See* Exh. 22, p. 3.

20.    Due to the many serious problems associated with the abuse of Xanax, it should almost never be prescribed chronically. Rather, it is most efficacious when prescribed prophylactically for discrete events; e.g., to quell the anxiety associated with having to cross a bridge or taking an airplane flight.

21.    I interviewed Mr. Parks on November 9, 2007, at the beginning of my treatment of him.  *See* Exh. 22, pp. 10-11.

22.    Mr. Parks came to the interview in a hostile manner.  He was very confrontational, entitled, and defiant.  At the outset of the interview, when I asked him why he was taking Xanax, he threatened to call the Office of Protection and Advocacy for Persons with Disabilities (OP&A) if I changed his dose.  Mr. Parks'

4

speech was loud and threatening.  He began a wringing of the hands when the possibility of changing Xanax was discussed.  *See* Exh. 22, pp. 10-11.

23.    Mr. Parks' reported that he had panic attacks and possibly panic disorder, that he believed he was managed with acceptable efficacy on Xanax 2mg BID.  This medical regimen made no sense to me from a pharmacologic perspective.  *See* Exh. 22, pp. 10-11.

24.    The half-life of Xanax is short, providing about four hours of coverage. Thus, even though Mr. Parks had no effective coverage for all but four of his waking hours, he was reporting no panic situations.  This was not congruent with the known dose-effect relationship of this medication.  *See* Exh. 22, pp. 10-11.

25.    Additionally, the use of Xanax has been reported to increase depression.   Since Mr. Parks was about to start treatment for his Hepatitis C with Interferon, another depressogenic agent, I believed there was excellent justification for discontinuing its use.  *See* Exh. 22, pp. 10-11.

26.    Mr. Parks' report of panic attacks that were successfully treated by a pharmacologic regimen that is extremely unlikely to provide successful treatment suggested either a) Mr. Parks was malingering or b) Mr. Parks was dependent upon Xanax.  I concluded that Mr. Parks' presentation was most consistent with both.  *See* Exh. 22, p. 11.

27.    Therefore, I decided to taper the Xanax over a period of 1 to 2 weeks and provide cross-benzodiazepine coverage with Klonopin (generic name

clonazepam), thereby ensuring 24 hour coverage of anxiety attacks, and serving to prevent withdrawal symptoms. *See* Exh. 22, pp. 11, 22-23.

28.     When I presented this plan to Mr. Parks, he became hostile, threatened once again to call OP&A, and threatened to sue me. I responded by stating that I would wait several days to hear from OP&A before I changed the medication. *See* Exh. 22, pp. 11, 21-23.

29.     I spoke with Mr. Parks again on November 12, 2007. I told him that I had not heard from OP&A and that I would begin to taper his Xanax as part of a cross-titration to Klonopin. Mr. Parks was extremely upset and became threatening. I wrote the medical order nonetheless. *See* Exh. 22, pp. 11, 21-23.

30.     Also on November 12, 2007, when I sought Mr. Parks' consent for treatment with Klonopin, a psychoactive medication, he refused to sign the consent form. See Exh. 22, p. 12.

31.     Klonopin (generic name, clonazepam) is another benzodiazepine drug having anxiolytic, anticonvulsant, muscle relaxant, sedative, and hypnotic properties. Klonopin is a long-acting benzodiazepine with a gradual onset of action that does not stimulate drug-craving as much as rapid onset of action medication, such as Xanax. Hence although it has considerable potential for dependence and abuse, the potential is less than with Xanax.

32.     Common adverse effects include drowsiness and motor impairment. Less common adverse effects include confusion, irritability and aggression, psychomotor agitation, and impaired motor function, such as impaired balance and dizziness. Possible side effects include disinhibition, suicidal ideation (rare),

6

skin rash, dizziness, lightheadedness, unsteadiness, and vertigo.  Paradoxical reactions associated with Klonopin include aggression, rage, hostility, mania, agitation, hyperactivity and restlessness.

33.    While Klonopin may be prescribed for anxiety disorders such as panic disorder, selective serotonin reuptake inhibitors (SSRIs) are the treatment of choice for panic disorder.

34.    On November 21, 2007, Mr. Parks complained to a social worker about my change to his medication.  "That quack decreased my Xanax. I will get the federal monitors in here."  *See* Exh. 22, p. 13.

35.    He continued to express his anger over my change to his medication to a number of other staff.  *See* Exh. 22, pp. 14, 16, 17.

