# EXHIBIT 23

## Affidavit of Edward A. Blanchette, M.D.

UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| DAVID S. L. PARKS<br>Plaintiff | : | CIVIL NO. 3:09CV604 (VLB) |
| VS. | : | |
| THERESA LANTZ, *et al.*<br>Defendants | : | JUNE 8, 2014 |

AFFIDAVIT OF EDWARD A. BLANCHETTE, M.D.

I, Edward A. Blanchette, hereby aver and say that:

1. I received a Doctor of Medicine from the University of Vermont, College of Medicine, in 1974. *See* Exh. 24, *Curriculum Vitae* of Edward A. Blanchette, M.D.

2. I have been licensed to practice medicine and surgery in Connecticut since July 1975. *See* Exh. 24.

3. I have been board certified by the National Board of Medical Examiners since 1975 and by the American Board of Internal Medicine since 1975. I became a Diplomate in the Subspecialty of Infectious Diseases in 1982. *See* Exh. 24.

4. Since August 2011, I have been the Medical Director at the Wyatt Detention Facility in Central Falls, Rhode Island. I also work as a consulting clinician at the Rhode Island Department of Corrections Adult Correctional Institute (ACI).

5. I was the Director of Clinical and Professional Services – Division of Health Services, Connecticut Department of Correction from May 1995 until my retirement in June 2010. To ease the transition, I worked for the DOC for approximately one year thereafter on a consulting basis.

6. As the DOC Clinical Director, I oversaw the policies and procedures governing medical issues, including those relating to the care and treatment of patients with Hepatitis C and HIV-AIDS. I based my policies and procedures on the accepted community standards of care. Where possible, I also looked to the Center for Disease Control, "CDC," guidelines and to the policies of the federal Bureau of Prisons.

7. As the DOC Clinical Director, I also served as a consultant on cases that were difficult either diagnostically or therapeutically. I responded to requests from physicians regarding the best approach to particular clinical issues. I was the gatekeeper for the emergency room, and was also involved in the management of medical patients.

8. While working for DOC, I also worked for UConn as an Infectious Disease specialist, and ran two to three evening Infectious Disease Clinics for inmates at the MacDougall-Walker C.I. and the Bridgeport Correctional Center.

9. I was an Assistant Clinical Professor of Medicine, University of Connecticut College of Medicine from 1980 through 1990, and again from December 1995 to the present. *See* Exh. 24.

10. In 1992, the federal court in Connecticut appointed me to the *Doe v. Meachum* Monitoring Panel to oversee the care of all HIV patients incarcerated in the Connecticut Department of Correction. Pursuant to the *Doe v. Meachum* decree, my responsibilities as a Monitoring Panel member include oversight of the care provided to Mr. Parks.

11.    While working for DOC, I served on the UCONN Medical Center Correctional Managed Health Care Hepatitis C Utilization Review Board (HepCURB) for many years.

12.    The UCONN HepCURB was established to oversee the care of all Hepatitis C (also known as "HCV) infected patients incarcerated in the Connecticut Department of Correction. The HepCURB is comprised of three board-certified infectious disease specialists who would approve the requests of treating doctors for diagnostic work or treatment for Hepatitis C patients.  If the matter before the Board for decision involves a request for treatment by one of physicians sitting on the Board, the Board's protocol requires that the physician Board member refrain from voting.

13.    While serving as DOC's Medical Director, I literally worked almost all waking hours.  Not only was I on site for a number of things, I also took calls, averaging 500 per month, to manage an emergency or discuss a case.

14.    Before coming to DOC, between 1975 and 1980, I worked as an Emergency Room physician at St. Francis Hospital and Medical Center in Hartford, and at Sharon Hospital in Sharon, Connecticut. *See* Exh. 24.

15.    Throughout my career, I have been very careful to separate medical and mental health issues.  While working as DOC's Clinical Director, I left decisions regarding medications and treatment issues for psychiatric patients to the Clinical Director of Mental Health and the associated psychiatrists.

16.     On very rare occasions while I was working for DOC, the after-hours on-call psychiatrist would not be available by phone to give orders for psychiatric mental health issues. In the event of a real emergency, a real necessity, I would step in with the *caveat* that as soon as the psychiatrist was reached he/she would take over the case.

17.     I am familiar with the plaintiff, Mr. David Parks. *See* Exh. 25, DOC Medical Record, pp. 1- 228.

18.     The Clinical Record reflects that I first saw Mr. Parks on June 21, 2004 at MacDougall-Walker C.I. in the Infectious Disease (I.D.) Clinic that I conducted. *See* Exh. 25, pp. 63-65.

19.     Mr. Parks appeared to be somewhat agitated, anxious, and belligerent, as well as anxious about his upcoming release from prison. *Id.*, p. 63.

20.     Mr. Parks reported that he had been HIV+ since at least 1991. He was on the HAART (Highly Active Antiretroviral Therapy) regimen. He was taking the anti-retroviral medications (ARV's) Trizivir and Sustiva, which he was tolerating well. *Id.*

21.     The particular ARV's Mr. Parks was taking were not without side-effects. The side effects associated with Trizivir, which is comprised of zbacavir, lamivudine, and zidovudine include fever, rash, nausea, vomiting, diarrhea, stomach pain, general tiredness, body aches, and shortness of breath, cough, and sore throat. Trizivir may also cause liver problems – stomach pain, low fever, lost appetite, dark urine, clay-colored stools, jaundice (yellowing of the skin or

eyes), lactic acidosis – muscle pain or weakness, numb or cold feeling in arms and legs, trouble breathing, stomach pain, nausea with vomiting, slow or uneven heart rate, dizziness, or feeling very weak or tired, chills, body aches, flu symptoms, pale skin; or white patches or sores inside the mouth or on the lips. Trizivir's less serious side effects may include sleep problems or strange dreams, headache, depression, anxiety, and mild diarrhea.

22.    The possible side effects of Sustiva (Efavirenz) may include headache, tired feeling, dizziness, spinning sensation, trouble concentrating, problems with balance or coordination, muscle or joint pain, sleep problems (insomnia), and unusual dreams.    Efavirenz may also cause serious psychiatric symptoms including confusion, severe depression, suicidal thoughts, aggression, extreme fear, hallucinations, or unusual behavior.

23.    Mr. Parks reported that he had previously been in the federal system.  He had recently transferred to Connecticut since he was about to leave the penal system to go "home" after having been incarcerated over 20 years.  See Exh. 25, pp. 63.

24.    Mr. Parks' lab result from Georgia indicated that as of June 1, 2004, he had an "absolute T4 count of 932," and 37% CD4, which were well within normal range. *Id.*, p. 59.