36.    On December 10, 2007, I had another meeting with Mr. Parks.  He reported that he was "sweaty" and unable to sleep, stating "I don't do well without my Xanax.  My Hep C treatment was put on hold."  *See* Exh. 22, pp. 13-14.

37.    Actually, it was Mr. Parks himself who expressed reluctance to start the Interferon treatment because of increased anxiety, decreased sleep, and increased sweating which he attributed to the discontinuance of the Xanax.  *See* Exh. 22, p. 16.

38.    I had observed Mr. Parks carefully during his casual activities on the cell block.  He *always* walked in a confident and determined manner.  He had frequent, casual interactions with other inmates.  In short, he showed no evidence of anxiety or panic.  Yet on this day, December 10, 2007, he came to the

7

interview wringing his hands and dramatically wiping the sweat from his forehead. He took off his glasses and fidgeted in the chair. He maintained poor eye-contact. He was defiant and uncooperative. *See* Exh. 22, pp. 14-15.

39.     Mr. Parks appeared to be conducting a relentless campaign to obtain Xanax. He had refused to start his Hepatitis C treatment while he "feels this way". I do not believe that Mr. Parks had a genuine anxiety disorder, as previously explained. If he did not want to take the Hepatitis C treatment, then there was no reason for him to be at Garner. I strongly believed Mr. Parks to be malingering to obtain medication, specifically benzodiazepines. *See* Exh. 22, p. 15.

40.     I determined that I would continue Mr. Parks on Klonopin 1mg po twice daily for 30 days, pending additional observation. Mr. Parks refused treatment with selective serotonin reuptake inhibitors (SSRIs), the treatment of choice for panic disorder. *See* Exh. 22, p. 15.

41.     In the course of treating physician for Mr. Parks, I diagnosed him with severe/extreme anti-social personality disorder (ASPD).

42.     Antisocial personality disorder, as defined in the DSM-IV-TR (2000) and DSM-V (2012)[1] is characterized by a pervasive pattern of disregard for, or violation of, the rights of others. There may be an impoverished moral sense or conscience and a history of crime, legal problems, and impulsive and aggressive behavior. This   diagnosis has been referred to, or may include what is referred to, as psychopathy or sociopathy, though distinctions are sometimes made.

---

[1] DSM refers to the *Diagnostic and Statistical Manual*, used in the practice of medicine.

43.   The (DSM-IV-TR), defines ASPD (in Axis II Cluster B):

A) There is a pervasive pattern of disregard for and violation of the rights of others occurring since age 15 years, as indicated by three or more of the following:

1. failure to conform to social norms with respect to lawful behaviors as indicated by repeatedly performing acts that are grounds for arrest;
2. deception, as indicated by repeatedly lying, use of aliases, or conning others for personal profit or pleasure;
3. impulsivity or failure to plan ahead;
4. irritability and aggressiveness, as indicated by repeated physical fights or assaults;
5. reckless disregard for safety of self or others;
6. consistent irresponsibility, as indicated by repeated failure to sustain consistent work behavior or honor financial obligations;
7. lack of remorse, as indicated by being indifferent to or rationalizing having hurt, mistreated, or stolen from another;

B) The individual is at least age 18 years.

C) There is evidence of conduct disorder with onset before age 15 years.

D) The occurrence of antisocial behavior is not exclusively during the course of schizophrenia or a manic episode.

44.   ASPD falls under the dramatic/erratic cluster of personality disorders. DSM-V retains the diagnosis antisocial personality disorder, but it is no longer on Axis II, as the Axis system for recording mental illness has been abandoned.

45.   ASPD is considered to be among the most difficult personality disorders to treat. Because of their very low or absent capacity for remorse, individuals with ASPD often lack sufficient motivation and fail to see the costs associated with antisocial acts. They may only simulate remorse rather than truly commit to change: they can be seductively charming and dishonest, and may

9

manipulate staff and fellow patients during treatment. Studies have shown that outpatient therapy is not likely to be successful. However the extent to which persons with ASPD are entirely unresponsive to treatment may have been exaggerated.

46.     No medications have been approved by the FDA to treat ASPD, although certain psychiatric medications may alleviate conditions sometimes associated with the disorder, such as aggression. These medications include antipsychotic, antidepressant and mood-stabilizing medications.

I hereby swear that the foregoing is true and correct to the best of my knowledge, information, and belief.

Signed under the pains and penalties of perjury, this the 2nd day of June, 2014.

Steven Lazrove, M.D.