25.    "T4" refers to the CD4 lymphocyte cells, which are also called "T-cells" or "T-helper cells." The T4 cells are the primary targets of the human immunodeficiency virus (HIV).

26. The "T4" (CD4) count is the number of CD cells per microliter (μL) of blood. The CD4 percentage is the percentage of the lymphocyte population that is CD4+; it is measured directly by flow cytometry.

27. The absolute T4/CD4 count and the CD4 percentage mark the degree to which the patient's immune system has been compromised. The higher the CD4 count, whether measured in absolute terms or by percentage, the stronger the patient's immune system.

28. During our June 21, 2004 meeting, Mr. Parks requested Klonopin for "seizures." There was, however, no information in Mr. Parks' Medical Record available to me regarding seizures. Moreover, since Klonopin is a short acting benzodiazepine, it would clearly not be considered an anti-convulsant for chronic use. *See* Exh. 25, p. 63.

29. I refused to prescribe Klonopin for Mr. Parks on June 21, 2004. *See* Exh. 25, p. 63. I note that the Clinical Record reflects that nine days before my meeting with Mr. Parks, he had been upset about not being able to obtain Klonopin. *Id.*, p. 62. In accord with my usual practice, I referred Mr. Parks to Mental Health regarding his request for Klonopin. *Id.*

30. As a general rule I do not prescribe psychotropic medications such as Xanax and Klonopin. These medications affect mental activity, behavior, perception, and mood, and can be very dangerous and prone to abuse. I leave their prescription to mental health professionals.

31. My notes indicate that I directed that Mr. Parks be scheduled for the next Infectious Disease Clinic on or around November 15, 2004 and that his next T-Cell profile be conducted in December 2004. *See* Exh. 25, p. 63.

32. On July 12, 2004, Mr. Parks reported that he stopped his HIV medications "like Dr. Blanchette suggested. They brought it at different times so I stopped." *Id.*, p. 66.

33. In my June 21, 2004 initial meeting with Mr. Parks, I never suggested that he stop taking his HIV medications. *Id.*, p. 63. June 21, 2004 was my first meeting with Mr. Parks and I did not know enough about his medical diagnosis and the trajectory of his disease to make such a suggestion.

34. I would never make such a suggestion to a patient unaccompanied by a direct order that the medication be discontinued. *See* e.g., Exh. 25, pp. 69, 74 reflecting my direct order on August 10, 2004 that Mr. Parks ARV medication be discontinued due to his non-compliance with the prescribed regimen.

35. My June 21, 2004 note indicates that Mr. Parks' June 1, 2004 lab results from Georgia were missing the HIV-1 Viral Load Assay: "[u]nfortunately, HIV-1 VLA was not available since the blood submitted was not sufficient to run study." *Id.*

36. The HIV-1 VLA (Viral Load Assay) indicates the number of copies of RNA per milliliter of plasma. The HIV-1 Viral Load is the best indicator of the level of HIV activity in the patient's body. The higher the Viral Load, the more severe the HIV-1 infection.

37. Both the CD4 Count and HIV Viral Load are used in determining the course of antiretroviral treatment (ARV) treatment. Without *both* of these tests, obtained over the course of time, I was in no position to recommend the cessation of Mr. Parks' ARVs at my first meeting with him on June 21, 2004.

38. The Medication Administration Record (MAR) reflects that Mr. Parks refused his HIV medications on fifteen (15) occasions between July 10, 2004 and August 6, 2004. *See* Exh. 25, pp. 67-70.

39. The Clinical Record reflects that on July 25, 2004, Mr. Parks submitted an Inmate Request form regarding, among other things, "Dr. Blanchette is refusing to restore my Kolonopin." (sic). *Id.*, p. 73.

40. On August 5, 2004, the Clinical Record reflects Mr. Parks' complaint that "no one is taking care of me" and that he needed "codeine with Tylenol and Kolonopin." *Id.*, p. 75. Mr. Parks insisted that he needed these medications to prevent behavior that is unwanted, including crimes upon release. *Id.*, pp. 75, 76.

41. On August 10, 2004, after Mr. Parks' repeated refusals of Trizivir and Sustiva, his ARV medications, I discontinued Mr. Parks' prescription for both. *Id.*, pp. 69, 74.

42. I discontinued Mr. Parks' ARV's on August 10, 2004 because I did not want him to be taking them intermittently, thereby highly increasing the likelihood of creating resistance to the medications. For Mr. Parks to take his ARV medication in this manner constituted highly self-destructive behavior. My intent was to stop

the medications for the time being, and then to discuss with him the need for his compliance with the prescribed administration regimen.

43. Dr. Fisher's August 11, 2004 entry in the Clinical Record indicated that he had been asked to see Mr. Parks because of the multiple complaints Mr. Parks had made in 11 Inmate Requests since June 14, 2004. See Exh. 25, pp. 75-76. Dr. Fisher noted that Mr. Parks had been seen by three doctors to date, as well as by an APRN, "yet his complaints persist." *See* Exh. 25, p. 76.

44. Dr. Fisher's notes reflect as well that Mr. Parks had "clearly stated to Dr. Fisher on July 27, 2004, that he (the patient) had attacked and injured a physician for taking away his Klonopin." *See* Exh. 25, p. 76.

45. On August 20, 2004, the Clinical Record notes that Mr. Parks "is bent on getting what he wanted, i.e., Klonopin or other benzodiazepenes. *See* Exh. 25, p. 76a.

46. On August 25, 2004, Mr. Parks informed the staff that he did not want to take Buspar because it doesn't do anything. *Id.*, p. 77. The patient said "why do they give you the bad stuff that doesn't do anything, instead of the good stuff – the stuff that makes you feel good." *Id.*

47. BuSpar (buspirone hydrochloride tablets, USP) is an antianxiety agent that is not chemically or pharmacologically related to the benzodiazepines, barbiturates, or other sedative/anxiolytic drugs.

48.     On September 3, 2004, Mr. Parks complained again, "that Buspar is junk – you guys got some paranoia about Benzos. That's OK, I get out in 33 days." *Id.*, p. 78.

49.     On September 20, 2004, Mr. Parks' "Discharge Meds" were recorded by the nurse and countersigned by me. They included his ARVs, Trizivir and Sustiva. *Id.*, p. 79.  This entry is created in the Clinical Record to facilitate Mr. Parks' treatment outside of the prison, in case his medical providers call for his records.

50.     On October 1, 2004, Mr. Parks was seen in medication assessment and stated "I'm not taking the Buspar and I'm not taking the Dilantin.  I'll get my Klonopin when I get out." *Id.*, p. 80.

51.     Dilantin (phenytoin) is an anti-epileptic drug, also called an anticonvulsant. It works by slowing down impulses in the brain that cause seizures.

52.     Medical records reflect that on October 4, 2004, Mr. Parks refused a laboratory test to measure his Dilantin level. *Id.*, p. 81.

53.     After having served his time and discharging from DOC custody on October 6, 2004 release, Mr. Parks was re-admitted to DOC custody 19 days later on October 25, 2004.  *See* Exh. 9, Plaintiff's Transfer History, RT 60, documenting Mr. Parks' movements while in  DOC custody.

54.     Mr. Parks had apparently robbed a bank after his discharge from DOC custody. *See* Exh. 25, p. 90. He blamed his re-admission to DOC custody in part upon my refusal to prescribe Xanax or Klonopin for him.  *See* Exh. 25, pp. 90, 92.

55. On October 26, 2004, during his mental health assessment at Bridgeport Correctional Center, Mr. Parks requested that he be put "back on Klonopin." *See* Exh. 25, p. 82.

56. Upon Mr. Parks' October 26, 2004 re-admission to DOC custody, I prescribed the antiretroviral medications ("ARVs") Trizivir and Sustiva for him. *Id.*, p. 84.

57. On November 4, 2004, while Mr. Parks was still at Bridgeport Correctional Center, he reported to staff that he was in pain from Hepatitis C. *Id.*, pp. 86, 88. Mr. Parks was prescribed Motrin 600 mg for the pain that he reported. *Id.*

58. Mr. Parks' complaints over the years of pain from his Hepatitis C are dubious at best. Hepatitis C does not induce pain the nature of which Mr. Parks complained. An abdominal organ such as the liver is unresponsive to many stimuli that normally would elicit severe pain. If a patient with hepatitis C has pain, even in the area of the liver, it does not mean that the liver is in danger or that the Hepatitis C is worsening. Further, treating the Hepatitis C will not necessarily meliorate any abdominal pain.

59. Rather, in the context of Mr. Parks' medical history, his complaints were in all likelihood one more *indicium* of the drug seeking behavior he exhibited throughout his imprisonment.

60. On November 8, 2004, I saw Mr. Parks at the Infectious Disease Clinic at Bridgeport Correctional Center. Exh. 25, pp. 86-87. In addition to being HIV positive, he had tested positive for Hepatitis C antibodies. *Id.*

61. Mr. Parks reported that he had been using 10 bags of heroin intravenously *per* day just before his October 25, 2004 re-admittance to DOC custody. *See* Exh. 25, p. 87.

62. Mr. Parks' Medical Record revealed that his most recent absolute T-4 (CD4) count was 768, *per* a June 15, 2004 lab test. *See* Exh. 25, p.p. 56, 87. Mr. Parks' Viral Load Assay was less than was less than 400 copies/µL on October 26, 2004. *Id.*, p. 56, 87. These numbers were well within normal range.

63. I explained the Department of Correction protocol regarding Hepatitis C evaluation and treatment to Mr. Parks. *See* Exh. 25, p. 87. Mr. Parks was an un-sentenced prisoner, having reported that he was being held on $500,000 bond for robbery in the 1st degree. *Id.* DOC policy at the time required that treatment for Hepatitis C be instituted only in sentenced prisoners to ensure that the one year course of treatment, once begun, had the optimal chance of continuing to completion.

64. *Per* DOC policy, I noted that I would wait until after the patient is sentenced, and then would submit a request to the HepCURB (Hepatitis C Utilization Review Board) for a liver biopsy. *Id.*, p. 87.

65. I continued Mr. Parks on his current HAART regimen of the antiretroviral medications Trizivir and Sustiva. *Id.*, p. 87, 89.

66. On December 21, 2004, the Clinical Record reflects that Mr. Parks told Dr. Fisher that he was angry over not being given Klonopin, Xanax, or Zyprexa. *See* Exh. 25, p. 90. Mr. Parks told Dr. Fisher that he blamed "the state" for his return to DOC, because he was put in a shelter and robbed a bank. *See* Exh. 25, p. 90. "What did they expect me to do? They're lucky no one got killed. You know I attacked a doctor, they didn't give me my meds once. What do I have to do now? I'm in for life. I'm a career criminal." *Id.*, p. 90.

67. On January 7, 2005, staff noted that Mr. Parks displayed irritability, distrust, and vigilance, "with some loose associations and conspiracy theories." *Id.*, p. 92.

68. The Clinical Record reflects that in May and June of 2005, Mr. Parks refused his HIV medications, Trizivir and Sustiva. *Id.*, pp. 93-97.

69. On May 20, 2005, when Mr. Parks was asked why, he stated "I take a holiday of 6 months. Dr. Gittzus told me to." *Id.*, p. 97-98.

70. The Clinical Record entry for May 20, 2005 indicates that the staff intended to continue to offer Mr. Parks his HIV medication, and have him sign refusals until he was seen by me. *Id.*, p. 97.

71. When I met with Mr. Parks at the Infectious Disease Clinic at MacDougall C.I. on July 12, 2005, I went over his most recent laboratory results of June 14, 2005 with him. His absolute T-4 (CD4) count was 779, his CD4 percent was at 40.2, and his Viral Load Assay was 100 copies/μL. *Id.*, pp. 56, 101.

72. Mr. Parks was still on the HAART, receiving the antiretrovirals Trezivir and Sustiva. *See* Exh. 25, p. 101.

73.     Upon reviewing Mr. Parks' previous HIV database, it appeared to me that the patient had consistently had an absolute T-4 count in the normal range, despite his spotty anti-retroviral (ARV) medication record at various times. *See* Exh. 25, p. 101.  It appeared as well that Mr. Parks' HIV Viral Load Assays had been excellent even during those times he was off his ARVs. *See* Exh. 25, p. 101. I explained to Mr. Parks that he may do very well off of all ARVs and that I believed it would be worthwhile to stop these medications and see how he did regarding his T-4 Counts and HIV-1 Viral Loads. *Id.*

74.     My considered medical judgment was that given Mr. Parks' stable and consistently favorable T-4 (CD4) counts, it was possible that he did not require any treatment at all.  In the course of my career, I have treated a number of HIV+ patients whose T-4 Counts are within the normal range and who are not on any antiretroviral medications.

75.     It was my considered medical judgment that this possibility needed to be explored, especially because of Mr. Parks' extremely poor compliance with his ARV medication regimen.

76.     It was my considered medical judgment that Mr. Parks' behavior in going on and off his antiretroviral medications engendered the very real possibility of "resistance," i.e., the creation of a mutation of the HIV viral strain that would be resistant to the ARV medications.

77.     It was my considered medical judgment that the risk to Mr. Parks of "resistance" outweighed the risk of a treatment interruption to determine whether he actually required the ARV medications.

78.     It was also my considered medical judgment that if Mr. Parks really did not need the ARV medications, it would be better not to expose him to the detrimental side effects associated with them.

79.     After a prolonged discussion, Mr. Parks did finally agree to try stopping all ARVs to see if he maintained reasonable parameters. *See* Exh. 25, p. 101.

80.     I discontinued Mr. Parks' prescriptions for Trizivir and Sustiva on that day, July 12, 2005. *See* Exh. 25, p. 99.

81.     I directed that Mr. Parks be seen for a mental health follow-up.

82.     I further directed that Mr. Parks' next HIV-1-RNA (viral load) and T-cell profile (CD4) lab tests be scheduled for September 5, 2005 and December 5, 2005. *Id.*, p. 100.

83.     It appears from the record that the Viral Load and CD4 tests were actually performed on October 20, 2005 and December 16, 2005. *See* Exh. 25, p. 56.

84.     I never told Mr. Parks that this interruption of his treatment would only be for 60 days. *See* Exh. 25, pp. 99-101.  The length of the interruption would have depended upon his lab assays and the degree to which his CD4 count and Viral Load Assays remained within normal parameters. *See* Exh. 25, p. 101.

85.     Further, in the many years I worked for DOC, I have never seen a form such as the one Mr. Parks claims he signed, whereby an imprisoned DOC patient agrees to the temporary cessation of a medication.

86.     Also on July 12, 2005, I discussed the treatment for Hepatitis C with Mr. Parks.  *See* Exh. 25, p. 101.  I told him that I would initiate his evaluation for Hepatitis C treatment as soon as he was admitted to MacDougall/Walker C.I. as a sentenced prisoner, and that that should occur within the next few months.  *Id.*

87.     When Mr. Parks was seen on June 16, 2005 for his Infectious Disease physical exam, he reported "I'm now on a drug holiday."  *Id.*, p. 97, 98.

88.     The Clinical Record reflects that on August 1, 2005, Mr. Parks was still focused on obtaining Klonopin.  *See* Exh. 25, p. 102.  He did agree, apparently after discussion, to continue with the Lithium and Seroquel that he had been prescribed.  *See* Exh. 25, p. 102.  He had also been observed trying to "cheek" the Seroquel to avoid ingesting it.  *Id.*, p. 102.

89.     Lithium is a medication that is approved for the treatment of bipolar disorder and acute mania.

90.     On August 21, 2005, Mr. Parks was observed to be "irritable as usual and demanding."  *See* Exh. 25, p. 102.  He stated that he wanted "Benzos" and was unwilling to try SSRIs to relieve his "anxiety."  *Id.*, p. 102.

91.     SSRIs (selective serotonin reuptake inhibitors), are the treatment of choice for those suffering from anxiety.

92. Mr. Parks refused his prescribed medication, Lithium, on August 25 and 26, 2005. *Id.*, pp. 103-104.

93. On September 19, 2005, the Clinical Record reflects that Mr. Park announced "I stopped taking the Lithium, it doesn't do any good. I've been spitting the Seroquil ...." *Id.*, p. 105.

94. On September 19, 2005, the Clinical Record reflects the observation that Mr. Parks was "med-seeking Benzos." *Id.*, p. 105. He was observed to be "irritable and confrontational." *Id.*

95. On November 22, 2005, I responded to Mr. Parks' Inmate Request Form regarding having been off his ARV "meds" for 120 days by telling him "You'll be seen in the ID Clinic sometime in the next two weeks." *Id.*, p. 107.

96. On November 23, 2005, Dr. Lewis, Mr. Parks' treating psychiatrist, met with Mr. Parks. *See* Exh. 25, p. 108. Mr. Parks told her that he had anxiety, headaches, and insomnia. *Id.* He stated that he was having problems with the doctor taking him off his HIV meds, unhappy with the Seroquel, and experiencing episodes of agitation and paranoia. *See* Exh. 25, p. 108. He was also unhappy with the Lithium trial he had been on in the past. *Id.*

97. Dr. Lewis indicated she would continue Mr. Parks on Seroquel and start him again on the Lithium. *See* Exh. 25, p. 108. Dr. Lewis sought and obtained Mr. Parks' consent for treatment with the psychoactive medications Lithium and Klonopin. *Id.*, pp. 109-110. Dr. Lewis placed a condition upon Mr. Parks' receipt

of the Klonopin, writing "only to receive if compliant with Lithium and Seroquel for 60 days." *Id.*, p. 112.

98. I met with Mr. Parks on December 1, 2005 in the Infectious Disease Clinic at MacDougall C.I. Id., p. 111-113. My notes recorded the reasons underlying my July 12, 2005 decision to discontinue all of Mr. Parks' ARVs. *See* Exh. 25, p. 111. Of most importance was that Mr. Parks' absolute T-4 counts (CD4) had always remained well in the normal range, despite erratic compliance by the patient with his antiretroviral medication regimen at various times in the past. *Id.*, p. 111.

99. As I conveyed to Mr. Parks on December 1, 2005, the follow-up HIV parameters obtained on October 20, 2005, three months after discontinuing his Trizivir and Sustiva, were excellent. *Id.*, p. 111. Mr. Parks' T-4 count (CD4) was 712, his CD4 percent was at 24.5, and the simultaneous HIV-1 Viral Load Assay was at 15,100 copies/µL. *Id.*, pp. 56,111.

100. I had a long discussion with Mr. Parks on December 1, 2005, after which it seemed that he finally understood that he his lab assays indicated that he did not meet the CDC criteria at this time for prescription of ARV medications, i.e., he did not need the medications for treatment of his HIV at this time. *See* Exh. 25, p. 111.

101. As I explained at length to Mr. Parks, given his erratic adherence to his medication regimen, it was my opinion that in his situation the risks of HIV treatment with ARVs outweighed the benefits. *Id.*, p. 111. After I told him that for now he would just be followed, he seemed to accept this. *Id.*, p. 111.

102.   The other major issue considered during my December 1, 2005 meeting with Mr. Parks was his request for Hepatitis C treatment.  *See* Exh. 25, p. 111. Since Mr. Parks had no upcoming court dates and was a sentenced inmate, I noted that I would continue to follow the DOC protocol then in effect regarding Hepatitis C evaluation. *Id.*, pp. 11-112.

103.   I was particularly concerned about Mr. Parks' mental status, should he go on pegylated interferon for treatment of his Hepatitis C.  *See* Exh. 25, p. 111.

104.   My concern was because treatment of Hepatitis C with pegylated interferon (peginterferon) and ribavirin can cause or exacerbate depression.

105.   Mr. Parks' "Bipolar Disorder with depression and anxiety [was] not always well controlled - partially because of his reluctance to take certain psychotropics, e.g., Lithium." *Id.*, p. 111.

106.   Thus treatment of Mr. Parks' for Hepatitis C had the potential for serious harm.    Interferon   may   cause   or   aggravate   fatal   or   life-threatening neuropsychiatric disorders.

107.   On December 1, 2005, I directed that the orders on the Hepatitis C Diagnostic Order sheet be carried out.  *Id.*, p. 112.  Staff was to have the patient fill out the Initial HCV (hepatitis C) Functional Status Report and refer him to Mental Health for a Mental Status Evaluation and mental health clearance for Hepatitis C treatment. *Id.*, p. 112.  I directed the HIV nurse to obtain a completed Consent and Compliance Agreement Sheet for Hepatitis C from Mr. Parks. *See* Exh. 25, p. 112.

108.   I directed that Mr. Parks be seen for mental health follow-up. *See* Exh. 25, p. 114.

109.   Lastly, I directed that Mr. Parks' next lab test for HIV-1/RNA (Viral Load) be scheduled for February 2006 and that his next T-cell profile (CD4) lab test be scheduled for April 2006. *See* Exh. 25, p. 114.

110.   It appears from the record, however, that Mr. Parks' lab test for Viral Load occurred in April at the same time as the test for CD4.

111.   This was not a matter of great clinical concern because where Mr. Parks was not on the antiretroviral medications, the need to follow the Viral Loads is less of an issue.  The reason for doing the Viral Loads is essentially, to determine if there's some resistance that is being generated by the natural mutations that occur on an ongoing basis with regard to HIV.  If someone is not on antiretroviral medications, then basically what one would be seeing is a promulgation of the "wild type", which doesn't correlate at all with resistance.

112.   Naturally occurring strains of HIV are known as "'wild-type'" virus and are the most susceptible to antiretroviral medications. Wild-type virus is normally the most powerful form of virus in the body and reproduces the best.

113.   The Clinical Record reflects the December 3, 2005 note of Nurse Margo Griffin that the "Hep C functional status report completed, consent, compliance signed...."  *See* Exh. 25, p. 113.

114.   The long-standing nature of Mr. Parks' cavalier approach to adherence to medication regimens is reflected in Mr. Parks' December 6, 2006 Inmate Request

Form wherein he stated, *inter alia*, that just before coming out of the federal prison system in 2004, he "was going 90 days on HIV meds, 30 off, then 60 on, 30 off, until he was down to 30 on 30 off! For over a year!" *Id.*, p. 118.

115. On December 14, 2005, Dr. Lewis, Mr. Parks' treating psychiatrist, increased Mr. Parks' Lithium and Klonopin doses and decreased the Seroquel dose, with the same *proviso* as earlier, that he was not to be given Klonopin unless he took the Lithium and Seroquel. *Id.*, p. 121.

116. The Clinical Record reflects that upon receipt, I reviewed the December 16, 2005 lab results for Mr. Parks. I noted his T4 (CD-4) absolute count of 623, his CD4 percent of 33.9, and his Viral Load Assay of 22,500. *See* Exh. 25, pp. 56, 125-126. I noted that while Mr. Parks' Viral Load was increasing, it was still reasonable that Mr. Parks remain off his antiretroviral medications. *Id.*, p. 126.

117. On January 5, 2006, I evaluated Mr. Parks as part of the Initial Evaluation required for Hepatitis C treatment. *See* Exh. 25, p. 130. I noted thereon that he had "severe antisocial personality disorder," "Bipolar Disorder," and that there was a question as to whether he also suffered from "Schizo-Affective Disorder." *See* Exh. 25, p. 130.

118. On January 5, 2006, I saw Mr. Parks again in the Infectious Disease Clinic at MacDougall C.I. *See* Exh. 25, p. 133. Despite Mr. Parks' report of thrush, I noted none on this day. *Id.*, p. 133. I noted that he was "very manic" and that the initial part of the patient interview "was marked by a steady and uninterrupted list of complaints and concerns, almost hysterical at times." *Id.*, p. 133. At the end of

the interview, however, the patient seemed to be enjoying himself. *Id.* Mr. Parks' major focus was his desire to be placed back on ARVs because as he described it, "my T-4 count and viral load are going south! [ ] I don't want to die of AIDS." *Id.*, p. 133.

119. I explained to Mr. Parks that a careful review of his recent lab studies showed "continued excellent T-4 counts and CD4 percentage levels of high quality." *Id.*, p. 133. Likewise, even though Mr. Parks' HIV-1 Viral Load assay had slowly climbed since the July 12, 2005 interruption of his ARV medications, his Viral Load Assay results had been "within a very reasonable range." *Id.*, p. 133.

120. My January 5, 2006 notes reflect that I intended to discuss the Hepatitis C protocol with Mr. Parks in depth at the next clinic. *Id.*, p. 133. I noted that "his tenuous mental health status, especially his volatility, may be an issue." See Exh. 25, p. 133.

121. Dr. Lewis saw Mr. Parks on February 22, 2006, continued his treatment with Lithium and Klonopin, and discontinued the Seroquel. *See* Exh. 25, pp. 137-138.

122. Dr. Lewis assessed Mr. Parks as having Generalized Anxiety Disorder, paranoia, and hypomania, although he was currently doing well. *See* Exh. 25, p. 138. She noted as well that he had a history of opiate dependence. *Id.*

123. The Clinical Record reflects that on February 28, 2006, Mr. Parks submitted an Inmate Request Form wherein he described Dr. Lewis as a "wonderful" doctor. *Id.*, pp. 140.

124.   Mr. Parks stated in a February 28, 2006 Inmate Request Form that during an admission to the infirmary back on January 27, 2006, he was able to get past the nurses' mouth checks and spit out the "Librum" that he had been prescribed. *Id.*, pp. 134-136, 140-141.

125.   Dr. Lewis saw Mr. Parks again on March 29, 2006. *See* Exh. 25, p. 146. Dr. Lewis continued Mr. Parks on the Lithium and Seroquel. *Id.*, pp. 145-146. She noted that there was a question as to whether he was Bipolar, and that he was "fidgety, hyperactive, and angry...." *Id.*, p. 146.

126.   I saw Mr. Parks on April 4, 2006 at the Infectious Disease Clinic at MacDougall C.I. *See* Exh. 25, p. 147. At the conclusion of our meeting, I noted as follows:

This 50 year-old white man was seen today in the MacDougall CI ID Clinic for further evaluation of his HIV disease, Hepatitis C infection, and issues related to difficulties in medical management related to mental health deterioration – severe antisocial personality disorder with bipolar disorder or schizo-affective process.

This patient is creating havoc in the MCI facility, related to his repeated, inappropriate demands for emergency medical attention, poor compliance with his medications (in particular, psychotropic meds), demands for narcotic medications that do not seem warranted with close medical observation, and a very paranoid ideation complex with a labile affect and a very aggressive, threatening manner.   Many health care providers, including myself, have safety issues when interacting with this patient in the past several weeks (escalating symptomatology).

With regard to his Infectious Disease issues, though I have reassured this patient repeatedly that he does not require antiretroviral medications at this time, in view of his normal absolute T4 counts and very favorable HIV-1 Viral Load Assays, he threateningly demands ARV medications, then relents when medical staff take great pains and time to explain the medical rationale for holding off on ARV medications, only to have the patient behave in an explosive, aggressive manner later the same day ---- with the

same demands. The patient is due to have both a T cell profile and an HIV-1 Viral Load Assay drawn this month, and I have assured him that I will carefully study these results to determine his need for HAART once they are available, but he continues to be extremely unreasonable.

He also insists that his Hepatitis C infection be immediately treated. When I informed him once again of the necessary protocol, the patient became agitated, verbally abusive, and threatening. The preliminary evaluation shows that he has a genotype 1 with a Hep C viral Load Assay that is > 3 million IU/ml. He has a positive HBsAb and a negative anti-HAV. He received his first Hepatitis A vaccine injunction in January 2006 and is due for his 2nd Hep A vaccine to complete the series in July 2006. The remainder of his baseline lab work for Hep C evaluation is not remarkable. He does have persistent elevated serum transaminases.

My major concern regarding Hepatitis C therapy is his Mental Status situation. I do not consider this patient stable enough at this time to pursue livery biopsy, which is likely to demonstrate enough fibrosis to warrant treatment per se, followed by Pegasys + ribavirin. I will ask Dr. Catherine Lewis, UCHC Psychiatrist, to give me her views regarding this gentleman. I suspect that he may require special psychiatric housing at Garner CI. If this does occur, I will discuss this case with Dr. O'Halloran, the Infectious Disease Consultant at Garner CI, so that he is aware of the special issues in this case. If this patient is cleared for Hep C therapy in the future, in view of the multiple and significant Mental Health adverse reactions that could occur in this patient, including the risk of severe depression and suicide, as well as full-blown psychosis, I would favor that he remain at Garner CI when Hep C therapy is initiated, and he should remain there until his treatment is terminated .... And perhaps beyond.

Please see update Treatment Plan + as well as Hep C and HIV lab data in the Clinic Section of this chart. Please call me if there are any questions concerning this patient.

*See* Exh. 25, p. 147.

127. My April 4, 2006 note was incident to my transfer of the supervision of the administration of Mr. Parks' Hepatitis C treatment to Infectious Disease Dr. O'Halloran at Garner C.I. Mr. Parks had developed an extreme distrust of me. The doctor-patient relationship between Mr. Parks and me was severely damaged.

*See e.g.*, Exh. 25, pp. 120, 142-144. *See also* Doc.'s 1 and17, plaintiff's April 14, 2009 Complaint and July 21, 2009 Amended Complaint, respectively.

128. It was my considered medical judgment, that Mr. Parks would have the best chance of success with the exceedingly taxing Hepatitis C treatment under the care of Dr. O'Halloran, whom he seemed to trust and with whom he got along with very well.

129. Further, given Mr. Parks' significant mental health issues, it was my considered medical judgment that Garner's capacity for specialized treatment of mental illness would provide a supportive environment for him while undergoing treatment.

130. The DOC Medical Record appears to reflect no further contact between Mr. Parks and me. I believe, therefore, that April 4, 2006 was my last interaction with Mr. Parks.

131. On April 5, 2006, I received the results of Mr. Parks' April 4, 2006 lab tests. I noted that his CD4 (T4) count of 567 remained good. *See* Exh. 25, p. 148. His Viral Load Assay of 93,500 copies per µL was, however, approaching 100,000. *See* Exh. 25, p. 56.

132. The continuing upward trajectory of Mr. Parks' Viral Load signaled the need to give serious consideration to resumption of the administration of Mr. Parks' antiretroviral medications. I did not want the increase in Viral Load to reach the point where it would drive down Mr. Parks' CD4 (T4) counts to unacceptable levels.

133.   The April 5, 2006, Inter-Agency Patient Referral Report referring Mr. Parks from MacDougall C.I. to Garner C.I. states that "Mr. Parks is referred for MH4 [Mental Health, level 4] housing at GCI *per* Dr. Lewis due to his unstable mental status and risk of injury to others.   Mr. Parks is characterized as emotionally labile, agitated, intimidating, and threatening with staff, he reports a current assaultive ideation and has a history of assault.   His thought process is perseverative and his insight is poor.  He is noncompliant with treatment and cheeks his meds.  He is diagnosed with Bipolar Disorder and severe personality pathology." *Id.*, p. 150.

134.   On April 6, 2006, Dr. Lewis' note in the Clinical Record stated that Mr. Parks was requesting to be on Interferon *per* Medical/Infectious Disease. She stated that he was "currently not a candidate for this protocol at this time."  He was "non-compliant with medications and is hostile, verbally assaultive and paranoid.  He lacks insight into need for treatment and maintains a threatening posture toward staff.  He exhibits severe personality pathology as well as serious mental illness (Bipolar Affective Disorder v. Schizo-Affective) in context of lengthy history of substance dependence and current medical issues." *Id.*, p. 149.  Mr. Parks "is non-compliant, aggressive, and exhibits signs of a psychotic disorder.  In my opinion, he requires Mental Health Housing to optimize his condition.  Once that condition is stabilized (if it is stabilized) formal assessment for Interferon should be conducted.  Recommend Mental Health housing." *See* Exh. 25, p. 149.

135.  On April 8, 2006, I signed the diagnostic work-up for Mr. Parks' Hepatitis C evaluation to submit to the HepCURB for their review and determination regarding Mr. Parks' suitability for treatment at this point in time. *Id.*, p. 151.

136.  HepPCURB is the Utilization Review Board to which doctors treating inmates for Hepatitis C submit requests for review and approval of proposed treatment.

137.  On April 10, 2006, the Utilization Review Board did not approve Mr. Parks as a candidate for Hepatitis C treatment, deeming it psychiatrically contra-indicated.  *See* Exh. 25, pp. 152, 159.  The Board noted Mr. Parks' "severe antisocial personality" and "poor compliance with medications." *Id.*, p. 152.

138.  Although I was a sitting member of the HepCURB at the time, as the then treating physician making the request, I did not participate in the vote on this matter relating to Mr. Parks' care.

139.  After April 2006, Dr. O'Halloran undertook the direct management of Mr. Parks' Hepatitis C treatment.  My role thereafter was limited to my position as a member of the Hepatitis C Utilization Review Board, where I participated in the review and approval of the requests of physicians treating DOC's inmates.

140.  The Clinical Record reveals that on April 16, 2006, Mr. Parks was seen in MacDougal C.I.'s Sick Call stating that he needed to be put back on his Codeine. *Id.*, p. 154.

141.  On April 19, 2006, Mr. Parks was transferred from MacDougall-Walker C.I. to Garner C.I. as a Mental Health Level 4 due to his "unstable mental status, risk of

injury to others, and for mental health level 4 housing as per Dr.Lewis/Dr. Coleman...." *Id.*, p. 156; *See also* Exh. 27, Plaintiff's 04/19/2006 Transfer History.

142. Garner's April 22, 2006 Initial Psychiatric Evaluation of Mr. Parks indicates that he stated he had stopped taking his Lithium for the past three weeks because it "gave him tremors." *Id.*, pp. 156-157. As a result, Mr. Parks' prescription for Lithium was discontinued on April 22, 2006. *Id.*, p. 156.

143. On April 24, 2006, Dr. O'Halloran met with Mr. Parks at Garner C.I. *See* Exh. 25, p. 158. Dr. O'Halloran told Mr. Parks that his current CD4 level of 567 was well above the 350 threshold, and that he did not, therefore, meet the criteria for administration of HIV treatment based on the current guidelines. *Id.*, pp. 56, 158.

144. Dr. O'Halloran noted that Mr. Parks continued to use the phrase "I was being experimented on" despite Dr. O'Halloran's review with him of the current guidelines which indicated that he did not need the ARV medications. *Id.*, p. 158.

145. On April 24, 2006, Dr. O'Halloran reinstituted Mr. Parks' prescription for the antiretroviral medications of Trizivir and Sustiva in preparation for the anticipated treatment for Hepatitis C. *Id.*, p. 158.

146. On May 17, 2006, Dr. O'Halloran ordered that Mr. Parks' Klonopin prescription be crushed before administration "indefinitely." *Id.*, p. 161.

147. On May 22, 2006, the results of the HIV-1 drug resistance assay that I had referred Mr. Parks for back on April 25, 2006 revealed that no drug resistance-associated mutations had been detected in Mr. Parks' blood. *See* Exh. 25, p. 162.

148.   A May 22, 2006 entry in the Clinical Record reveals that while at Garner C.I. Mr. Parks threatened to throw up all of his medications if the staff crushed his Xanax and Klonopin. *Id.*, p. 165.

149.   On June 2, 2006, Garner staff noted that although Mr. Parks was *again* complaining of thrush, there was none visible. *Id.*, p. 166 (emphasis in original).

150.   On July 6, 2006, Dr. Hair spoke with Mr. Parks at Garner and he informed her that he had taken his Seroquel just once in the past week. *Id.*, p. 169.

151.   On July 7, 2006 and July 12, 2006, psychiatrist Dr. Hair noted Mr. Parks' Axis-1 diagnosis of "psychosis NOS and anxiety NOS and rule out Bipolar NOS." *Id.*, p. 167.

152.   On July 19, 2006, Dr. O'Halloran met with Mr. Parks at Garner C.I. and obtained his reluctant agreement to take the prescribed Seroquel as he would be more likely to tolerate the Interferon that was part of the Hepatitis C medication regimen if he was taking Seroquel. *Id.*, p. 168.

153.   Psychiatrist Dr. Arias spoke with Mr. Parks on August 15, 2006, while at MacDougall. *See* Exh. 25, p. 170. Mr. Parks had informed the medical staff that although he had been spitting out the Seroquel while at Garner, he was now taking it at MacDougall. *Id.*, p. 170.

154.   Dr. Arias described Mr. Parks as "dramatic and manipulative." *Id.*, p.171. Dr. Arias noted that "nursing staff had verified that Mr. Parks had been found hoarding Xanax and doing other inappropriate things with Xanax." *Id.*, p. 170.  Dr.

Arias decided to implement a slow taper and discontinuation of Mr. Parks' Xanax. *Id.*, p. 170.

155.   On August 22, 2006, when Dr. Arias met again with Mr. Parks, he noted that Mr. Parks was not "adherent with medication except Xanax." *Id.*, p. 171.  Mr. Parks was becoming "increasingly irritable, paranoid, illogical, and out of touch with reality, with poor insight." *Id.*, p. 171. Dr. Arias noted that Mr. Parks was benzodiazepine seeking and was engaged in manipulation to get his dose increased. *Id.*, p.  171. Dr. Arias diagnosed Mr. Parks as "Bipolar NOS." *Id.*, p. 171.

156.   The Transfer Summary that MacDougall prepared as part of Mr. Parks' August 25, 2006 transfer to Garner C.I. described him as "demanding and manipulative." *Id.*, p. 172.

157.   While at Garner, Mr. Parks' Mental Health score was lowered on October 2, 2006, from a 4 to a 3. *Id.*, p. 173.

158.   On October 24, 2006, while at MacDougall C.I., Mr. Parks' Axis-1 diagnosis appears as "Bipolar Disorder Not Otherwise Specified." *Id.*, p. 174.

159.   On December 21, 2006, Dr. Arias met briefly with Mr. Parks at MacDougall to evaluate him for Hepatitis C Interferon treatment. *Id.*, p. 175.

160.   As I recall, it was around this time that Mr. Parks had exhibited out of control behavior such as yelling while in the Infirmary. Mr. Parks' distrust of me was so great that I decided that his clinical care would best be overseen by another doctor, to ensure optimal circumstances for success of his upcoming

Hepatitis C treatment. *See* Doc.'s 1 and17, plaintiff's April 14, 2009 Complaint and July 21, 2009 Amended Complaint, respectively.

161.   On December 27, 2006, the Clinical Record reveals that while at MacDougall C.I., Mr. Parks claimed that another inmate had assaulted him causing a contusion to the back of his head. Id., p. 178. He also claimed to have lost consciousness and that he had had a seizure. *Id.*, p. 176-178. This resulted in his admission to the infirmary. *Id.*, pp. 176-178.

162.   The Clinical Record notes of January 3, 2007 and January 6, 2007 indicate that the plan for Mr. Parks was to send him back to Garner C.I. "to manage his Hepatitis C and psychiatric problems and that the infectious disease doctors all agreed on this plan." *Id.*, p. 180-183.

163.   The other infectious disease doctor referenced in the notes was Dr. O'Halloran.  He and I had discussed Mr. Parks' treatment and Dr. O'Halloran had indicated he was happy to take on the direct management of Mr. Parks' care at garner C.I. Of importance, Mr. Parks seemed to have trust in Dr. O'Halloran.

164.   Accordingly, once Mr. Parks was sufficiently recovered from the injuries he claimed to have sustained back on December 27, 2006, he was transferred to Garner C.I. on January 16, 2007. *Id.*, p. 184.

165.   The January 16, 2007 transfer was for the purpose of having Dr. O'Halloran manage Mr. Parks' Hepatitis C treatment and psychiatric issues at Garner which specialized in the treatment of psychiatric problems. *See also* Exh. 28, Plaintiff's 01/16/2007 Transfer History.

166.   In accordance therewith, Dr. O'Halloran submitted a request on February 9, 2007 to the HepCURB for a liver biopsy.  *Id.*, pp. 185-186.

167.   The Hepatitis C Utilization Review Board recommended that a second psychiatric evaluation be performed. *See* Exh. 25, pp. 189-191.

168.   On April 2, 2007, Patricia Ottolini, the Department of Correction Director of Health and Addiction Services, wrote to Mr. Parks. *Id.*, p. 188.  She explained that a request to the HepCURB for approval to treat his Hepatitis C was necessary because it was not a routine procedure and because the treatment can produce uncomfortable side effects.  *Id.*, p. 188.

169.   Ms. Ottolini further explained to Mr. Parks that during the period of time when he was not receiving his HIV medication, his ID physician, had monitored his "T cells and [ ] Viral Load." *Id.*, p. 188.

170.   Ms. Ottolini also repeated to Mr. Parks what Dr. O'Halloran and I had already told him, that his CD4 level as of April 2006 did not warrant medication. *Id.*, p. 188.

171.   Mr. Parks' liver was biopsied on October 17, 2007 while he was resident at MacDougall C.I. *Id.*, p. 193, 194.

172.   Also on October 17 2007, Dr. O'Halloran submitted a request for approval to begin the Hepatitis C therapy for 12 months.  *See* Exh. 25, p. 195.

173.   Upon Mr. Parks' October 18, 2007 return from the biopsy procedure, staff found Xanax that Mr. Parks had been hoarding. *Id.*, p. 193.

174.   My October 25, 2007 entry in the Clinical Record states "Please transfer back to Garner CI – hold there for one year." *See* Exh. 25, p. 192.

175.   My recommendation that Mr. Parks be transferred to Garner was because Mr. Parks' liver biopsy had been performed and the results were pending.  Exh. 25, p. 194.  Given the mental health effects associated with Interferon treatment for Hepatitis C, it made sense to transfer Mr. Parks to Dr. O'Halloran's care with the mental health support that Garner could provide.  It seemed very likely that HepCURB approval for the Hepatitis C treatment would follow.

176.   My recommendation that Mr. Parks remain at Garner for a year was largely because the course of treatment for Hepatitis C is one year. *See* Exh. 25, p. 195.

177.   Further, the Hepatitis C protocol in place required that once an inmate started the treatment at one facility he was to remain there for the entire course. This was because any transfer could potentially result in a lapse of medication administration, and adversely affect the outcome of the treatment.

178.   Of note, I did not have the power to order transfers of inmates. I would recommend a transfer for medical reasons which would be conveyed to DOC's Population Management.  If Population Management was able to accommodate the patient's transfer, the patient would be transferred.

179.   Of further note, I did not make recommendations of transfers for psychiatric reasons. A recommendation of transfer for psychiatric care would require the recommendation of a psychiatrist.

180. On October 26, 2007, Mr. Parks was transferred from MacDougall to Garner for the anticipated treatment. *See* Exh. 25, p. 192, 199; *see also* Exh. 29, Plaintiff's 10/26/2007 Transfer History.

181. The October 26, 2007 Transfer Summary reflects that Mr. Parks transfer was to the "Chronic Care Clinics" at Garner. *See* Exh. 25, p. 196.

182. In fact, Mr. Parks did remain at Garner until August 1, 2008, before returning once again to MacDougall.

183. On December 3, 2007, while Mr. Parks was resident at Garner, the HepCURB committee approved the administration of Hepatitis C therapy for 12 months to Mr. Parks. *Id.*, p. 195. The committee directed the "[f]acility to notify UR of therapy start date & must very closely monitor adherence & mental health status." *Id.*, p. 195.

184. The Medical Record reveals that from January 2008 through September 2008, Mr. Parks complained that his Viral Load was increasing due to the discontinuation of his Xanax. *Id.*, pp. 196, 209, 211-212, 215, 221, 225.

185. On February 10, 2008, Garner staff noted that Mr. Parks refused to follow protocol requiring that his Klonopin be crushed and put into water, describing "non-compliance with prescribed procedure for medicine." *Id.*, p. 213. When staff spoke to him he was verbally abusive with a hostile, aggressive demeanor. *Id.*, pp. 213-213a.

186. The April 29, 2008 Clinical Record reveals that although Mr. Parks was prescribed Celexa, he refused to be compliant, causing his Infectious Disease doctor to discontinue it on April 11, 2008. *Id.*, pp. 215-219.

187. Celexa is an anti-depressive medication in the Selective Seratonin Reuptake Inhibitors (SSRI) class.

188. On April 16, 2008, while at Garner C.I. under the care of Infectious Disease Dr. O'Halloran, Mr. Parks began his Hepatitis C treatment. *Id.*, 220-222.

189. The Hepatitis C treatment failed and Dr. O'Halloran discontinued it on August 7, 2008. *Id.*, p. 222, 226.

190. On August 13, 2008, Mr. Parks' medication for Klonopin was renewed and ordered crushed. *Id.*, p. 223.

191. On September 1, 2008, I conducted a Chart Review pursuant to my transfer of oversight of the Infectious Disease Clinic to Dr. Pesanti. I noted as follows:

> This patient is a very anxious, manic, manipulative patient who should have all meds on-line in my opinion – esp. Anti-Retroviral meds. For this reason, I have changed all his meds from KOP (if this was the case) to on-line DOT. He has failed Hep C therapy and has usually blamed various physicians for treatment failures or difficulties. He constantly demands a myriad of various medications and I would be careful to order only those medications that he needs (requires) and not all the medications that he wants – his list becomes endless in time in my experience. <signature Edward A. Blanchette MD>

*Id.*, p. 225.

The foregoing is true and correct to the best of my knowledge, information and belief.

Signed under the pains and penalties of perjury, this the 8th day of June, 2014.

Edward A. Blanchette MD

Edward A. Blanchette, M.D.