UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

DAVID S.L. PARKS
        Plaintiff,

v.                                    CASE NO. 3:09-cv-604 (VAB)

EDWARD A. BLANCHETTE,
JAMES E. DZURENDA, and
PETER J. MURPHY,
        Defendants.

## RULING ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND MOTION TO AMEND EXHIBITS

# TABLE OF CONTENTS

<u>Page</u>

I.      Defendants' Motion to Correct the Exhibits ........................................................2

II.     Defendants' Motion for Summary Judgment ...................................................5

        A.  Background Facts.........................................................................................6

        B.  Standard .........................................................................................................8

        C.  Mr. Parks's Objections to Defendants' Supporting Evidence ....................9

        D.  Qualified Immunity.....................................................................................15

        E.  Statement of Facts Regarding Deliberate Indifference Claims.................17

        F.  Legal Analysis of Deliberate Indifference Claims.....................................33

        G.  Statement of Facts Regarding Transfers .....................................................56

        H.  Legal Analysis of Retaliation Claims ........................................................67

        I.  Legal Analysis of ADA and Rehabilitation Act Claims...........................79

III.    Conclusion ......................................................................................................86

Plaintiff, David Parks, filed a complaint *pro se* in 2009, challenging various prison conditions he faced while in the custody of the Connecticut Department of Correction ("DOC"). Compl., ECF No. 1; Am. Compl., ECF No. 17.  After the Court dismissed a number of claims in an Initial Review Order under 28 U.S.C. §1915A(b), ECF No. 26, and in a Ruling on a motion to dismiss, ECF No. 96, appointed counsel for Mr. Parks filed a Second Amended Complaint, ECF No. 146, in which he asserts three claims against the three remaining Defendants.[1]  The three Defendants are a medical doctor employed by DOC, Dr. Edward Blanchette, and two wardens of facilities in which Mr. Parks was incarcerated from 2004 to 2010, Wardens James Dzurenda and Peter J. Murphy.

Defendants now move for summary judgment, seeking dismissal of all three claims against all Defendants.  Defs.' Mot. For Summ. J., ECF No. 219.  In Defendants' view, the undisputed material facts demonstrate that they are not liable.  Defs.' Br. 2, ECF No. 219-2.  Mr. Parks, on the other hand, suggests that this is "the quintessential case" that hinges on questions of fact and credibility, and, therefore, that summary judgment would be inappropriate on any of his claims.  Pl.'s Opp. Br. 2, ECF No. 232.

Defendants have also filed a motion to correct one of their summary judgment filings. Defs.' Mot. to Correct Exhibits, ECF No. 255.  The motion asks the Court to accept a certificate of authenticity for medical records accompanying their summary judgment motion, which they inadvertently omitted from the initial filing.

For the reasons that follow, the Court **DENIES AS MOOT** the Motion to Correct, ECF No. 255, and **GRANTS** Defendants' Motion for Summary Judgment, ECF No. 219, in its entirety.

---

[1] The Court appreciates the advocacy provided by appointed counsel on Mr. Parks's behalf throughout this case.

## I.      Defendants' Motion to Correct the Exhibits

Defendants' Motion to Correct seeks to add a certificate of authenticity to some of their summary judgment exhibits, explaining that they inadvertently left this document out when filing their Motion for Summary Judgment.  Defs.' Mot. to Correct, ECF No. 255.  Mr. Parks opposes the motion because it is untimely.  Pl.'s Opp. Br. 2-3, ECF No. 257.  It is true that Defendants provide no explanation for why they waited one full year after their summary judgment motion was filed to correct the exhibit.  However, the Court finds that the medical records which the Motion to Correct seeks to authenticate are still admissible and will consider them in ruling on Defendants' Summary Judgment Motion.  Accordingly, Defendants' motion is denied as moot.

In ruling on a motion for summary judgment, a court need only consider admissible evidence.  *Raskin v. Wyatt Co.*, 125 F.3d 55, 66 (2d Cir. 1997); *see also* Fed. R. Civ. P. 56(c). The medical records provided by Defendants are hearsay but would be admissible under the business records exception to the general exclusion of hearsay, provided they meet the requirements of Federal Rule of Evidence 803(6).[2]  Fed. R. Evid. 803(6); *see cf. Hodges v. Keane,* 886 F. Supp. 352, 356 (S.D.N.Y. 1995) (noting that medical records kept by a medical provider in a prison can be admissible as business records if they meet the requirements of Rule 803(6)) (citing *Romano v. Howarth*, 998 F.2d 101, 108 (2d Cir. 1993)); *see also Lewis v. Velez,* 149 F.R.D. 474, 484 n.5 (S.D.N.Y. 1993) (citations omitted).  To be admissible as business records, the documents must have been made near the time of the recorded event by someone with knowledge and must have been kept in the course of regularly conducted business activity. Fed. R. Evid. 803(6)(A)-(B).  In addition, it must have been the regular practice of that business

---

[2] Most of the statements contained within these records are also admissible under Federal Rule of Evidence 803(4), which admits statements made for medical diagnosis or treatment or that describe medical history or symptoms. The Court need not analyze the records separately under this rule, because it finds that they are admissible as business records.

activity to make them.  Fed. R. Evid. 803(6)(C).  Even if the documents meet all of these

requirements, "if the source of information or the method or circumstances of preparation

indicate [a] lack of trustworthiness, such records may be excluded."  *Hodges*, 886 F. Supp. at

356 (citation omitted); Fed. R. Evid. 803(6)(E).

Because "[t]he principles governing admissibility of evidence do not change on a motion

for summary judgment," Defendants must introduce their medical records "in a manner, typically

through a custodian's affidavit, that identifies them and establishes that they are admissible under

Federal Rule of Evidence 803(6)."  *Ravenell v. Avis Budget Grp.*, *Inc.,* No. 08-cv-2113

(SLT)(SMG), 2014 WL 1330914, at *2 (E.D.N.Y. Mar. 31, 2014) (internal quotation marks and

citations omitted).  Defendants may do so either by testimony of the custodian or other qualified

witness or by certifying the records as self-authenticating in compliance with Federal Rule of

Evidence 902(11).  Fed. R. Evid. 803(6)(D) (requiring that the conditions of the business records

rule be shown "by the testimony of the custodian or another qualified witness, or by a

certification that complies with Rule 902(11) or (12)…"); *see also United States v. Komasa*, 767

F.3d 151, 154-55 (2d Cir. 2014) (describing the relationship between Rules 803(6) and 902(11)).

In their motion, Defendants belatedly seek to do the latter under Rule 902(11).  Fed. R. Evid.

902(11).

Mr. Parks argues that, without any foundation for the exhibits' admissibility, the Court

cannot consider Defendants' medical records.  The Court disagrees.  Even if the exhibits are not

properly authenticated under Rule 803(6)(D), Mr. Parks relied on Defendants' medical records in

opposing Defendants' summary judgment motion without objecting to their authenticity.[3]  *See*

---

[3] Mr. Parks specifically objected in his Opposition Brief to the authenticity of one type-written portion of the
medical records, a set of notes written by Dr. Blanchette on April 4, 2006.  Pl.'s Opp. Br. 18, ECF No. 232; Pl.'s
Counterstmt. ¶¶79-80, ECF No. 234; Ex 25, Clinical Record Notes dated 4/4/2006 at 0147.  He does not question
the authenticity of any other aspect of the medical records.

*e.g.*, Pl.'s Opp. Br. 12, 15-16, ECF No. 232 (citing Exhibit 25, which contains Defendants'

medical records); *see also e.g.*, Pl.'s Local Rule 56(a)2 Stmt. ¶224, ECF No. 234 (same).

Because Mr. Parks relied on these exhibits, the Court will consider them.  *See Goris v. Breslin*,

No. 04-CV-5666 (KAM)(LB), 2010 WL 376626, at *1 n.1 (E.D.N.Y. Jan. 26, 2010) (admitting

medical records that were not properly authenticated under Rule 803(6)(D), because the

opposing party relied on them without objecting to their authenticity or admissibility); *Atkinson*

*v. Fischer,* No. 9:07-CV-00368 (GLS/GHL), 2009 WL 3165544, at *3 n.1 (N.D.N.Y. Sept. 25,

2009) (Report and Recommendation adopted by the District Court) (same); *Sheils v. Flynn*, No.

06-CV-0407, 2009 WL 2868215, at *2 n.2 (N.D.N.Y. Sept. 2, 2009 (Report and

Recommendation adopted by the District Court) (same).

   Moreover, like Defendants, Mr. Parks also provides no explanation for why his objection

to the admissibility of the medical records was not raised until nearly one year after his

opposition was filed.  In his Opposition Brief to Defendants' Motion for Summary Judgment,

Mr. Parks does make certain objections to Defendants' exhibits, which are addressed below, but

he does not argue that all of the medical records are generally inadmissible or not authentic and

has waived those objections at this stage.  *See Capobianco v. City of New York*, 422 F.3d 47, 55

(2d Cir. 2005) (finding that, in deciding summary judgment, a district court erred when it refused

to consider two reports because the objecting party had waived objections to admissibility by

relying on the same reports in support of their motion for summary judgment).

   In addition, it is "well-established" that "even inadmissible evidence may properly be

considered on summary judgment if it may reasonably be reduced to admissible form at trial."

*Bill Salter Advert., Inc. v. City of Brewton, Ala.*, Civil Action No. 07-0081-WS-B, 2008 WL

183237, at *4 n.10 (S.D. Ala. Jan. 18, 2008) (rejecting objections made to the late submission of

a signature necessary to authenticate a summary judgment exhibit); *see also* Fed. R. Civ. P. 56(c)(2); *Celotex Corp.*, *v. Catrett,* 477 U.S. 317, 324 (1986) 324 (1986) ("We do not mean that the nonmoving party must produce evidence in a form that would be admissible at trial in order to avoid summary judgment."); *Fraser v. Goodale*, 342 F.3d 1032, 1036 (9th Cir. 2003) ("At the summary judgment stage, we do not focus on the admissibility of the evidence's form.  We instead focus on the admissibility of its contents"), *cert. denied*, 541 U.S. 937 (2004). Defendants easily could authenticate these records at trial using the same certificate they seek to file now.  Refusing to consider the Defendants' exhibits now would strip summary judgment of "[o]ne of its principal purposes… to isolate and dispose of factually unsupported claims or defenses."  *Celotex Corp.*, 477 U.S. at 323-34.

Because the Court will consider the Defendants' medical records without a certificate of authenticity, their request to correct them and add that certificate is **DENIED AS MOOT**.

## II.    Defendants' Motion for Summary Judgment

Defendants seek summary judgment on all three of Mr. Parks's claims.  First, Mr. Parks claims that Dr. Blanchette was deliberately indifferent to his medical needs in denying him treatment for his HIV/AIDS and Hepatitis C.  Am. Compl. ¶¶ 74-76, ECF No. 146.  Second, he claims that all three Defendants retaliated against him for filing grievances and otherwise complaining about both the lack of medical treatment he received and the frequency with which he was moved to different cells and different facilities.  *Id.*  ¶¶ 77-82.  He contends that the retaliatory actions Defendants took against him consisted of frequent transfers, both within and among DOC facilities, further denials of adequate medical treatment for his Hepatitis C condition, and a prohibition on him filing grievances.  Pl.'s Opp. Br. 29, ECF No. 232.  Finally, Mr. Parks claims that Defendants Dzurenda and Murphy failed to reasonably accommodate his

HIV/AIDS as a disability when they continued moving him from cell to cell frequently, in violation of the Americans with Disabilities Act of 1990 ("ADA"), 42 U.S.C. §12131 *et seq.,* and the Rehabilitation Act, 29 U.S.C. §794. *Id.* ¶¶ 83-86. Mr. Parks makes the third claim against Defendants Dzurenda and Murphy only and in their official capacities, while all other claims are made against all Defendants in their individual capacities. *Id.* ¶¶ 6-8.

For the reasons that follow, Defendants' Summary Judgment Motion is **GRANTED** in its entirety.

### A. Background Facts[4]

Mr. Parks was incarcerated in the federal system for "over 20 years" prior to the facts relevant to this lawsuit. Defs.' Local Rule 56(a)1 Stmt. ¶¶ 42-43, ECF No. 219-1. On June 10, 2004, near the end of a federal prison sentence, Mr. Parks was transferred to the custody of the DOC at MacDougall Walker Correctional Institution ("MWCI"), where he served the remainder of his federal sentence. *Id.*; Ex. 9, Inmate Transfer History 5.[5] Mr. Parks was released on October 6, 2004 but was readmitted into DOC custody nineteen days later, on October 25, 2004, after being arrested for robbing a bank. Defs.' Local Rule 56(a)1 Stmt. ¶¶ 94-95, ECF No. 219-1. Mr. Parks's claims in this lawsuit are based on events alleged to have occurred while he was awaiting trial and serving his sentence for these charges and the resulting conviction.

Defendant James Dzurenda served as the warden at Garner Correctional Institution ("Garner") from April 2005 through July 2009, where Mr. Parks was incarcerated at various times from 2006 to 2008. Ex. 7, Dzurenda Aff. ¶ 6; Ex. 9, Inmate Transfer History 4. Defendant

---

[4] All facts in this opinion derive from a review of the pleadings, Local Rule 56(a) Statements, briefs on the Motion for Summary Judgment and associated exhibits, and certain relevant subsequent filings made by both parties. Unless noted otherwise, these facts are undisputed or the opposing party has not pointed to any contradictory evidence in the record.

[5] In its citations, the Court does not indicate explicitly whether exhibits were filed by the Plaintiff or Defendants, because Plaintiff's exhibits are lettered and Defendants' exhibits are numbered.

Peter J. Murphy served as warden at MWCI from April 2007 until December 2013, where Mr.

Parks was also incarcerated at various times from 2004 to 2010.  Ex. 17, Murphy Aff. ¶ 4; Ex. 9,

Inmate Transfer History 4-5.

Defendant Dr. Edward A. Blanchette treated Mr. Parks, while he was in DOC custody

and held three different roles relevant to Mr. Parks's treatment.  First, Dr. Blanchette served as

the Director of Clinical and Professional Services Division of Health Services of the DOC from

May 1995 to June 2010.  Defs.' Local Rule 56(a)1 Stmt. ¶ 7, ECF No. 219-1.  In this position,

Dr. Blanchette consulted on difficult medical cases and "oversaw the policies and procedures

governing medical issues, including those related to the care and treatment of patients with

Hepatitis C and HIV-AIDS."  *Id.* ¶¶ 9, 12-14.  He also served on the University of Connecticut

("UConn") Medical Center Correctional Managed Health Care Hepatitis C Utilization Review

Board ("HepCURB"), the body established to oversee the care of all inmates infected with

Hepatitis C.  *Id.* ¶¶ 19-20.  Finally, he served on the *Doe v. Meachum* Monitoring Panel to

oversee the care of all HIV patients incarcerated by the DOC.[6]  *Id.* ¶ 17. While working for the

DOC, Dr. Blanchette also worked for UConn as an Infectious Disease specialist and ran evening

Infectious Disease Clinics for inmates at MWCI and Bridgeport Correctional Center.  *Id.* ¶ 15.  It

was in all three of these capacities that Dr. Blanchette became familiar with Mr. Parks, as a

patient with HIV/AIDS and Hepatitis C in DOC custody.

---

[6] *Doe v. Meachum* is a consent judgment setting forth requirements for the standard of medical care provided to HIV positive inmates in DOC custody.  The judgment set up an Agreement Monitoring Panel ("AMP") of doctors to monitor the implementation of the consent judgment. Ex. K, Consent Judgment, *Doe v. Meachum (In re Conn. Prison Overcrowding and AIDS Cases)*, Civil No. H88-562, slip op. at 61 (D. Conn. Nov. 2, 1990).  The consent judgment also required that the DOC institute a "tickler system" to ensure that examinations and laboratory work for HIV patients were scheduled and provided at regular intervals.  *Id.* at 24.  It also requires that a T cell profile (including an absolute CD4 count) "shall be repeated twice a year [ ]or more often if there is evidence of clinical deterioration consistent with advancing HIV disease or if the inmate's most recent T4 count was approaching a level of which s/he would qualify… for a treatment that had not yet been offered.  Once the T4 count falls below 200/mm 3, the T cell profile need not be repeated unless medically appropriate." *Id.* at 13-14.  Finally and most importantly, the decree requires DOC to offer HIV-infected inmates any drug therapies that "are determined medically necessary for him/her by the treating physician… in accordance with accepted professional standards" *Id.* at 28.

In resolving Defendants' summary judgment motion, the Court first will address objections Mr. Parks raises to Defendants' evidence offered in support of their motion.  It then will address the Defendants' qualified immunity defense, which is applicable to Mr. Parks's deliberate indifference and retaliation claims.  As a practical matter, because they arise from two relatively distinct sets of facts, the Court will provide a statement of facts with respect to the deliberate indifference claims and apply the law to the facts in this case on those claims.  It will then provide a separate statement of facts with respect to the transfers, which pertain to Mr. Parks's retaliation and ADA and Rehabilitation Act claims and apply the law to those facts.

## B.  Standard

Courts must "grant summary judgment, if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The moving party carries the burden of demonstrating that there is no genuine material dispute of fact by citing to "particular parts of materials in the record."  Fed. R. Civ. P. 56(c)(1)(A); *Carlton v. Mystic Transp., Inc.*, 202 F.3d 129, 133 (2d Cir. 2000).   A dispute regarding a material fact is "'genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party'" and material if the substantive law governing the case identifies those facts as material.  *Williams v. Utica Coll. Of Syracuse Univ.*, 453 F.3d 112, 116 (2d Cir. 2006) (quoting *Stuart v. Am. Cyanamid Co.,* 158 F.3d 622, 626 (2d Cir. 1998))); *Bouboulis v. Transp. Workers Union of Am.*, 442 F.3d 55, 59 (2d Cir. 2006) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

In assessing a summary judgment motion, the Court must resolve all ambiguities, including credibility questions, and draw all inferences from the record as a whole in favor of the non-moving party.  *Kaytor v. Elec. Boat Corp.*, 609 F.3d 537, 546 (2d Cir. 2010); *see also*

*Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).  "Only when reasonable minds could not differ as to the import of the evidence is summary judgment proper." *Bryant v. Maffucci*, 923 F.2d 979, 982 (2d Cir. 1991).

### C.  Mr. Parks's Objections to Defendants' Supporting Evidence

Before addressing the merits of the Defendants' motion, the Court must resolve certain evidentiary disputes.  Mr. Parks objects to aspects of the evidence Defendants rely on to support their Motion for Summary Judgment.  He argues that, without this evidence, Defendants have not carried their burden, and that summary judgment "should be denied for this reason alone."  Pl.'s Opp. Br. 43-48, ECF No. 232.  Mr. Parks makes two objections: (1) that the affidavits supporting the Defendants' motion are improperly caveated and not based on personal knowledge; and (2) that Dr. Blanchette's and Dr. Lazrove's testimony is inappropriately presented as expert testimony in certain portions of the motion and that their affidavits inappropriately incorporate inadmissible hearsay.  For the following reasons, the Court finds that none of these claimed deficiencies results in a denial of Defendants' Motion for Summary Judgment.

### 1.  Affidavits Not Based on Personal Knowledge

Defendants' affidavits were all sworn either "to the best of [the person's] knowledge, information, and belief" or "to the best of [his] knowledge and belief."  *See e.g.,* Ex. 4, Dieckhaus Aff., ECF No. 219-6; Ex. 1, Wu Aff., ECF No. 219-3.  Mr. Parks argued in his summary judgment opposition that these phrases did not establish that the affidavits were based on "personal knowledge," as required by Rule 56(c)(4).  Fed. R. Civ. P. 56(c)(4).  For the reasons set forth in its May 1, 2015 Order, the Court agreed with Mr. Parks and, under Rule

56(e)(1), ordered Defendants' to submit revised affidavits based on personal knowledge.  Order
Regarding Defs.' Mot. for Summ. J., ECF No. 254.

Defendants submitted these revised affidavits on June 1, 2015.  Revised Affs., ECF No.
256.  The submissions contain additional affidavits from each witness adopting their earlier
affidavits and attesting that the statements within them were based "entirely upon personal
knowledge."  *See e.g.*, Lazrove Aff. ¶5, ECF No. 256-4.  These additional affidavits were sworn
"to the best of my personal knowledge."  *See e.g., id.*

Mr. Parks argues that these revised affidavits do not suffice because the jurat of the
additional affidavit uses "non-committal" language, namely the phrase "to the best of my
knowledge."  Pl.'s Opp. To Defs.'s Mot. to Correct 1 n.1, ECF No. 257.  The Court disagrees.
The affidavits themselves unequivocally state that the previous affidavits were made "entirely
upon personal knowledge."  Moreover, the jurat of the additional affidavit is sufficient to
indicate it was made based on personal knowledge for Rule 56 purposes.  *See Colon v. Coughlin*,
58 F.3d 865, 872 (2d Cir. 1995) (finding that a verified complaint sworn "to the best of
[plaintiff's] knowledge," which was construed as an affidavit in the summary judgment context,
was sufficient to raise genuine questions of material fact and withstand Defendants' summary
judgment motion).  The Court, therefore, cannot deny Defendants' motion on this basis.

### 2.  Objections to Affidavits Submitted by Dr. Blanchette and Dr. Lazrove

Mr. Parks also objects to portions of Dr. Blanchette and Dr. Lazrove's affidavits in
which, he argues, the two doctors inappropriately testify as experts or rely on hearsay.  He
contends that they cannot testify as experts because they were not properly disclosed and asks
that, as a result, their entire affidavits be stricken under Federal Rule of Civil Procedure 37(c)(1).
Pl.'s Opp. Br. 44, ECF No. 232; Pl.'s Local Rule 56(a)2 Stmt. ¶¶ 53, 58, 85, 100-03, 105-06,

330-33, 362-63, 396, 399-414, ECF No. 234.  Mr. Parks asks the Court to limit the testimony of these doctors to the "four corners" of the notes they took during their sessions with Mr. Parks. Pl.'s Local Rule 56(a)2 Stmt. ¶ 330, ECF No. 234.

Mr. Parks also objects to portions of Dr. Blanchette and Lazrove's affidavits that "interpret notes from the medical record or testify as to facts and events of what occurred during medical visits to which they were not witness."  Pl.'s Opp. Br. 47, ECF No. 232.  In his view, these portions of the affidavits are inadmissible hearsay and cannot be considered by this Court as support for the summary judgment motion.  *Id.*  While the Court finds some of Mr. Parks' evidentiary concerns meritorious, as further explained below, excluding these portions of the record does not result in a denial of summary judgment.

### a. Expert Testimony from Fact Witnesses

Federal Rule of Civil Procedure 37(c)(1) provides that, "[i]f a party fails to provide information or identify a witness as required by Rules 26(a) or (e) [the former includes expert witnesses], the party is not allowed to use that information or witness to supply evidence on a motion… unless the failure was substantially justified or is harmless."  Unless disclosed as an expert, treating physicians are limited to testifying about what they learned from their "*consultation, examination, and treatment of the Plaintiff, 'not from information acquired from outside sources.'*"  *Barack v. Am. Honda Motor Co., Inc.*, 293 F.R.D. 106, 109 (D. Conn. 2013) (emphasis in original) (citation omitted); *see also Ordon v. Karpie*, 223 F.R.D. 33, 36 (D. Conn. 2004) (finding that a doctor who planned to testify about "facts beyond the scope of those made known to him in the course of the care and treatment of the patient" must submit an expert report, per Rule 26, to provide that testimony).

However, the *Barack* case does not indicate that the treating physician cannot testify about opinion at all, only that the opinion he or she testifies about must have been established during his or her treatment of the patient. *Barack*, 293 F.R.D. at 109 ("[T]reating physicians 'cannot be limited to solely factual testimony' and they 'may testify as to opinions formed during their treatment.'") (citation omitted). A treating physician's testimony is also not limited exclusively to the content of his or her notes, but rather to personal knowledge from consultation, examination, and treatment of the plaintiff. *Anderson v. Eastern CT Health Network, Inc.*, No. 3:12-cv-785, 2013 WL 5308269, at *2 (D. Conn. Sept. 20, 2013) (citations omitted). Accordingly, a treating doctor's testimony may not include any information obtained from outside sources, nor can he opine on any medical reports or opinions received from other doctors. *Id.*

Mr. Parks has provided no support for why the entire affidavits of Dr. Blanchette and Dr. Lazrove should be struck, as he does not argue that their entire affidavits consist of inappropriate expert testimony. Thus, the Court will analyze the specific portions of the affidavits that Mr. Parks argues contain inappropriate expert testimony and determine whether each of these disposes of the entire summary judgment motion.

In paragraphs 53, 58, and 85 of Defendants' Local Rule 56(a)1 Statement, Defendants cite to Dr. Blanchette's Affidavit regarding the general nature and use of the drugs Klonopin, Xanax, and Buspar. In paragraphs 400 to 414 of the same document, Defendants also cite to Dr. Lazrove's Affidavit as support for various conclusions about the nature of anti-social personality disorder. Mr. Parks is correct that this testimony is inappropriate for a treating physician. These general opinions were not obtained through the course of treating Mr. Parks. Accordingly, the Court will not consider them.

In paragraphs 100 to 103 and 105 to 106 of Defendants' Local Rule 56(a)1 Statement, Defendants cite Dr. Blanchette's Affidavit as support of the allegations that Mr. Parks was prescribed Motrin as well as to make some general statements about the nature of Hepatitis C. Only paragraphs 100 and 102 relate to Dr. Blanchette's diagnosis and treatment of Mr. Parks, thus the Court can consider them. Paragraphs 101, 103, 105, and 106 are inappropriate expert testimony, because they opine on the general nature of Hepatitis C and its symptoms in an abstract way, rather than with respect to Mr. Parks. Accordingly, the Court will not consider these four paragraphs.

In paragraph 330 of Defendant's Local Rule 56(a)1 Statement, Defendants cite to Dr. Lazrove's Affidavit to describe his approach to reviewing Mr. Parks's records. In paragraphs 331 to 333 of the same document, Defendants cite to his affidavit to summarize what he learned from the medical records he reviewed. In paragraph 362, Defendants cite to Dr. Lazgrove's Affidavit for the statement that, in his view, Mr. Parks was either malingering or dependent on Xanax. In paragraphs 363, 396 and 399 of the same document, Defendants cite to Dr. Lazrove's Affidavit to explain his conclusion about Mr. Parks's condition after his observing him. Since all of this testimony is related to Dr. Lazrove's treatment of Mr. Parks, including his opinion formed while treating Mr. Parks, it is appropriate testimony for a treating physician and will be considered in evaluating the Defendants' summary judgment motion.

In analyzing Mr. Parks's objection, the Court has memorialized its analysis only on the objections he explicitly raised in his Local Rule 56(a)2 Statement. The Court, however, appreciates that Drs. Lazrove and Blanchette are not experts and has not considered any of their testimony that is not based on their "consultation, examination, and treatment of the Plaintiff" in resolving the summary judgment motion. *Barack,* 293 F.R.D. at 109.

### b. Hearsay

Mr. Parks also objects to portions of the Defendants' Local Rule 56(a)1 Statement that, in his view, rely on inadmissible hearsay by citing to either the affidavits of Drs. Blanchette or Lazrove.  Pl.'s Opp. Br. 47, ECF No. 232.  "Rule 56(e) provides that affidavits in support of and against summary judgment 'shall set forth such facts as would be *admissible in evidence*.'" *Raskin*, 125 F.3d at 66 (citations omitted and emphasis in original).  On summary judgment, a party may "object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence."  Fed. R. Civ. P. 56(c)(2).  But this provision of the rule simply means that the evidence must be capable of presentation in admissible form at the time of trial.  Fed. R. Civ. P. 56(e).  It does not require that the materials be presented in an admissible form on summary judgment.  *See Celotex Corp.*, 477 U.S. at 324; *Fraser*, 342 F.3d at 1036.

The only specific objection Mr. Parks raises explicitly on the basis of hearsay is to paragraph 255 of Defendants' Local Rule 56(a)1 Statement.  In that paragraph, Defendants cite Dr. Blanchette's Affidavit as evidence that Mr. Parks informed Dr. Hair that he had taken his Seroquel "just once in the past week."  This statement comes from Mr. Parks's medical records. Ex. 25, Clinical Record Notes dated 7/6/2006, 169 ("'I haven[']t taken the Seroquel but once in the past week.'")  Even if this statement is hearsay, the Court is able to consider it because it could be presented in admissible form at trial by presenting the medical record which contains it. *See* Fed. R. Evid. 803(6).[7]  Accordingly, the Court will consider it.

Otherwise, Mr. Parks has not identified any particular paragraphs of the witness affidavits that he objects to as hearsay.  To the extent that the Defendants have provided affidavits from

---

[7] As discussed in footnote 2 above, this statement is also independently admissible as a statement made for medical diagnosis.  Fed. R. Evid. 803(4),

witnesses that quote or summarize the contents of Mr. Parks's medical records, the Court can and will consider the factual statements they make because they may be presented in admissible form at trial, namely by introducing the medical records and/or by calling the witnesses to testify.  In addition, statements made for the purpose of obtaining a medical diagnosis are independently admissible under Federal Rule of Evidence 803(4).  To the extent that there are hearsay statements in the Defendants' witness affidavits that cannot be presented in admissible form at trial, the Court has not considered them.

### 3.  Conclusion

In light of the foregoing, the Court finds that the Defendants' Motion for Summary Judgment is not so unsupported by admissible evidence that it must be denied outright.  The Court will consider the motion but will remain mindful that it cannot rely on inappropriate expert testimony or evidence that cannot be presented in admissible form at trial.  Fed. R. Civ. P. 56(e).

### D.  Qualified Immunity

Defendants argue that they are entitled to qualified immunity for the retaliation and deliberate indifference claims[8], because the rights at issue were not sufficiently clearly established at the time the Defendants acted.  Defs.' Br. 32, ECF No. 219-2.  "A government official performing a discretionary function is entitled to qualified immunity provided his or her 'conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'"  *Jermosen v. Smith*, 945 F.2d 547, 550 (2d Cir. 1991) (citation omitted).  In determining whether qualified immunity applies, the Court must engage in a "two-part inquiry: [determining 1] whether the facts shown make out a violation of a

---

[8] As mentioned above, this defense is limited to the retaliation and deliberate indifference claims, because qualified immunity is only available in cases where the plaintiff sues defendants in their individual capacity.  *See Rodriguez v. Phillips*, 66 F.3d 470, 482 (2d Cir. 1995) (noting that qualified immunity is unavailable in an official capacity lawsuit).

constitutional right and [2] whether the right at issue was clearly established at the time of the defendant's alleged misconduct." *Taravella v. Town of Wolcott*, 599 F.3d 129, 133 (2d Cir. 2010) (citing *Pearson v. Callahan*, 555 U.S. 223, 232 (2009)).[9]  To be clearly established, "'the contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right.'"  *Id.* (citation omitted).  If a defendant "has an objectively reasonable belief that his actions are lawful, he is entitled to qualified immunity."  *Spavone v. New York State Dept. of Corr. Servs.*, 719 F.3d 127, 135 (2d Cir. 2013) (citation omitted).

Mr. Parks argues that an inmate's rights to be free from retaliatory transfer, retaliatory denial of adequate medical treatment, and retaliatory denial of access to the grievance process, as well as from deliberate indifference to serious medical needs, were well-established at the time the Defendants acted.  Pl.'s Opp. Br. 73, ECF No. 232.  The Court agrees.

While inmates do not have a liberty interest in remaining at a particular correctional facility, it was well-established before 2006 that prison authorities could not transfer an inmate in retaliation for the exercise of constitutionally protected rights.  *See Meriwether v. Coughlin*, 879 F.2d 1037, 1046 (2d Cir. 1989) (noting that prison officials cannot transfer inmates "solely in retaliation for the exercise of constitutional rights").  As more fully discussed below, filing of grievances and lawsuits were also clearly established constitutionally protected activities at the time.  *See Gill v. Pidlypchak*, 389 F.3d 379, 384 (2d Cir. 2004) (the "use of the prison grievance system" is a protected activity); *Espinal v. Goord*, 558 F.3d 119, 128-29 (2d Cir. 2009) (filing a lawsuit is a protected activity).  It also was well-established before 2004 that deliberate indifference to an inmate's serious medical need or denial of adequate medical treatment was not

---

[9] In *Pearson*, the Supreme Court clarified that the district court may decide in its discretion the order in which the two prongs should be addressed.  *Hilton v. Wright*, 673 F.3d 120, 126-27 (2d Cir. 2012).

constitutionally permitted.  *See Estelle v. Gamble*, 429 U.S. 97, 104 (1976); *see also Wright v. Dee*, 54 F. Supp.2d 199, 204 (S.D.N.Y. 1999).

Because the Court finds that the rights at issue were well-established at the time they were allegedly violated, it also finds that the question of qualified immunity turns on whether it was objectively reasonable for Defendants to believe that their conduct did not violate Mr. Parks's rights.  This inquiry is the same one the Court must undertake in evaluating Defendants' summary judgment motion.  *See Salahuddin v. Goord*, 467 F.3d 263, 273 (2d Cir. 2006) (noting, in the deliberate indifference context, that the issue of whether there was a constitutional violation for qualified immunity analysis is the same the court undertakes in assessing a summary judgment motion); *Johnson v. Ganim*, 342 F.3d 105, 117 (2d Cir. 2003) (noting that the question of whether the defendant's actions were objectively reasonable overlapped with the "ultimate question" of whether defendant acted with a retaliatory motive) (citation omitted). Accordingly, qualified immunity is not dispositive of any issue in this case.

### E.  Statement of Facts Regarding Deliberate Indifference Claims

Mr. Parks contracted the HIV virus and Hepatitis C at some point prior to 1991, when he tested positive for both illnesses.  Defs.' Local Rule 56(a)1 Stmt. ¶ 33, ECF No. 219-1; Ex. C, Parks Decl., ¶¶ 4, 8.  The HIV virus "affects the immune status of the infected patient" and causes "progressive loss of CD4-positive lymphocytes [ ] known as T-4 cells or T-helper cells[ ]."  Ex. 4, Dieckhaus Aff. ¶¶21-23.  These cells are "important mediator[s] of the immune system" and their loss leads to "progressive immune deficiencies."  *Id.* ¶24.  Both sides agree that, if a patient develops a T4/CD4 level of less than 200 and/or is diagnosed with certain types of illnesses, he or she is considered to have AIDS.  *Id.* ¶ 27; *see also* Ex. B, Edlin Decl. ¶¶16, 26. Hepatitis C is a viral disease that causes "inflammation and progressive fibrosis [or scarring] of

the liver," and which can result in "cirrhosis, liver failure, liver cancer, and death."  Ex. B, Edlin

Decl. ¶37; *see also* Ex. 1, Wu Aff. ¶8 (noting that Hepatitis C "usually results in slowly

progressive liver damage" which in about 30% of cases results in "severe scaring or cirrhosis,

and liver failure.").  Mr. Parks sought treatment for both his HIV/AIDS[10] and Hepatitis C while

in DOC custody.

### 1.  Medical Treatment for HIV/AIDS by Dr. Blanchette

Mr. Parks first met Dr. Blanchette in June 2004 at the Infectious Disease Clinic at

MWCI.  Defs.' Local Rule 56(a)1 Stmt. ¶ 31, ECF No. 219-1.  At the time, Mr. Parks was on a

Highly Active Antiretroviral Therapy regimen ("HAART") and was taking the anti-retroviral

medications ("ARVs") Trizivir and Sustiva to treat his HIV/AIDS.  *Id.* ¶¶ 34-35; Ex. C, Parks

Decl. ¶ 13.  These medications forestall replication of the HIV virus for a sustained period of

time, if taken regularly.  Defs.' Local Rule 56(a)1 Stmt. ¶¶ 495-501, ECF No. 219-1. Other than

during a brief period in August 2004 that is not at issue in this case, it is undisputed[11] that Dr.

Blanchette continued to prescribe ARV medications for Mr. Parks after this initial meeting and

until he was discharged from DOC custody in October 2004.  Defs.' Local Rule 56(a)1 Stmt. ¶¶

62, 75, ECF No. 219-1; Pl.'s Local Rule 56(a)2 Stmt. ¶¶ 61, 71, 75, ECF No. 234; Ex. 25,

---

[10] The parties take different positions on the nature of Mr. Parks' HIV/AIDS illness.  Mr. Parks contends that he has
AIDS, whereas Defendants characterize Mr. Parks as being HIV positive.  The dispute centers on a 1990 medical
diagnosis of pneumocystis carinii pneumonia, which DOC's medical records indicate did occur.  Ex. J, Infectious
Disease Problem Report, DEF_000013.  Supported by his medical expert, Dr. Brian Edlin, Mr. Parks claims that the
diagnosis of this disease, when taken in conjunction with his HIV positive status, indicated that he had AIDS during
the relevant time period.  Ex. B, Dr. Edlin Decl. ¶ 26; Pl.'s Local Rule 56(a)2 Stmt. ¶ 108, ECF No. 234.  At oral
argument, Defendants did not dispute that the pneumonia diagnosis occurred.  Moreover, Defendants' own expert,
Dr. Kevin Dieckhaus, opined that Mr. Parks had AIDS based on his prior history.  Ex. D, Dieckhaus Dep. 82:10-
83:5, 100:2; Ex. 4, Dieckhaus Aff. ¶ 27 ("A CD4 level of less than 200, and/or the presence of one of several CDC-
defined infections and malignancies, indicates a label of AIDS.") (internal quotation marks omitted).  Defendants
also do not cite any record evidence indicating that Mr. Parks does not have AIDS.  Thus, the Court concludes that it
is an undisputed fact that Mr. Parks has AIDS and will refer to his infection as "HIV/AIDS" throughout this opinion.
[11] The parties dispute whether Dr. Blanchette told Mr. Parks to only take his ARVs every twelve hours (which
resulted in him refusing them because they were administered every 8 hours) and why Dr. Blanchette refused to
prescribe Klonopin to Mr. Parks.  Pl.'s Local Rule 56(a)2 Stmt. ¶¶ 32, 52-53, 61, ECF No. 234; Ex. 25, Clinical
Record Notes dated 7/12/2004, 066 (noting that Mr. Parks said he stopped his HIV medications because they
brought the medication at different times).

Physician's Orders dated 9/20/04, 0079 (indicating that ARV medications were among his "discharge" medications).[12]

When Mr. Parks re-entered DOC custody on October 26, 2004, Dr. Blanchette prescribed him the same ARVs he had been taking earlier in the year. Defs.' Local Rule 56(a)1 Stmt. ¶ 98, ECF No. 219-1. However, on July 12, 2005, Dr. Blanchette discontinued Mr. Parks's prescriptions for the ARVs. *Id.* ¶ 137. According to Mr. Parks, Dr. Blanchette told him he would only be stopping his medication for sixty days, with the promise of beginning treatment for Hepatitis C after this sixty-day period. Ex. C, Parks Decl. ¶ 30. Dr. Blanchette contends he stopped the medication for an indefinite period of time because he believed Mr. Parks did not need it and noted in his July 12, 2005 Clinical Record notes that the patient consistently had "excellent" T4 counts and Viral Load Assays and that he "may do very well off all ARV." Defs.' Local Rule 56(a)1 Stmt. ¶¶ 127, 129-30, 132-36, 141-42, ECF No. 219-1; Ex. J, Clinical Record Notes dated 7/12/2005, DEF_001282. Dr. Blanchette also believed that Mr. Parks took the pills irregularly, which Mr. Parks disputes. *Id.*; *see e.g.,* Pl.'s Local Rule 56(a)(2) Stmt. ¶¶77-78, 127, ECF No. 234. Dr. Blanchette's Clinical Record notes indicate that "after a prolonged discussion, the [patient] did finally agree to try stopping all ARVs to see if he maintains reasonable parameters." Ex. J, Clinical Record Notes dated 7/12/2005, DEF_001282.

Dr. Blanchette met with Mr. Parks on December 1, 2005, January 5, 2006, and April 4, 2006 and did not reinstate his ARV medications at any of these appointments. Defs.' Local Rule

---

[12] According to Defendants, Dr. Blanchette stopped the ARVs in August 2004 because he was concerned that Mr. Parks had been taking them "intermittently, thereby increasing the likelihood of creating resistance to the medications." Defs.' Local Rule 56(a)1 Stmt. ¶ 76, ECF No. 219-1. Mr. Parks asserts that he stopped taking his medication either because it was delivered in improper time intervals or because he was following the advice of his prior physician, Dr. Gittzus. *See e.g.,* Pl.'s Local Rule 56(a)2 Stmt. ¶ 71, ECF No. 234. Mr. Park indicates that he began taking medication, "AZT," for his HIV/AIDS in the 1990s and was treated by Dr. Gittzus at UConn's "IDS" during this time. Ex. C, Parks Decl. ¶¶ 9-10. He notes that as part of this course of treatment, Dr. Gittzus recommended that "every six to nine months" that he stop taking his ARVs "for a short period of time (no more than 30 days)" to avoid developing a "resistance" to the medication. *Id.* ¶ 11.

56(a)1 Stmt. ¶¶ 166, 198-206, 217-18, ECF No. 219-1.  During this time, Mr. Parks made

numerous complaints and requests to have his ARV medication restarted.  Ex. C, Parks Decl. ¶¶

43-44, 51-52, 55-56, 61, 64-73, 76.[13]

Mr. Parks did not begin taking his ARVs again until April 24, 2006, when he met with a

different doctor at Garner, Dr. O'Halloran, who re-prescribed them.  Defs.' Local Rule 56(a)1

Stmt. ¶¶ 247-50, ECF No. 219-1.  In re-prescribing the medication, Dr. O'Halloran's notes

indicate that Mr. Parks's CD4 count was at "567 [therefore] well above 350 [therefore] did not

meet criteria for RX based on current guidelines."  Ex. 25, Clinical Record Notes dated

4/24/2006, 158.[14]  Despite this observation, Dr. O'Halloran chose to prescribe Mr. Parks the

ARV medication.  *Id.*

During the nearly ten-month period when Mr. Parks was not taking his ARV medication,

he suffered "increasing levels of viral replication" and a decrease in his CD4 count.  Pl.'s

Counterstmt. ¶ 7, ECF No. 234.  To understand this statement, the Court must briefly describe

the indicators monitored in the blood tests conducted by DOC.  In monitoring Mr. Parks's

HIV/AIDS status, the doctors at the DOC relied on three indicators.  First, they relied on the T4

---

[13] Mr. Parks filed an inmate request form on October 9, 2005 noting that he was in "PAIN" and asking for his HIV medication.  Ex. C, Ex. 1, Inmate Request Form dated 10/9/2005 at 003971.  He again complained on November 12, 2005 of "PAIN," outbreaks of thrush, and his climbing viral load.  Ex. C, Ex. 3, Inmate Request Form dated 11/12/2005 at 003975-76.  On November 13, 2005, in an inmate request form, Mr. Parks complained that he had not received his HIV medication and noted a "thrush attack."  Ex. C, Ex. 2, Inmate Request Form dated 11/13/2005 at 0107.  On December 6, 2005, Mr. Parks filed an inmate request form asking for HIV treatment and complaining that he did not see Dr. Blanchette regularly or have his blood tested for HIV activity regularly.  Ex. C, Ex. 4, Inmate Request Form dated 12/6/2005 at 0116-20.  Mr. Parks again requested his ARV medication in an inmate request form on February 28, 2006.  Ex. C, Ex. 5, Inmate Request Form dated 2/28/2006 at DEF_001618. Mr. Parks also complained on March 24, 2006 that he was in pain and not on his ARV medication.  Ex. C, Ex. 6, Inmate Request Form dated 3/24/2006 at DEF_001616-17.  Finally, Mr. Parks reached out to a third party regarding the lack of treatment for his HIV/AIDS, and she wrote a letter dated March 28, 2006 to Wanda White-Lewis, Director of Field Services at MWCI.  Ex. C, Ex. 7, Letter dated 3/28/2006 at DEF_001610.
[14] The experts for both sides indicate that the prevailing guidelines at the time applicable to HIV/AIDS were published by the Department of Health and Human Services in April 2005.  Ex. 4, Dieckhaus Aff. ¶ 56; *see also e.g.*, Ex. B, Edlin Decl. ¶17 (relying on the same guidelines).  These guidelines were submitted to the Court by Mr. Parks's expert.  Pl.'s Ex. B, Edlin Decl. and Exhibits, Department of Health and Human Services, Guidelines for the Use of Antiretroviral Agents in HIV-1-Infected Adults and Adolescents, dated April 7, 2005.

Count, also known as CD4 count, which indicates how many "T-cells" or "T-helper cells" exist in a patient's body. Defs.' Local Rule 56(a)1 Stmt. ¶¶ 45, 47, ECF No. 219-1. These T-cells are the primary targets of the HIV. *Id.* ¶ 46. The count indicates how many T4 or CD4 cells are present in a microliter of blood. *Id.* ¶ 47. Second, the doctors looked at the CD4 percentage, which represents the percentage of the "lymphocyte population that is" positive for T4 or CD4 cells. *Id.* ¶48. According to a set of HIV/AIDS Guidelines published by the Department of Health and Human Services and submitted by Mr. Parks (the "HIV/AIDS Guidelines"), which both sides agree are applicable, this factor is "usually the most important consideration in decisions to initiate antiretroviral therapy." Pl.'s Ex. B, Department of Health and Human Services, Guidelines for the Use of Antiretroviral Agents in HIV-1-Infected Adults and Adolescents, dated April 7, 2005 at 4 [hereinafter the "HIV/AIDS Guidelines"]; *see also* Ex. 4, Dieckhaus Aff. ¶56; Ex. B, Edlin Decl. ¶17. The higher the T4/CD4 count, the stronger the patient's immune system. Defs.' Local Rule 56(a)1 Stmt. ¶ 50, ECF No. 219-1. Third, the Viral Load Assay "indicates the number of copies of RNA per milliliter of plasma" and represents the "best indicator of the level of HIV activity in the patient's body." *Id.* ¶¶ 66-67. The higher the Viral Load, the more severe the HIV infection. *Id.* ¶ 68.

The below chart lists Mr. Parks's indications on these three metrics over time that were discussed by the parties in their filings, none of which are undisputed.

| Date of Test[15] | T4 Count | CD4 Percentage | Viral Load Assay |
|---|---|---|---|
| 6/1/2004<br><br>Defs.' Local Rule 56(a)1 Stmt. ¶¶ 44, 65. | 932 | 37% | None because the blood sample submitted to run the test was "not sufficient." |

---

[15] Unless otherwise indicated, the citation(s) in the date column is/are the source for all information in the following rows.

| | | | |
|---|---|---|---|
| 6/15/2004<br><br>Defs.' Local Rule 56(a)1 Stmt. ¶ 110; Ex. J, Infectious Disease Problem Report at DEF_000011. | 768 | -- | < 400 copies/ml |
| 10/26/2004<br><br>Defs.' Local Rule 56(a)1 Stmt. ¶ 111; Ex. J, Infectious Disease Problem Report at DEF_000011. | -- | -- | < 400 copies/ml |
| 6/14/2005<br><br>Defs.' Local Rule 56(a)1 Stmt. ¶ 125; Ex J, Infectious Disease Problem Report at DEF_000011. | 779 | 40.2% | 100 copies/ml |
| 7/12/2005 | On July 12, 2005, Dr. Blanchette discontinued Mr. Parks's prescriptions for his ARVs.  Defs.' Local Rule 56(a)1 Stmt. ¶ 137. | | |
| 9/5/2005 | Viral Load and T-Cell Profile scheduled for this date but did not occur until October 20, 2005.  Defs.' Local Rule 56(a)1 Stmt. ¶¶ 139-40. | | |
| 10/20/2005 (conveyed to Mr. Parks on 12/1/2005)<br><br>Defs.' Local Rule 56(a)1 Stmt. ¶ 170; Ex. J, Infectious Disease Problem Report at DEF_000011. | 712 | 24.5% | 15,000 copies/ml |
| 12/5/2005 | Viral Load and T-Cell Profile scheduled for this date but did not occur until December 16, 2005.  Defs.' Local Rule 56(a)1 Stmt. ¶¶139-40. | | |

| 12/16/2005 Defs.' Local Rule 56(a)1 Stmt. ¶¶195-96; Ex. J, Infectious Disease Problem Report at DEF_000011. | 623 | 33.9% | 22,500 copies/ml |
|---|---|---|---|
| February 2006 | Test for Viral Load was scheduled but did not occur until April, when the test for CD4 had been scheduled.  Defs.' Local Rule 56(a)1 Stmt. ¶¶185-86. | | |
| 4/4/2006 Defs.' Local Rule 56(a)1 Stmt. ¶¶227-28; Ex. J, Infectious Disease Problem Report at DEF_000011; Ex. 25, Daily Report dated 4/4-5/2006 at 0148. | 567 | 28.7% | 93,500 copies/ml |
| 4/24/2006 | Dr. O'Halloran begins ARV treatment.  Defs.' Local Rule 56(a)1 Stmt. ¶250. | | |
| 6/12/2006 Ex. J, Infectious Disease Problem Report at DEF_000011. | 814 | N/A | <400 copies/ml |

As the chart shows, when Mr. Parks stopped taking his ARVS, his T4/CD4 Count decreased from 779 to a low of 567.  His Viral Load Assay also increased during the same period from 100 to a high of 93,500 copies per ml.  When he resumed the medication, his Viral Load Assay declined to under 400 copies per ml two months later and stayed under 50 copies per ml for the next several months.  Ex. 25, Infectious Disease Problem Report, 56.  His T4/CD4 count also rose to 814 after he resumed treatment.

During the time he was not taking his ARVs, Mr. Parks also claims that he experienced a "significant increase" in the risk of opportunistic disease and damage to the immune system that

would have been prevented had he continued to receive his HIV/AIDS medications.  Pl's Counterstmt. ¶ 7, ECF No. 234 (citing Ex. B, Dr. Edlin Decl. ¶ 32, ECF No. 233-1).  Mr. Parks also contends that the fact that he had both HIV/AIDS and Hepatitis C increased his need for ARV treatment.  *Id.* ¶¶ 5-6.  Defendants admits that patients who have a lower CD4 count are at a higher risk for opportunistic illness.  Defs.' Local Rule 56(a)1 Stmt. ¶484, ECF No. 219-1; Ex. 4, Dieckhaus Aff. ¶27.

Mr. Parks claims that not taking his ARVs caused him to suffer "physical ailments, including thrush, diarrhea, and night sweats" and has presented evidence from his own recollections and his medical records supporting this contention.  Pl.'s Counterstmt. ¶ 8, ECF No. 234; *see* Ex. C Parks Decl. ¶¶ 45, 51, 55, 65; Ex. J, Clinical Record notes dated 1/18/2006, 1/22/2006, 1/25/2006, DEF_1652-53 (noting Mr. Parks had diarrhea); Ex. D Dieckhaus Dep. 101:7-9, 106:9-11 (noting that Mr. Parks complained of thrush and that a nurse saw two small white patches on December 9, 2005 which Defendants' expert, Dr. Kevin Dieckhaus, believed could have been thrush); Ex. 25, Clinical Record Notes dated 12/9/05, 113 (noting that Mr. Parks was complaining of thrush and noting the observance of "2 small white patches" at 8:40 am); Ex. B, Edlin Decl. ¶35 (noting that "Mr. Parks's medical records document that he suffered physical ailments, including thrush, diarrhea, and night sweats, during the time he was denied his antiretroviral medications."); Ex. 25, Clinical Record Notes dated 4/3/2006, 149 (noting Mr. Parks complaining about thrush and sores).[16]

---

[16] On January 5, 2006, Dr. Blanchette noted that Mr. Parks complained of thrush that day and that he failed to observe any.  Ex. 25, Clinical Record Notes dated 1/5/2006, 133.  Otherwise, the Court has not found any indication in the medical records that Dr. Blanchette examined Mr. Parks while he was complaining of physical symptoms and did not observe those symptoms.  Dr. Blanchette testified that he recalls Mr. Parks's complaints of diarrhea and thrush but does not recall any complaints of night sweats and elevated temperatures.  Ex. E, Blanchette Dep. 92:7-17.

Finally, Mr. Parks also claims that the denial of his HIV/AIDS treatment exacerbated his

"anxiety and other health issues," which manifested in physical symptoms "including night

sweats, diarrhea and thrush."  Pl.'s Counterstmt. ¶ 19, ECF No. 234; Ex. C, Parks Decl. ¶ 66, 77

("I was upset that I had been experiencing these symptoms and anxious because I was not on my

HIV meds… I was extremely upset and worried that my viral loads had gotten so high."); *see*

*also e.g.,* Ex. 25, Clinical Record Notes at 102 (anxiety, fear and tension observed on 8/21/2005),

at 108 ("agitation" observed on 11/23/2005), at 133 (describing Mr. Parks's "major focus" on

1/5/2006 was to be placed back on ARVs and noting fears about increasing T4 and Viral Load

counts).

### 2.  Mr. Parks's Treatment for Hepatitis C

The treatment Mr. Parks sought for his Hepatitis C was known as Interferon, which is

administered typically over a twelve-month period.  Defs.' Local Rule 56(a)1 Stmt. ¶ 232, 288,

305, ECF No. 219-1.  To receive this treatment while in DOC custody, Mr. Parks needed to

obtain approval of the HepCURB, a committee consisting of three board-certified infectious

disease specialists[17] who review and approve the requests of treating doctors for diagnostic work

or treatment for inmates infected with Hepatitis C.  Ex. Q, UConn and DOC Hepatitis C

Management & Treatment, effective 12/10/2002 at 1 [*hereinafter* "Hepatitis C Guidelines"];

Defs.' Local Rule 56(a)1 Stmt. ¶ 21, ECF No. 219-1.

DOC policy sets out the following sequence of events to guide how treatment of an

inmate with Hepatitis C should proceed.  Upon testing positive for the Hepatitis C virus, an

inmate first must undergo an initial evaluation by his primary care provider, which consists of

blood and liver function tests.  Ex. Q, Hepatitis C Guidelines 1-2.  The policy provides that the

---

[17] Dr. Blanchette testified that he, Dr. John Gittzus, and Dr. Fred Altice were members of the HepCURB.  Ex. E, Blanchette Dep. 13:3-8.

primary care provider "shall withhold any referral to the Infectious Disease Specialist ('IDS')

until court sessions have concluded and the offender has been sentenced" and until two complete

blood count and two liver function tests spaced at least 6 months apart "are available and

consistent with active liver disease." *Id.* at 2.  Once a case is referred to an IDS, he should

evaluate the individual for potential Hepatitis C treatment, conducting a series of tests to

determine the suitability of the treatment, including a mental health assessment.  *Id.* at 2-5.  A

psychiatrist must conduct the mental health assessment, if the patient is classified as a level 3 in

mental health or higher.  *Id.* at 4.  "If the results of the mental health assessment do not indicate

any increased psychological risk, the IDS may then initiate a referral" to the HepCURB to

request treatment.  *Id.* at 4.

      In deciding whether an inmate may receive treatment, the HepCURB reviews various

forms submitted with each request, including a mental health screening and any written opinions

provided by a psychiatrist. *Id.* at 5.  It is undisputed that the treatment for Hepatitis C Plaintiff

sought, Interferon, was known to have neuropsychiatric side effects, including "depression, and,

in rare cases suicide."  Defs.' Local Rule 56(a)1 Stmt. ¶180, ECF No. 219-1; Ex. B, Edlin Decl.

¶48.  DOC policy notes that "[i]n general, the HepCURB will follow the specific

recommendations of the Center for Disease Control (CDC) and the National Institute of Health

(NIH) regarding Hepatitis C management and treatment currently in force at the time of the

offender review."  Ex. Q, Hepatitis C Guidelines 1.  It also notes that "[t]he HepCURB will not

generally approve Hepatitis C therapy unless there is a reasonable likelihood that the offender

will remain under CDOC supervision for the entire duration of treatment period."  *Id.* at 6.

      Protocol at the time prohibited a patient's treating physician from participating in a vote

on his or her application for treatment.  Defs.' Local Rule 56(a)1 Stmt. ¶22, ECF No. 219-1.  Dr.

Blanchette attended and participated in the discussion that occurred during all of the meetings in which Mr. Parks's readiness for Hepatitis C treatment was evaluated, as a sitting member of the HepCURB at the time.  *See* Defs.' Local Rule 56(a)2 Stmt. ¶¶239-41, ECF No. 219-1; Pl.'s Local Rule 56(a)2 Stmt. ¶241, ECF No. 234; *see also* Ex E, HepCURB Minutes dated 5/10/2006, 4/24/2007, 8/8/2007, 006143-44, 006147-51 (noting that Dr. Blanchette was present at each of these meetings during which a vote on Mr. Parks's readiness for treatment was taken). But, as will be described further below, Dr. Blanchette denies violating this protocol because he did not vote on Mr. Parks's readiness for treatment when he was actively treating him; he only voted on Mr. Parks's readiness for treatment after he had stopped actively treating him.  *See* Defs.' Local Rule 56(a)2 Stmt. ¶¶239-41, ECF No. 219-1; Pl.'s Local Rule 56(a)2 Stmt. ¶241, ECF No. 234.  Dr. Blanchette also testified that the HepCURB votes were "almost always" unanimous and that he does not recall an instance where the vote was not unanimous.  Ex. E, Blanchette Dep. 198:16-199:9, 211:4-17.

Mr. Parks claims that he first discussed his need for treatment for Heptatitis C during his initial June 2004 meeting with Dr. Blanchette.  Ex. C, Parks Decl. ¶ 17.  Dr. Blanchette's Clinical Record notes from this visit do not memorialize this request or mention Hepatitis C.  Ex. 25, Clinical Record Notes dated 6/21/2004 at 0063.  On November 4, 2004, while he was at Bridgeport Correctional Center, Mr. Parks reported that he was in pain from Hepatitis C.  Defs.' Local Rule 56(a)1 Stmt. ¶99, ECF No. 219-1.[18]  On November 8, 2004, Mr. Parks met with Dr. Blanchette and made a request for Hepatitis C treatment.  *Id.* ¶¶107, 113-16.  According to the Clinical Record notes from this visit, Dr. Blanchette explained to Mr. Parks the "Department of

---

[18] Defendants question Plaintiff's credibility regarding the pain he complained of being related to Hepatitis C and indicate that they believe it was related to his drug-seeking behavior.  Defs.' Local Rule 56(a)(1) Stmt. ¶¶101-106, ECF No. 219-1; see also Ex. E, Blanchette Dep. 89:7-10 (noting that Hepatitis C is a "very asymptomatic disease").  Given that Defendants' Motion for Summary Judgment is before the Court, all possible inferences will be drawn in favor of the Plaintiff.  *See Kaytor v. Elec. Boat Corp.*, 609 F.3d 537, 546 (2d Cir. 2010)

Correction protocol regarding Hepatitis C evaluation and treatment," meaning that he could not be treated until he was sentenced. *Id.* ¶113; Ex. J, Clinical Record Notes dated 11/8/2004 at DEF_001283. Dr. Blanchette's notes from this meeting indicate that he understood that Mr. Parks was "held on one half million dollar bond robbery 1st" and that he "probably" had "chronic active hepatitis." Ex. E, Blanchette Dep. 54:4-59:24; Ex. J, Clinical Record Notes dated 11/8/2004 at DEF_001283.[19] During the November 8, 2004 visit, Dr. Blanchette did not begin the process, as laid out in the DOC policy, of examining Mr. Parks to assess his suitability for Hepatitis C treatment; his notes indicate that he "will wait to see [patient] sentenced, then will submit to UXC for liver [biopsy]." Ex. J, Clinical Record Notes dated 11/8/2004, DEF_001283; Ex. E Blanchette Dep. 59:5-24 (interpreting his November 8, 2004 notes).

On July 12, 2005, Dr. Blanchette reiterated that he would begin Mr. Parks on Hepatitis C treatment as soon as he was sentenced. Defs.' Local Rule 56(a)1 Stmt. ¶¶144-45, ECF No. 219-1; Ex. 25, Clinical Record Notes dated 7/12/2005 at 0101. After Mr. Parks began serving his sentence in September 2005, Dr. Blanchette met with Mr. Parks on December 1, 2005 and began the process of evaluating him for Interferon treatment by having him fill out the Initial HCV Functional Status Report and referring him for a Mental Status Evaluation. Defs.' Local Rule 56(a)1 Stmt. ¶¶ 175, 181-84, ECF No. 219-1. Dr. Blanchette's notes from this meeting reflect, for the first time, concerns about the impact of Mr. Parks's mental health on his ability to receive treatment for Hepatitis C. *Id.* ¶¶176-80, 184*;* Ex. 25, Clinical Record Notes dated 12/1/2005 at 0111 ("I am particularly concerned about his mental status while on [ ]interferon as his bipolar

---

[19] Mr. Parks argues that this delay in his treatment was not justified under the DOC policy, because the policy only prohibits patients from being referred to IDS if they had not yet been sentenced and Mr. Parks was already seeing Dr. Blanchette, an IDS. Pl.'s Local 56(a)2 Stmt. ¶¶ 115-16, ECF No. 234. Dr. Blanchette explained that the policy prohibited the administration of Hepatitis C treatment before trial because a number of pre-trial patients "might have problems with agitation and exacerbation of their mental health issues" which could impact their ability to defend themselves. *See* Ex. E, Blanchette Dep. 57:7-25. As will be explained in footnote 20 below, because this conduct occurred before September 2005, it is not a basis for his claim but rather factual background.

disorder with depression + anxiety is not always well-controlled.").  Despite the content of the notes, Mr. Parks has denied that Dr. Blanchette mentioned any concern about mental health at this meeting.  Pl.'s Local Rule 56(a)2 Stmt. ¶172, ECF No. 234.

On January 5, 2006, Dr. Blanchette met with Mr. Parks and reiterated that "his tenuous mental health status, esp[ecially] his volatility, may be an issue."  Ex. 25, Clinical Record Notes dated 1/5/2006, at 133; Defs.' Local Rule 56(a)1 Stmt. ¶¶198-99, 207-208 ECF No. 219-1; Ex. 25, Initial Evaluation of Hepatitis C Infection dated 1/5/2006, 0130-31 (noting under "significant medical or psychological problems" that Mr. Parks had "severe antisocial personality D/O," "schizo-affective D/O," and "bipolar D/O").  Consistent with this observation, the psychiatrist, Dr. Lewis, met with Mr. Parks on February 22, 2006 and March 29, 2006 and noted that he had "GAD, paranoia, hypomania, [and] anxiety" but observed that he was "doing well."  Defs.' Local Rule 56(a)1 Stmt. ¶¶ 209-10, 214-216, ECF No. 219-1; Ex. 25, Clinical Record Notes dated 2/22/2006, 138.

Dr. Blanchette met with Mr. Parks on April 4, 2006.  Defs.' Local Rule 56(a)1 Stmt. ¶217, ECF No. 219-1.  The parties dispute the authenticity and, therefore, the admissibility of Dr. Blanchette's notes from that visit, which Dr. Blanchette claims to have typed into a memorandum.  Pl.'s Local Rule 56(a)2 Stmt. ¶219, ECF No. 234 (disputing the authenticity of Clinical Record Notes dated April 4, 2006, available at Ex. 25 at 0147).  On April 6, 2004, Dr. Lewis's Clinical Record notes indicate that the patient was requesting to be on Interferon but that he was "currently not a candidate for this protocol at this time."  Ex. 25, Clinical Record Notes dated 4/6/2014 at 0149; Defs.' 56(a) Stmt. ¶¶232-33.  Dr. Lewis notes that she was referring Mr. Parks to mental health housing and that once "that condition is stabilized (if it is stabilized)

formal assessment for Interferon [ ] be conducted."  Ex. 25, Clinical Record Notes dated
4/6/2014 at 0149.

On April 10, 2006, Dr. Blanchette submitted his recommendation to the HepCURB that
Mr. Parks not receive Hepatitis C treatment, which noted that "[b]oth Dr. Blanchette & Dr.
Lewis/psychiatrist agree [patient] is extremely poor candidate for HCV Rx."  Ex. E, Treatment
Recommendation dated 4/10/2005 at 006083.  Consistent with this recommendation, Dr.
Blanchette testified in his deposition that he made this decision because he believed Mr. Parks
needed to be "stabilized at Garner" before beginning the Hepatitis C treatment.  Ex. E,
Blanchette Dep. 138:15-139:22.  He also noted that, in making the recommendation, he relied on
the conclusion of Dr. Lewis that Mr. Parks's psychological state indicated he was not ready for
treatment.  *Id.*  The HepCURB denied Mr. Parks Hepatitis C treatment on May 10, 2006, noting
that he had a "psychiatric contraindication" and suggesting that the patient be monitored.  Ex. E
at 4-5, Treatment Recommendation dated 4/10/2005 at 006084-85; *see also* Ex. E at 6-7,
Minutes from HepCURB dated 5/10/2006, 006143-44 (noting with respect to Mr. Parks "[c]lear-
cut psychiatric contraindication to treatment noted after ID & psych eval").

Dr. Blanchette was a sitting member on the HepCURB when this initial treatment
decision was made, but he denies voting on Mr. Parks's application on May 10, 2006 because he
was Mr. Parks's treating physician at the time.  Defs.' Local Rule 56(a)1 Stmt. ¶240, ECF No.
219-1; *see also* Ex. E, Blanchette Dep. 13:9-14:7.  Mr. Parks does not offer any evidence that Dr.
Blanchette voted at this particular meeting.  Dr. Blanchette also testified that he was present and
participated in the discussion of Mr. Parks that took place at this meeting, even though he did not
vote.  Pl.'s Local Rule 56(a)2 Stmt. ¶240, ECF No. 234; Ex. E, Blanchette Dep.196:10-20.

On April 24, 2006, Mr. Parks met with Dr. O'Halloran, who Mr. Parks claims indicated at the time that he would recommend Mr. Parks for Hepatitis C treatment.  Ex. C, Parks Decl. ¶¶83-86.  After this meeting, Dr. O'Halloran submitted a "Non-Formulary or Restricted Drug Request" dated June 20, 2006 asking that Mr. Parks receive Interferon treatment.  Ex. J, Non-Formulary or Restricted Drug Request, DEF_001543.  This request was denied on June 26, 2006, because Mr. Parks had been "[t]urned down by  Hep Curb."  *Id.*

Dr. O'Halloran submitted a request for a liver biopsy to the HepCURB on February 27, 2007, to assess Mr. Parks's readiness for Interferon.  Ex. 25, Utilization Review Report dated 4/3/2007, 0189.  In April 2007, the HepCURB met again to consider this request for treatment and decided that "[i]n view of discrepancy between prior and current psychiatric eval, and between current psych eval and functional status report," Mr. Parks should receive a second psychiatric evaluation.  *Id.*; Ex. E, HepCURB Minutes dated 4/27/2007 at 006148.  On August 3, 2007, the HepCURB noted that the panel was "still concerned about psych issues" and would request an opinion from Dr. Berger.  Ex. 25 Utilization Review Report dated 8/3/2007, 0190.  The minutes from a meeting on August 8, 2007 memorialize the same concerns.  Ex. E at 9, HepCURB Minutes dated 8/8/2007, 006151.

Dr. Berger cleared Mr. Parks for a biopsy on August 23, 2007, and his liver was biopsied on October 17, 2007.  Ex. E, HepCURB Minutes dated 8/8/2007 at 006151; Defs.' Local Rule 56(a)1 Stmt. ¶ 287, ECF No. 219-1; Ex. 25, Consultation Form dated 10/17/2007, 194.  The HepCURB met again on November 29, 2007 and approved Mr. Parks for twelve months of Interferon treatment on December 3, 2007.  Ex. 25, Utilization Review Committee dated 11/29/2007, 0195; Ex. E, HepCURB Minutes dated 11/29/2007 at 006152-53; Defs.' Local Rule 56(a)1 Stmt. ¶305, ECF No. 219-1.  Mr. Parks began his Hepatitis C treatment on April 16,

2008.  Defs.' Local Rule 56(a)1 Stmt. ¶ 312, ECF No. 219-1.  This treatment failed and was

discontinued on August 7, 2008.  *Id.* ¶ 313.

At various times from October 2005 through February 2006 and into 2007, Mr. Parks's

Clinical Record and his own testimony indicates that he experienced pain in the abdomen or

tenderness over the liver area.  *See* Ex. J, Clinical Record Notes dated 1/27/2006, DEF_001652;

Ex. C, Parks Decl. ¶¶44, 65, 70, 97; *see also* Ex. B, Edlin Decl. ¶70 (noting that the medical

record reflects that Mr. Parks suffered abdominal pain consistent with suffering from Hepatitis C

during the time Interferon was not being provided to him).  Dr. Blanchette was aware of these

complaints.  Ex. E, Blanchette Dep. 107:1-14 (noting that he would have had access to

documents chronicling Mr. Parks's complaints of pain).

Mr. Parks also contends that he suffered liver damage and deterioration during the time

he was denied treatment, particularly as shown by the biopsy of his liver that occurred in October

2007.  *See* Ex. B, Edlin Decl. ¶60 (noting that based on his review of Mr. Parks's medical

records, a biopsy in October 2007 showed "extensive fibrosis" at stage 4/5 out of 6), ¶69 (noting

that without proper treatment "[i]t is very likely that Mr. Parks's liver continued to deteriorate

and that he continued to lose normal liver tissue.").  Defendants do not dispute the results of the

October biopsy but categorize the fibrosis as "moderate."  Defs.' Local Rule 56(a)1 Stmt. ¶446,

ECF No. 219-1.  They also do not contest that Mr. Parks was suffering some level of liver

damage and, when considering this factor alone and apart from any other health concerns, that he

was a candidate for Interferon treatment.  Ex. 1, Wu Aff. ¶¶15-16; Ex. E, Blanchette Dep.

246:21-23.

Mr. Parks also claims that the delay in his treatment for Hepatitis C harmed him because

it decreased the likelihood of success for the treatment.  Pl.'s Counterstmt. ¶¶ 13-15, 17, ECF

No. 234; *see also* Ex. B, Edlin Decl. ¶¶60-61, 67-69, 74.  Both sides agree that the rate at which

Hepatitis C progresses is accelerated in patients co-infected with HIV/AIDS and Hepatitis C,

"increasing the risk of hepatocellular carcinoma and end-stage liver failure."  Pl.'s Counterstmt.

¶ 10, ECF No. 234; Ex. B, Edlin Decl. ¶¶38, 75; Ex. D, Dieckhaus Dep. 12:5-15 ; Ex. 1, Wu Aff.

¶7.  Both sides also agree that a delay in treating Hepatitis C infections is generally ill-advised

but disagree about whether the delay negatively impacted Mr. Parks in a "measurable" way.  *See*

Ex. 1, Wu Aff. ¶18; Ex. B, Edlin Decl. ¶¶45, 58, 60-61, 67-71.

Mr. Parks also claims that the denial of Hepatitis C treatments exacerbated his "anxiety

and other health issues."  Pl.'s Counterstmt. ¶ 19, ECF No. 234.  Mr. Parks notes that his Viral

Load rose to 199,000 in December 2007 as a result of the anxiety he felt while he was not

receiving Hepatitis C treatment.  Pl's Local Rule 56(a)2 Stmt. ¶307, ECF No. 234; *see also* Ex J

at 5, Infectious Disease Problem Report, DEF_000011.

### F.  Legal Analysis of Deliberate Indifference Claims

Mr. Parks claims under 42 U.S.C. §1983 that Dr. Blanchette denied him necessary

medical treatment for HIV/AIDS from July 12, 2005 to April 24, 2006 and for Hepatitis C from

September 19, 2005[20] to April 16, 2008[21] and was, therefore, deliberately indifferent to Mr.

Parks's medical needs.  Section 1983 enables a plaintiff to bring a cause of action for "redress"

---

[20] In his Amended Complaint, Mr. Parks claims that he was improperly denied treatment for Hepatitis C from
November 2004 to April 2008. Am. Compl. ¶¶16, 37, ECF No. 146.  At oral argument on Defendants' Summary
Judgment Motion, however, Mr. Parks's counsel indicated that his claim was based on the denial of Hepatitis C
treatment after Mr. Parks was sentenced, and that conduct before this time was only factual background for his
claim.  Mr. Parks was sentenced in June 2005 and began serving that sentence in September 2005. Ex. J, Judgment,
003587.  Accordingly, the basis for Mr. Parks's Hepatitis C claim begins on September 19, 2005, after he began
serving his sentence, and runs through April 16, 2008, when Mr. Parks received Interferon treatment.

[21] Defendants argue that Dr. Blanchette stopped directly treating Mr. Parks on April 19, 2006 when Dr. O'Halloran
took over the care of the plaintiff.  Defs' Br. 14, ECF No. 219-2.  They contend, therefore, that Dr. Blanchette
cannot be liable for any treatment decisions made after that date.  *Id.*  The Court disagrees.  It is undisputed that Dr.
Blanchette had supervisory roles across the entire DOC with respect to the administration of HIV/AIDS and
Hepatitis C treatment after April 19, 2006 and that he participated in the HepCURB votes about Mr. Parks after this
date as well.  Thus, he was involved in the denial of treatment after April 2006, even though he was no longer Mr.
Parks's treating physician.

against any person who, under color of state law "subjects, or causes to be subjected, any citizen

of the United States… to the deprivation of any rights, privileges, or immunities secured by the

Constitution and laws."  42 U.S.C. §1983.  The Supreme Court has held that deliberate

indifference to a prisoner's serious medical need constitutes unnecessary and wanton infliction of

pain in violation of the Eighth Amendment, as made applicable to the states by the Fourteenth

Amendment.  *See Estelle v. Gamble*, 429 U.S. 97, 104 (1976).  Accordingly, such claims are

actionable under section 1983.

To prevail on a deliberate indifference claim, a plaintiff must prove both objective and

subjective elements.  *Salahuddin v. Goord*, 467 F.3d 263, 279-81 (2d Cir. 2006).  The Court will

analyze each element with respect to HIV/AIDS and Hepatitis C in turn.

### 1.   Objective Element

The objective, "'medical need' element measures the severity of the alleged deprivation"

of medical care.  *Smith v. Carpenter*, 316 F.3d 178, 183-84 (2d Cir. 2003) (citations omitted).  In

assessing the objective prong, the Court must determine (a) "whether the prisoner was actually

deprived of adequate medical care," and (b) "whether the inadequacy in medical care is

sufficiently serious" to constitute a constitutional violation.  *Salahuddin*, 467 F.3d at 279-80.

These inquiries are highly fact-specific.  *See Smith*, 316 F.3d at 185 (citation omitted).

On part (a) of the test, the Second Circuit has explained that

> the Supreme Court has noted [that] the prison official's duty is
> only to provide reasonable care.  Thus prison officials who act
> reasonably [in response to an inmate-health risk] cannot be found
> liable under the Cruel and Unusual Punishments Clause, and,
> conversely, failing to take reasonable measures in response to a
> medical condition can lead to liability.

*Salahuddin*, 467 F.3d at 279-80 (citations and internal quotation marks omitted).
Accordingly, a plaintiff must establish that he was denied reasonable care or "reasonable measures" in response to a medical condition.

On part (b), the Court must "examine how the offending conduct is inadequate and what harm, if any, the inadequacy has caused or will likely cause the prisoner." *Id.* at 280 (citation omitted). For an ailment to qualify as sufficiently serious, typically, the Eighth Amendment contemplates "'a condition of urgency' that may result in 'degeneration' or 'extreme pain.'" *Chance v. Armstrong*, 143 F.3d 698, 702 (2d Cir. 1998) (citation omitted). In determining the severity of the medical need, the Court looks a variety of factors, including but not limited to whether the impairment is one that a reasonable doctor or patient would find important and worthy to treat, whether the condition affects the daily activities of an individual, and whether the condition is accompanied by chronic and substantial pain. *Id.* at 702-703 (citations omitted). It may also consider "the absence [or type] of adverse medical effects or demonstrable physical injury" as well as any unreasonable and very likely risk of future harm, even if physical harm is not currently present. *Smith*, 316 F.3d at 187-88 (citations omitted); *Salahuddin*, 467 F.3d at 280; *see also Helling v. McKinney*, 509 U.S. 25, 35 (1993) (finding the potential future health risk caused by exposure to second hand smoke could form the basis for relief under the Eight Amendment).

In cases where interruption of treatment is at stake (as compared to no treatment at all), the Court must consider the harm or the risk of harm faced by a prisoner due to this temporary deprivation, rather than the nature of the underlying condition itself. *Smith*, 316 F.3d at 185-86.

### a.  HIV/AIDS

Regarding HIV/AIDS, Defendants argue that since Mr. Parks only experienced an interruption in treatment, rather than a complete absence of treatment, the Court cannot consider the symptoms of the underlying condition HIV/AIDS in assessing the objective prong.  Defs.' Br. 28, ECF No. 219-2. They also argue that the medical deprivations Mr. Parks endured were not "sufficiently serious" because he has not suffered "any serious or permanent injury as a result." *Id.* at 28-30.  Defendants also contend that because all of Mr. Parks's injuries pre-date Dr. Blanchette's medical treatment, they cannot have been caused by Dr. Blanchette. *Id.* at 29. Mr. Parks argues that the Court should look at the condition as a whole, rather than the impact of an interruption in treatment, because the ARV medication was denied for such a long period of time.  Pl.'s Opp. Br. 50-52, ECF No. 232.  He argues that AIDS is a very serious ailment that satisfies the objective prong. *Id.*

The Court finds that Dr. Blanchette's decision to withhold HIV/AIDS medication for ten months, particularly given that Mr. Parks's blood levels were being monitored during this time, cannot be categorized as a complete denial of treatment.  Instead, it is a temporary cessation of a particular treatment, namely the administration of prescription medication.[22]  Considering the effects of a temporary cessation of ARV medication, *Smith*, 316 F.3d at 185-86, the Court finds that Mr. Parks has created a genuine question of material fact as to whether the denial of ARVs for his HIV/AIDS satisfies the objective prong.

---

[22] It does appear that Mr. Parks's blood work was not always taken as scheduled when he was not taking his ARVs. However, this fact, without more, does not show that he was not being treated for his HIV but rather that he may have been receiving irregular treatment.  Such irregular treatment may substantiate a medical malpractice claim, but not necessarily a deliberate indifference claim. *See Hathaway v. Coughlin,* 99 F.3d 550, 554 (2d Cir. 1996) (noting that the inadvertent failure to provide medical care does not constitute an Eighth Amendment violation) (citation omitted).  There is also no evidence that the irregular administration of blood tests Mr. Parks experienced was the result of Dr. Blanchette's alleged deliberate indifference.

Plaintiff's expert, Dr. Brian Edlin, has noted that the risks of episodic interruptions in ARV medication administration include: "significantly increased" risk of "opportunistic disease and death," a negative impact on Mr. Parks's mental health, and the potential to severely disable his immune system (since he had a history of pneumocysistis carinii pneumonia).  Ex. B, Edlin Decl. and Exhibits, Ex. A, Edlin Rep. at 5-8.  Accordingly, there is record evidence linking the cessation of Mr. Parks's ARV medication to an increased risk of future and possible current harm.  Mr. Parks also has presented evidence from his medical records and his own recollection that he suffered from physical symptoms while he was not taking his ARV medication, such as thrush, diarrhea, night sweats, and spikes in body temperature, indicating that his HIV/AIDS was becoming more active.

When construing all ambiguities in Mr. Parks's favor, this evidence is sufficient to demonstrate the existence of a genuine issue of material fact as to whether the interruption of his HIV/AIDS medication satisfies the objective element of a deliberate indifference claim.  *See Leavitt v. Corr. Medical Servs.*, *Inc.,* 645 F.3d 484, 500-501 (1st Cir. 2011) (finding that a triable issue of fact existed on a deliberate indifference claim where a doctor did not re-initiate ARV treatment after plaintiff's viral load had risen to 143,000 and as a result plaintiff was "likely to be susceptible to opportunistic infections [ ] in the future" and experienced physical symptoms from his HIV including thrush, "nightsweats, chills fevers, fatigue… vomiting and constipation"); *see also Mastroianni v. Reilly*, 602 F. Supp. 2d 425, 438 (E.D.N.Y. 2009) (denying plaintiff prescription medications for high blood pressure, heart condition, and diabetes over a two-year period created a question of material fact on objective prong of deliberate indifference claim).

Defendants' argument that Mr. Parks suffered from these conditions before Dr. Blanchette stopped his ARV medication in July 2005 does not change the Court's conclusion.

37

This case involves symptoms of a progressive disease, which, if treated, subside rather than disappear entirely.  The fact that Mr. Parks has suffered from them at some point in his life does not mean that removing him from ARV medication did not cause the symptoms to recur. Accordingly, Mr. Parks has created a genuine question of material fact on the objective prong with respect to his HIV/AIDS deliberate indifference claim.

### b.  Hepatitis C

Dr. Blanchette's decision to withhold Interferon treatment for Hepatitis C from Mr. Parks for two and a half years was not a delay in treatment but a complete denial of that treatment.  Mr. Parks was not receiving any other kind of care for his Hepatitis C, other than pain management. As such, the Court may consider the nature of the illness itself in determining whether it is "sufficiently serious."  *Smith*, 316 F.3d at 186.  It is well-established that Hepatitis C is sufficiently serious to satisfy the objective prong of the test for deliberate indifference.  *See Hilton v. Wright*, 928 F. Supp. 2d 530, 547-48 (N.D.N.Y. 2013) (noting that it is "well-established that HCV is a serious medical condition.") (citing *Hatzfield v. Eagen*, No. 9:08-cv-283, 2010 WL 5579883, at *10 (N.D.N.Y. Dec. 10, 2010) (collecting cases)).

Even if Dr. Blanchette's actions are characterized as a delay in treatment, rather than a complete denial, a reasonable fact-finder still could conclude that the consequences of that delay were sufficiently serious to satisfy the objective prong.  *See Salahuddin*, 467 F.3d at 281 (finding that plaintiff made a sufficient case on the objective prong where a prison official "postpone[d] for five months a course of treatment for an inmate's Hepatitis C.")  Plaintiff's expert, Dr. Edlin, has indicated that a delay in treatment for Hepatitis C decreases its effectiveness.  Other courts have found that evidence of a delay that decreases the effectiveness of a treatment creates a genuine question of material fact on the objective prong of the deliberate indifference inquiry,

even in the absence of evidence of physical injury.  *See e.g., Ippolito v. Goord*, No. 05-CV-6683

(MAT), 2012 WL 4210125, at *11-12 (W.D.N.Y. Sept. 19, 2012) (finding that evidence of a

seven to nine year delay in receiving HCV treatment, given expert testimony that early treatment

presented a better chance or arresting the disease's progression, was sufficient to raise a triable

question of fact on the objective prong); *DiChiara v. Wright*, No. 06-cv-6123 (KAM)(LB), 2011

WL 1303867, at *7-8 (E.D.N.Y. Mar. 31, 2011) (finding the same given a one-year delay in

Hepatitis C treatment and similar expert testimony). Accordingly, Mr. Parks has introduced

evidence sufficient to raise a genuine question of material fact as to whether the delay in

receiving Hepatitis C treatment was sufficiently serious.

### 2.  Subjective Element

Because Mr. Parks has raised a genuine question of material fact on the objective prong,

with respect to both his HIV/AIDS and Hepatitis C, the Court may proceed to analyze the

subjective aspect of Mr. Parks's deliberate indifference claim.  The subjective element of the

deliberate indifference inquiry is intended to assess whether a defendant acted with a

"sufficiently culpable state of mind."  *Salahuddin*, 467 F.3d at 280 (citation omitted).  To prevail

on this element, a plaintiff must prove that the official in question operated recklessly or that he

knew of and disregarded "an excessive risk to inmate health or safety."  *Farmer v. Brennan*, 511

U.S. 825, 836-37 (1994) (defining the state of mind for deliberate indifference as "lying

somewhere between the poles of negligence at one end and purpose or knowledge at the other"

and noting that it is "routinely equated… with recklessness") (citations omitted).  The defendant

"need not desire to cause such harm or be aware that such harm will surely or almost certainly

result.  Rather, proof of awareness of a substantial risk of the harm suffices."  *Salahuddin*, 467

F.3d at 280 (citation omitted).  He must also be "subjectively aware" that his conduct creates that

risk. *Id.* at 281 (citing *Farmer*, 511 U.S. at 837). Mere negligence or disagreement over proper treatment does cannot sustain a deliberate indifference claim as long as the treatment provided was adequate. *Id.* at 280; *Chance*, 143 F.3d at 703 (citation omitted). Instead, to sustain a deliberate indifference claim, the defendant's conduct must be "repugnant to the conscience of mankind" or "incompatible with the evolving standards of decency that mark the progress of a maturing society." *Estelle*, 429 U.S. at 102, 105-06.

If medical judgment was consciously exercised, even if that judgment was "objectively unreasonable," the defendant's conduct does not constitute deliberate indifference. *See Salahuddin*, 467 F.3d at 280; *see also Harrison v. Barkley*, 219 F.3d 132, 139 (2d Cir. 2000) (noting that "mere malpractice" cannot substantiate a deliberate indifference claim and that identifying as examples of such conduct as "a delay in treatment based on a bad diagnosis or erroneous calculus of risks and costs, or a mistaken decision not to treat based on an erroneous view… or that the cure is as risky or painful or bad as the malady.") (citation omitted).

However, the Second Circuit also has recognized explicitly that some instances of "malpractice [ ] can rise to the level of deliberate indifference." *Hathaway*, 99 F.3d at 554. A number of district courts in this Circuit have interpreted this distinction to mean that "[m]edical decisions that are 'contrary to accepted medical standards,' may exhibit deliberate indifference, because the doctor has 'based his decision on something other than sound medical judgment.'" *Stevens v. Goord*, 535 F. Supp. 2d 373, 385 (S.D.N.Y. 2008) (citation omitted). These courts "have denied summary judgment where a reasonable jury could conclude that conduct 'was a substantial departure from accepted professional judgment and that the evidence of risk was

40

sufficiently obvious to infer the defendants' actual knowledge of a substantial risk to plaintiff.'" *Id.* at 385 (citation omitted).[23]

If a policy is used to justify the relevant decision, a defendant may not apply that policy mechanically in contravention of sound medical advice or without some consideration of the plaintiff's individual circumstance. The crucial question in this circumstance is not whether the policy is "generally justifiable" but whether "a jury could find that the application of the policy in plaintiff's case could have amounted to deliberate indifference to plaintiff's medical needs." *Johnson v. Wright*, 412 F.3d 398, 404 (2d Cir. 2005) (citation omitted). In other words, the jury must determine whether the defendants "sincerely and honestly believed that they were required to comply" with the policy and "that applying this policy was, in plaintiff's case, medically justifiable." *Id.*

### a. HIV/AIDS

Defendants argue that Mr. Parks merely disagreed with Dr. Blanchette's course of treatment, and, therefore, he cannot sustain a deliberate indifference claim. Defs.' Br. 17, 27, ECF No. 219-2. They also argue that Dr. Blanchette's choice to discontinue Mr. Parks's ARVs was well-supported by relevant medical literature and was a reasonable medical judgment, particularly in light of Mr. Parks's history of sporadically taking the ARVS when they were

---

[23] The Court considers this "substantial deviation" or "contrary to accepted medical standards" test consistent with Second Circuit jurisprudence. *See Hathaway*, 99 F.3d at 554; *see also Chance*, 143 F.3d at 703-04 ("In certain instances, a physician may be deliberately indifferent if he or she consciously chooses 'an easier and less efficacious' treatment plan.") (citation omitted). It is also worth mentioning this standard because the parties and their experts make arguments under it. However, this Court has not found a Second Circuit case explicitly applying this precise standard in these terms. Indeed, the Second Circuit has refused to reverse a jury verdict for the defendant where the district court refused to give a jury instruction that "'evidence of a substantial departure from accepted medical practice… may be considered in determining defendant's state of mind'" because the instruction failed to distinguish negligence, which could not justify a deliberate indifference action, from recklessness. *Rippy-El v. Makram*, No. 99-0321, 2000 WL 426202, at *2-3 (2d Cir. Apr. 14, 2000). Thus, the Second Circuit has left open the possibility that cases may exist where the substantial deviation standard helps determine whether a defendant acted recklessly but emphasized that the ultimate inquiry in deliberate indifference cases is the defendant's state of mind.

prescribed to him.  *Id.* at 18-21.[24]  In making this argument, they rely on Dr. Blanchette's own testimony, in which he explains the bases for his decisions, as well as the testimony of their HIV/AIDS expert, Dr. Dieckhaus, who concludes that Dr. Blanchette's decision was medically justifiable and met the standard of care at the time.  *See* Ex. 23, Blanchette Aff.; Ex. 4, Dieckhaus Aff. ¶¶95-96.  They also rely on Mr. Parks's T4/CD4 count, which they argue never reached the 350 count that would have justified ARV treatment.  Defs.' Br. 17, 18-21, ECF No. 219-2.  Moreover, they emphasize that the treating physician who decided to reinstate Mr. Parks's ARV medication, Dr. O'Halloran, specifically noted that based on Mr. Parks's T4 count, the HIV/AIDS Guidelines did not justify treating him with ARVs.  Thus, Defendants argue, this case represents a mere difference of medical opinion that does not rise to the level of deliberate indifference.

The Court agrees that Mr. Parks has failed to produce a genuine issue of material fact that Dr. Blanchette knew of and disregarded an excessive risk to his health and safety in taking him off of his ARVs.  The strongest evidence Mr. Parks has produced on this question is Dr. Edlin's expert report, which opines that Dr. Blanchette's decision to withhold ARV medication constituted a substantial deviation from the prevailing standard of medical care.  Ex. B, Edlin Decl. ¶4.[25]  Dr. Edlin justifies his conclusion in the following two ways: first, he looks to the HIV/AIDS Guidelines and second, he looks to Dr. Blanchette's failure to communicate with Mr. Parks.  The Court will address these two bases for his opinion in turn.

[24] It is undisputed that sporadic adherence to an ARV regimen can decrease its effectiveness by allowing the patient to develop a resistance to the therapy.  Defs.' Local Rule 56(a)1 Stmt. ¶¶496-502, ECF No. 219-1.  However, Mr. Parks disputes, as a matter of fact, that he sporadically took the medication.  *See e.g.,* Pl.'s Local Rule 56(a)(2) Stmt. ¶¶77-78, 127, ECF No. 234.  His expert, Dr. Edlin, also disputes that the medically appropriate way to handle a patient who takes his medication irregularly is to stop administering the medication altogether.  Ex. B, Edlin Decl. ¶¶17-18.

[25] This question of "substantial deviation" from the standard of care is only relevant because it may show that Dr. Blanchette based his decision on something other than sound medical judgment, indicating that he acted with deliberate indifference.  *See Stevens,* 535 F. Supp. 2d at 385.

In his report, Dr. Edlin relies on the HIV/AIDS Guidelines to identify two problems with Dr. Blanchette's course of treatment.  First, because Mr. Parks was experiencing physical symptoms of HIV/AIDS and had been diagnosed with an AIDS-defining illness, Dr. Edlin opines that he should have been taking his ARVs regardless of the CD4 and Viral Load Assay levels in his blood.  Ex. B, Edlin Decl. ¶¶16, 22, 35; HIV/AIDS Guidelines 6 ("Antiretroviral therapy is recommended for all patients with a history of an AIDS-defining illness… regardless of CD4+ T Cell count.").  In support of this conclusion, Mr. Parks has produced evidence from his recollections and the medical records that he suffered from physical symptoms of his HIV/AIDS infection progressing or becoming more active, such as diarrhea.  Moreover, the Guidelines also indicate that a patient suffering the physical symptoms that Mr. Parks claims to have experienced should have been taking ARV medication.  HIV/AIDS Guidelines 6, 44 n.* ("Antiretroviral therapy is recommended for all patients with… severe symptoms regardless of CD4+ T Cell count" and defining "severe symptoms" as including "unexplained fever of diarrhea >2-4 weeks, oral candidiasis, or >10% unexplained weight loss.").[26]

Second, Dr. Edlin argues that Mr. Parks never should have stopped taking his ARVS, because "no studies" at the time provided data to support this treatment decision, and the Guidelines indicate that a patient must be in a clinical trial to justify doing so.  Ex. B, Edlin Decl. ¶17-20, 35.  Both sides agree that Mr. Parks was not enrolled in a clinical trial at the time.  *See id.*; Ex. 4, Dieckhaus Aff. ¶78.

Neither of these issues shows that Dr. Blanchette violated the Guidelines.  The Guidelines themselves indicate that they are "only a starting point for medical decision-making" and that they "cannot substitute for sound medical judgment."  HIV/AIDS Guidelines 39.  Thus,

---

[26] Even the Defendants' expert concedes that if a patient were suffering these physical symptoms, they should have prompted a doctor to at least consider prescribing ARVs.  Ex. D, Dieckhaus Dep. 102:15-18;

even assuming Dr. Edlin is correct, his testimony about the Guidelines has not shown that Dr. Blanchette substantially deviated from the standard of care and, therefore, cannot have shown that he acted with deliberate indifference.  *See Graham v. Wright,* No. 01 Civ. 9613(NRB), 2004 WL 1794503, at *5 (S.D.N.Y. Aug. 10, 2004) (granting summary judgment for defendants because the plaintiff was unable to show that defendants' decisions "deviated from prevailing medical standards" so "there would be no basis for a jury to find that their [actions] support a claim of deliberate indifference.")

Mr. Parks presents no evidence from which a reasonable juror could infer that Dr. Blanchette knew that withholding ARV medication subjected Mr. Parks to an "excessive risk" of harm and disregarded that risk.[27]  *Farmer*, 511 U.S. at 836-37.  Given the Guidelines' equivocal language, the strongest inference that a reasonable juror could draw from Dr. Edlin's opinion in Mr. Parks's favor is that Dr. Blanchette was negligent, not that he was deliberately indifferent. Accordingly, Dr. Edlin's testimony fails to create a genuine issue of material fact on Mr. Parks's deliberate indifference claim.  *See Chance*, 143 F.3d at 703 (holding that accusations of negligence, "even if it constitutes medical malpractice," cannot alone sustain a deliberate indifference claim) (citation omitted); *Bowman v. Campbell*, 850 F. Supp. 144, 147-48 (N.D.N.Y. 1994) (granting summary judgment because expert testimony that defendants "deviated significantly from the appropriate standard of care" constituted "at most, a medical malpractice claim" that failed to rise to the level of deliberate indifference.).

---

[27] As discussed above, there is no factual basis for claiming that Dr. Blanchette would not prescribe ARV medication to Mr. Parks, if he believed it was medically necessary.  When Dr. Blanchette first began treating Mr. Parks in June 2004, he kept Mr. Parks on the ARV medication that had been prescribed to him until he was discharged from DOC custody in October 2004.  When Mr. Parks returned under his care, later that same month, Dr. Blanchette again prescribed ARV medication to him until deciding to discontinue the medication in July 2005, the course of treatment at issue in this lawsuit.

Dr. Edlin also claims that, if Dr. Blanchette was concerned about Mr. Parks taking his medication irregularly, he should have "discuss[ed] these concerns with Mr. Parks," and that the failure to do so was a substantial deviation from the standard of care.  Ex. B, Edlin Decl. ¶15. Assuming Dr. Edlin's testimony on this point is not conclusory, the Court has not found any case law – nor have the parties directed the Court to any case – to support the notion that Dr. Blanchette's alleged failure to discuss these concerns with Mr. Parks constitutes deliberate indifference as a matter of law.

Outside of Dr. Edlin's report, Mr. Parks cannot rely on Dr. O'Halloran's decision to restart the medication as evidence of Dr. Blanchette's deliberate indifference or that he should have been taking ARVs, because Dr. O'Halloran's own notes indicate that the guidelines did not mandate that he restart the medication.  Thus, the evidence does not indicate that Dr. O'Halloran disagreed with Dr. Blanchette's reasoning or course of treatment.  Nor can Mr. Parks rely on the fact that he suffered physical symptoms of his HIV/AIDS becoming more active, because he has failed to show that Dr. Blanchette knew of and disregarded these symptoms.  In fact, there is evidence in the record that Dr. Blanchette investigated Mr. Parks's complaints about some of his physical symptoms and considered them when evaluating Mr. Parks for treatment.  *See* Ex. 25, Clinical Record Notes dated 1/5/2006, 133 (noting that Mr. Parks had complained of thrush but that Dr. Blanchette observed none).

Thus, the Court must grant summary judgment for Dr. Blanchette on Mr. Parks' deliberate indifference claim based on the treatment of his HIV/AIDS.

b.  **Hepatitis C**

Mr. Parks claims that Dr. Blanchette was deliberately indifferent to his serious medical need in denying him Interferon treatment for his Hepatitis C from September 19, 2005 to April

18, 2008.  This time period can be sub-divided into two separate intervals for which the legal analysis is different.  From September 19, 2005 to December 3, 2007, Mr. Parks was awaiting approval by the HepCURB for his treatment.  From December 3, 2007 to April 2008, Mr. Parks was approved for treatment and was waiting to receive it.  The Court finds that Mr. Parks has failed to show a genuine issue of material fact with respect to the subjective prong during either time period.

### i.   September 19, 2005 to December 3, 2007

Regarding this first time period of roughly two years, Mr. Parks first argues that he has shown that a genuine issue of material fact exists because he "did not have mental issues" and complied with the Hepatitis C regimen when he finally received it.  Pl.'s Opp. Br. 64, ECF No. 232.  He contends the concerns about his mental health that Defendants claim prevented him from receiving treatment earlier were "a *post hoc* rationalization," which Dr. Blanchette created in April 2006 when he realized that Mr. Parks was contacting human rights organizations with concerns about his treatment.  *Id.* at 63.

Based on the record before it, the Court finds that no fact-finder could reasonably agree with this view.  Dr. Blanchette's Clinical Record notes from December 1, 2005 explicitly refer to concerns about Mr. Parks's mental health condition.  There is no evidence, other than Mr. Parks's own conjecture, that these notes were created after April 2006, when Mr. Parks claims Dr. Blanchette developed a motive or realized a need to justify his treatment of Mr. Parks.  *See Hicks v. Baines*, 593 F.3d 159, 166 (2d Cir. 2010) (noting that a party opposing a motion for summary judgment "may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment.").  The fact that Dr. Blanchette did not convey these concerns to Mr. Parks on December 1, 2005, as Mr. Parks testifies, does not mean

that he did not have these concerns at the time.  Ex. C, Parks Decl. ¶60.  Moreover, Mr. Parks admits that, on January 5, 2006, Dr. Blanchette reiterated his mental health concerns in his notes. Pl.'s Local Rule 56(a)2 Stmt. ¶¶198-99, 207-208.  Nor does Mr. Parks dispute that Dr. Lewis met with him in February and March 2006 and observed that he had mental health conditions. *Id.* ¶¶209-210, 214-16.

There also is ample record evidence indicating that Mr. Parks suffered from some kind of mental health condition and that health care professionals, other than Dr. Blanchette, believed this to be the case in late 2005 through 2006.  *See e.g.*, Ex. 25, Clinical Record Notes labeled psychiatry dated 11/23/2005, 0108 (noting patient's paranoia and agitation); Ex. 25, Clinical Record Notes dated 2/22/2006, 0138 ("GAD, paranoia, hypomania, anxiety, doing well"); Ex. 25, Clinical Record Notes dated 3/29/2006, 0146 ("bipolar D/O… hypomania, paranoia"); Ex. 25, Initial Psychiatric Evaluation dated 4/22/2006, 0156 (noting diagnoses of "[illegible] Bipolar D/O" and "Personality D/O"); Ex. 25, Mental Status Evaluation dated 7/6/2006 and 7/12/2006, 0167 (noting diagnoses of "Psychosis," "Bipolar," "personality [ ] + antisocial + paranoid traits"); Ex. 25, Mental Health Services Individual Treatment Plan dated 10/24/2006, 0174 (noting diagnoses of "BiPolar Dis, Anxiety Dis, Personality Disorder.")  In addition, Dr. Lazrove diagnosed him with severe/extreme anti-social personality disorder while he was treating him at Garner in the Fall of 2007.  Ex. 20, Lazrove Aff. ¶¶3,4, 41.  Mr. Parks emphasizes portions of the record that indicate that he was doing well, *see e.g.,* Edlin Decl. ¶56, but the fact that he was doing well does not mean he did not have any mental health conditions at the time.

Record evidence indicates that Mr. Parks's mental health conditions caused Dr. Blanchette's and the HepCURB's decision not to administer Hepatitis C medication.  On April 6, 2006, a psychiatrist explicitly indicated that Mr. Parks's mental state precluded him from

47

receiving Interferon treatment.  Ex. 25, Clinical Record Notes dated 4/6/2006, 0149 ("requesting to be on Inteferon [sic]… currently not a candidate for this protocol @ this time.  He is non-compliant with meds and is [illegible], verbally assaultive, and paranoid…. Exhibits severe personality pathology as well as serious mental illness/BAD v. schizoaff… This pt is non-compliant, aggressive, and exhibits signs of a psychotic D/O.").  The HepCURB itself also periodically analyzed Mr. Parks's readiness for the Hepatitis C treatment and expressed the same concerns about Mr. Parks's mental health condition.  Ex. 25, Utilization Review Reports dated 4/3/2007, 8/8/2007, 0189-91; Ex. E, Treatment Recommendation dated 4/10/2005 at 006083; Ex E, HepCURB Minutes dated 5/10/2006, 4/24/2007, 8/8/2007, 006143-44, 006147-51.  There is no evidence other than Mr. Parks's own speculation that the decision to withhold the treatment was not related to concerns about his mental health conditions.

Mr. Parks argues that Dr. Blanchette improperly influenced the other two members of the HepCURB to consistently vote against Mr. Parks's requests for treatment.  Pl.'s Opp. Br. 62, ECF No. 232; Pl.'s Local Rule 56(a)2 Stmt. ¶¶240-41, 282, ECF No. 234; Pl.'s Counterstmt. ¶¶116-17, 124-27, ECF No. 234.  In making this argument, he relies on Dr. Blanchette's testimony that the HepCURB's decisions were typically unanimous and that Dr. Blanchette participated in the discussion of Mr. Parks and shared information about his experiences with him.  Ex. E, Blanchette Dep. 14:8-13, 198:16-22, 211:4-212:20.  This testimony does not indicate that the HepCURB votes were unanimous for improper reasons, unrelated to medical judgment.  Nor does it suggest that Dr. Blanchette was providing an improper opinion or conveying anything other than his medical judgment.  Indeed, Dr. Blanchette testified that he provided information about Mr. Parks's mental health condition that he believed was relevant to

determine whether he was fit to receive Interferon treatment.  Ex. E, Blanchette Dep. 239:22-241:18.

Mr. Parks also argues that, even if he had some mental conditions that formed the basis for the decisions to deny him Hepatitis C treatment, they were not the types of conditions that should have precluded him from receiving Interferon treatment.  *See e.g.,* Ex. B, Edlin Decl. ¶¶49-51 ("personality disorders are not a contraindication to hepatitis C treatment").  Mr. Parks does not contest that Interferon could negatively impact a patient's mental health.  Pl.'s Local Rule 56(a)2 Stmt. ¶423, ECF No. 234 (admitting that Interferon is known to have "neuropsychiatric side effects") (citing Ex. B, Edlin Decl. ¶48).  Accordingly, he does not argue that mental health is generally an inappropriate consideration in evaluating a patient's fitness for Interferon treatment.  Instead, he claims that he was not suicidal or depressed, which are, in his view, the only mental health conditions that could justify withholding Interferon treatment.  Pl.'s Opp. Br. 64, ECF No. 232; Ex. B, Edlin Decl. ¶52.  Mr. Parks's expert, Dr. Edlin, opines that the decision to allow the other mental health conditions to prevent him from receiving treatment was a significant deviation "from accepted medical standards of care."  *Id.* ¶¶47, 59.  He cites to no external source to support this conclusion.

Conversely, Defendants' expert, Dr. George Wu, opines that the delay in the administration of Interferon in Mr. Parks's case was consistent with the standard of care.  Ex. 1, Wu Aff. ¶17.  He indicates that the consideration of Mr. Parks's mental illnesses, including psychiatric conditions outside of depression such as "manic behavior, aggressiveness, and non-compliance with medications [ ], and the administration of psychiatric medications," triggered an appropriate amount of caution and justified waiting to administer the Hepatitis C treatment.  *Id.* ¶¶14, 16-17, 19.  Consistent with his broader view, DOC's Hepatitis C Guidelines indicate that

treatment may proceed if the results of the mental health assessment do not indicate "any increased psychological risk."  Ex. Q, Hepatitis C Guidelines at 4.  Moreover, the notes from the psychiatrist who recommended Mr. Parks not receive the treatment because of his mental health status as well as the HepCURB's reasoning indicates a focus on Mr. Parks's mental condition generally, not exclusively on depression or suicidal ideation.

In essence, the remaining question presented here is whether Dr. Blanchette acted with deliberate indifference by substantially deviating from accepted medical practice in withholding Hepatitis C treatment based on mental health conditions other than depression or suicidal ideation.  Mr. Parks has failed to show in a non-conclusory way that a genuine question of material fact exists on this inquiry.  His expert, Dr. Edlin, cites to no external source to justify his opinion that depression or suicidal ideations are the only mental health reasons Hepatitis C treatment may be delayed.  His conclusory testimony fails to create a genuine question of material fact sufficient to defeat a summary judgment motion and is the type of conclusion that *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579 (1992), renders inadmissible.  *See In re Agent Orange Prod. Liab. Litig.,* 818 F.2d 187, 193 (2d Cir. 1987) ("mere speculation or idiosyncratic opinion, even if that opinion is held by one who qualifies as an expert" cannot establish a genuine issue of material fact on summary judgment); *Kelsey v. City of N.Y.,* No. 03 CV 5978(JFB)(KAM), 2007 WL 1352550, at *5 (E.D.N.Y. May 7, 2007) ("Conclusory affidavits, even from expert witnesses, do not provide a basis upon which to grant or deny motions for summary judgment.") (internal quotation marks and citation omitted); *Major League Baseball Props., Inc. v. Salvino, Inc.,* 542 F.3d 290, 311-12 (2d Cir. 2008) (affirming a district court's finding that an expert who conclusorily disagreed with another failed to create a genuine question of material fact sufficient to defeat a summary judgment motion); *see also Simmons v.*

50

*United States,* 88 F. App'x 435, 437-38 (2d Cir. 2004) (expert's conclusory statement that physician's actions fell below the standard of care was "rightly regarded by the district court as insufficient to raise a genuine issue of material fact").

Even accepting Dr. Edlin's position as true, as a matter of medicine and admissible under *Daubert*, there is no evidence in the record that Dr. Blanchette was subjectively aware of this alleged mistake other than Mr. Parks's own speculation.  The record supports the contrary assertion, that Dr. Blanchette was evaluating Mr. Parks carefully for Interferon treatment and making judgments about his health and fitness for that treatment.

Because Dr. Blanchette exercised his medical judgment in deciding to delay the administration of Interferon and that judgment was not entirely arbitrary, the Court finds that no reasonable fact-finder could conclude that Dr. Blanchette acted with deliberate indifference.  *See Victor v. Millcevic,* 361 F. App'x 212, 215 (2d Cir. 2010) (finding that a ten-month delay in administering a liver biopsy did not constitute deliberate indifference because one of plaintiff's doctors believed that he did not meet the Department of Correctional Services criteria for the procedure); *Pabon v. Wright,* No. 99 Civ.2196(WHP), 2004 WL 628784, at *6-8 (S.D.N.Y. Mar. 29, 2004) (finding that summary judgment was appropriate on plaintiff's deliberate indifference claim because the requirement for regular liver biopsies to continue Interferon treatment for Hepatitis C was a "medical judgment" "made to ensure that Interferon treatment was appropriate for plaintiff[ ].").

"Many courts in this circuit have held that determinations as to whether to treat Hepatitis-C with Interferon, pursuant to [Department of Correctional Services] Guidelines, reflect medical judgments, not 'deliberate indifference' under the Eighth Amendment."  *Watson v. Wright,* No. 9:08-CV-62 (NAM/ATB), 2011 WL 4527789, at *10 (N.D.N.Y. Aug. 4, 2011) (collecting cases)

(granting summary judgment for the defendant on a deliberate indifference claim based on a denial of Hepatitis C treatment for two weeks) (Report and Recommendation adopted by the District Court 2011 WL 4528931 (N.D.N.Y. Sept. 28, 2011)).  Mr. Parks's case is no different. This case does not involve a mechanical application of aspects of the guidelines "that are less clearly correlated with treatment success."  *Id.* (citations omitted)*; see also cf. Johnson,* 412 F.3d at 404 (finding that a mechanical application of a Hepatitis C guideline created a genuine question of material fact as to whether defendant acted with deliberate indifference).  Instead, this case involves a reasoned medical judgment by Dr. Blanchette, supported by the DOC guidelines, that the benefit of Interferon treatment did not outweigh the risk of exacerbating his mental health conditions.

The fact that Dr. O'Halloran and Dr. Edlin disagree with Dr. Blanchette's course of treatment does not mean he was deliberately indifferent, because Dr. Blanchette's decision was based on a condition that the record shows existed, and there is no evidence that it was an arbitrary judgment.  "[T]he law is clear that a difference of opinion… even among medical professionals themselves, as to the appropriate course of medical treatment does not in and of itself amount to deliberate indifference."  *Williams v. M.C.C. Inst.,* 97 CIV. 5352, 1999 WL 179604, at *7 (S.D.N.Y. Mar. 31, 1999) (citations omitted).

Moreover, this case is distinguishable from *Johnson,* where the Second Circuit reversed a grant of summary judgment on a deliberate indifference claim based on (1) the fact that every single one of plaintiff's treating physicians indicated that he should receive the treatment, (2) that there was conflicting evidence about whether the decision to not provide the treatment was medically justifiable, and (3) there was no evidence suggesting that the defendants took any steps to verify whether not treating him was medically appropriate.  412 F.3d at 404.  Here, there may

have been some disagreement among treating physicians, namely between Dr. O'Halloran and

Dr. Blanchette, but there is little evidence on the record as to why this disagreement existed.  The

parties also agree that a patient's mental health status generally is relevant to prescribing

Interferon, because the medication can exacerbate certain mental illnesses or conditions.  Dr.

Blanchette took steps to verify whether treatment was medically appropriate by relying on

evaluations performed by a psychiatrist.

Finally, Mr. Parks argues that in delaying the administration of Interferon, Dr. Blanchette

acted with an inappropriate financial incentive because it is an expensive treatment.  Pl.'s Opp.

Br. 7, 64, ECF No. 232.  Although the Hepatitis C medications are certainly costly, *see* Ex. P,

Prescription and Treatment Costs for Mr. Parks, 3, there is absolutely no evidence in the record

that Dr. Blanchette considered the cost in specifically in evaluating Mr. Parks other than Mr.

Parks's own speculation.  *See cf. Leavitt,* 645 F.3d at 498 (finding that a genuine question of

material fact existed with respect to whether a defendant was deliberately indifferent in not

prescribing medication for HIV/AIDS where there was evidence that defendant "had a financial

interest" in not prescribing the drug).

Mr. Parks does show that a non-voting member of the HepCURB was aware of the cost

of Interferon generally, but there is evidence that the HepCURB did not directly consider cost in

making its decisions.  Ex. E, Blanchette Dep. 236:10-237:18 ("I do know that [Dr. Buchanan]

was concerned about the high cost of hepatitis C therapy and having the budget reflect the

ongoing and escalating costs… But the URB itself didn't have any role in that."), 248:16-23,

221:19-21 (indicating that Dr. Buchanan did not vote on HepCURB decisions).  In *Leavitt,* the

First Circuit relied on direct evidence that the treating physician's assisstant was motivated by

financial concerns.  He "purportedly said to Leavitt that he would not provide him with HIV

medications because they are too costly" and had a "financial stake in keeping treatment and referral costs low" as the president and largest shareholder of a medical contractor that provided healthcare services to the prisoners where Leavitt was housed.  *Leavitt,* 645 F.3d at 498-99.  Mr. Parks has failed to provide any similar evidence in this case that Dr. Blanchette considered cost at all when making a determination about Mr. Parks's readiness for Interferon.

### ii.   December 3, 2007 to April 2008

With respect to the second time period, after Mr. Parks was approved and waiting for the treatment, Mr. Parks has failed to show how the delay was caused by deliberate indifference. "[A] delay in treatment does not violate the constitution unless it involves an act or failure to act that evinces 'a conscious disregard of a substantial risk of serious harm.'" *Thomas v. Nassau Cnty. Corr. Ctr.,* 288 F.Supp. 2d 333, 339 (E.D.N.Y. 2003) (quoting *Chance,* 143 F.3d at 703). Based on the current record, the Court does not know why this delay occurred.  Mr. Parks has provided no evidence, other than his own conjecture, that the delay of treatment during this period was the result of conscious disregard by anyone at DOC.  Moreover, the delay between the approval and the administration of treatment was roughly four months, which may indicate negligence but not deliberate indifference without more evidence about the Defendant's state of mind.

Mr. Parks also has failed to show that Dr. Blanchette was involved with the delay in treatment during this time period.  "It is a well-established principle that 'personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under [section] 1983.'" *Pelletier v. Armstrong,* Civ. No. 3:99cv1559(HBF), 2007 WL 685181, at *6 (D. Conn. Mar. 2, 2007) (citation omitted and alteration in original); *see also Wright v. Smith*, 21 F.3d 496, 501 (2d Cir. 1996) (citations omitted); *Murphy v. State of Conn. Dep't. of Public*

*Health,* 3:04CV976RNC, 2006 WL 908435, at *2 (D. Conn. Mar. 30, 2006) ("A suit for

deliberate indifference to a serious medical need cannot be maintained against a defendant who

has no role in the provision of medical care.") (citation omitted).

Personal involvement of a supervisory official may be shown by evidence that "(1) the

defendant participated directly in the alleged constitutional violation, (2) the defendant, after

being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the

defendant created a policy or custom under which unconstitutional practices occurred, or allowed

the continuance of such a policy or custom, (4) the defendant was grossly negligent in

supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited

deliberate indifferent to the rights of inmates by failing to act on information indicating that

unconstitutional acts were occurring." *Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir. 1995).[28]

The parties agree that, after December 3, 2007, Dr. Blanchette was not seeing Mr. Parks

as a patient, and the role of the HepCURB in the process was complete. There also is no

evidence that he was aware that Mr. Parks was not receiving the treatment that was approved by

HepCURB. Without more evidence of personal involvement, the Court must dismiss this aspect

of the claim. *See Pelletier,* 2007 WL 685181, at *8 (finding that a plaintiff could not establish

the personal involvement of a director of the UConn program from which he was receiving

treatment in a deliberate indifference claim because he had no personal contact with the plaintiff

and was not involved with his care or treatment); *Ozuno v. Vadlamudi,* Civil No. 9:03-CV-

_____

[28] The Court is not aware of any ruling from the Second Circuit clarifying the impact of *Ashcroft v. Iqbal,* 556 U.S. 662 (2009), on the *Colon* factors. *See Grullon v. City of New Haven,* 720 F.3d 133, 139 (2d Cir. 2013) (noting that *Iqbal* "may have heightened the requirements for showing a supervisor's personal involvement with respect to certain constitutional violations" but declining to specifically address the issue); *Johnson v. White,* No. 9:14-cv-00715 (MAD)(DJS), 2015 WL 6449126, at *4 n.2 (N.D.N.Y. Oct. 23, 2015) (noting that the Second Circuit has yet to decide the impact of *Iqbal* on *Colon*); *see also Koehl v. Bernstein,* No. 10 Civ. 3808(SHS)(GWG), 2011 WL 2436817, at *9 (S.D.N.Y. June 17, 2011) (noting that in *Iqbal,* the Supreme Court "explicitly rejected the argument that, 'a supervisor's mere knowledge of his subordinate's discriminatory purpose amounts to the supervisor's violating the Constitution.'") (quoting *Iqbal,* 556 U.S. at 677). Accordingly, the Court will apply the five factors as they were described in *Colon.*

00475(GLS/DEP), 2005 WL 1977618, at *9 (N.D.N.Y. July 11, 2006) (granting summary judgment on a deliberate indifference claim in favor of the associate commissioner of health services because there was no evidence that he was aware of, much less involved in, the plaintiff's treatment).

### 3.  Conclusion

Accordingly, for all of the foregoing reasons, summary judgment is hereby **GRANTED** on both of Mr. Parks's deliberate indifference claims.

### G.  Statement of Facts Regarding Transfers

As mentioned above, Mr. Parks also makes retaliation claims and claims under the ADA and Rehabilitation Act, both of which involve Mr. Parks's transfer to different cells and different facilities in the DOC system.  The Court will provide a brief summary of the relevant facts and then apply the law of each claim to those facts.

### 1.  Inter-Facility Transfers

Mr. Parks was transferred to different facilities within the DOC system twelve times while he was in DOC custody from October 2004 to November 2010.  He claims that Defendants[29] caused eight of these transfers, all between MWCI and Garner, to retaliate against him for filing grievances, threatening to sue, and generally complaining about the quality of his medical care.[30]  Pl.'s Opp. Br. 28-29, ECF No. 232.  In particular, Mr. Parks believes that Dr. Blanchette continually transferred him from MWCI to Garner under the pretext of receiving

---

[29] Mr. Parks alleges in his Complaint that John Sieminski was warden of MWCI from 2004 to 2007 and was, therefore, responsible for some of these earlier transfers.  Am. Compl. ¶9, ECF No. 146.  Because the claims based on those transfers were dismissed, Mr. Sieminski is not currently a party to this lawsuit but under Mr. Parks's theory, he was responsible for the transfers during his tenure as warden.

[30] Defendants' Local Rule 56(a)1 Statement discusses more than just these eight transfers.  Mr. Parks was transferred to Corrigan for treatment June 2007 and was transferred to Osborn in 2010.  Defs.' Local Rule 56(a)1 Stmt. ¶¶598-604, 615-20, ECF No. 219-1.  He was transferred back to Garner after his stay at Corrigan and back to MWCI after his stay at Osborn.  *Id.*  Since Mr. Parks does not put these other transfers at issue in his Complaint or his Opposition Brief to Defendants' Summary Judgment Motion, the Court will not consider them.

mental health treatment, and that, repeatedly, the doctors at Garner found that he did not require such treatment and transferred him back to MWCI.  *Id.* at 31-32.  It is undisputed that Garner provides housing for inmates with significant mental health issues that require specialized mental health care as well as general population housing for inmates at security level 4.  Defs.' Local Rule 56(a)1 Stmt. ¶¶ 326-27, 573, ECF No. 219-1; Ex. 7, Dzurenda Aff. ¶¶ 6, 17.  MWCl does not have this specialized mental health housing and only offers general population housing at security levels 4 and 5.  *See* Ex. 17, Murphy Affidavit ¶¶ 14-16.

Defendants argue that they have provided a non-retaliatory reason that all of the transfers occurred.  Defs.' Br. 8-10, ECF No. 219-2.  They also have produced evidence that the Director of Offender Classification and Population Management, and none of the three Defendants, was responsible for authorizing all inter-facility inmate transfers.  Ex. 8, Administrative Directive 9.1(4) ("The Director of Inmate Classification and Population Management shall be responsible [ ] for all inmate transfers and placement.").  According to Administrative Directive 9.1, the Director "shall be authorized to transfer an inmate for medical purposes at the request of medical personnel."  *Id.* at 7(D).  This subsection also provides that "[u]pon resolution of the medical concern, the inmate shall be returned to the sending facility as soon as possible unless reclassification or reassignment is warranted."  *Id.*

More specifically, the parties take the positions described below with respect to each disputed transfer.

### a.  April 19, 2006 Transfer From MWCI to Garner

Defendants argue that Mr. Parks was transferred on April 19, 2006 to receive mental health treatment available only at Garner.  Defs.' Local Rule 56(a)1 Stmt. ¶231-32, 244, ECF No. 219-1.  In support of this theory, Mr. Parks's Inmate Transfer History indicates that this

transfer occurred because "facility unable to meet MH nee[d]."  Ex. 26, Display Inmate Transfer History, 005386.  In addition, Psychiatrist Dr. Lewis noted that she referred Mr. Parks at this time to level 4 mental health housing. Ex. 25, Inter-Agency Patient Referral Report dated 4/5/2006, 0150; Ex. 19, Clinical Record Notes dated 4/6/2006, 1 (Dr. Lewis notes that Mr. Parks required mental health housing).  As of October 3, 2005, the last date Mr. Parks's mental health status was adjusted before he was transferred, he was at a level 4.  Ex. 19, Needs History, 12.

Mr. Parks argues that he was transferred on this date because he had filed numerous grievances about his health care in the preceding months.  *See* Ex. C, Parks Decl. ¶103; Defs.' Local Rule 56(a)1 Stmt. ¶¶ 73, 79, ECF No. 219-1; *see also e.g.,* Ex. 25, Inmate Request Form dated 12/6/05, 116; Ex. 25, Inmate Request Form dated 2/28/06, 139; Ex. C, Ex. 6, Inmate Request Form dated 3/24/2006, DEF_001616.  He indicates that Dr. Blanchette was angry with him and, on April 4, 2006, Dr. Blanchette orally threatened to send him to Garner as a result.  Pl.'s Local Rule 56(a)2 Stmt. ¶244, ECF No. 234; Ex. C., Parks Decl. ¶¶ 51-75.  Mr. Parks does not contest the contents of the Inter-Agency Patient Referral Report or the Clinical Record Notes cited by Defendants.  Pl.'s Local Rule 56(a)2 Stmt. ¶231-32, ECF No. 234.  But he argues that Dr. Blanchette's own testimony indicates that he "played a major role" in having Mr. Parks transferred to Garner, and that Mr. Parks's mental health classification score was a 2 or 3 until August 2006.  *Id.* ¶244; Pl.'s Counterstmt. ¶¶112-13.

In addition to Mr. Parks's complaints, after hearing from Mr. Parks, a prisoner rights organization wrote a letter dated March 28, 2006 to MWCI asking why Mr. Parks was not receiving treatment for his HIV/AIDS and Hepatitis C.  Ex. J, Letter to Wanda White-Lewis Dated 3/28/2006, DEF_001613.  On April 3, 2006, Ms. Wanda White of the DOC responded to this letter, copying Dr. Blanchette; thus making Dr. Blanchette aware of this organization's letter

in early April.  Pl.'s Counterstmt. ¶142-43, ECF No. 234; Ex. E, Blanchette Dep. 112:1-10; Ex.

C, Ex. 8, Letter dated 4/3/2006 at DEF_001609.

### b.  August 11, 2006 Transfer from Garner to MWCI

Defendants argue that Mr. Parks was transferred on August 11, 2006 at the request of

mental health because his treatment at Garner had been completed. Defs.' Local Rule 56(a)1

Stmt. ¶¶587-88, ECF No. 219-1.  Mr. Parks's Clinical Record notes indicate "notified by mental

health that I/M Parks will transfer to MacDougall later this afternoon." Defs' Local Rule 56(a)1

Stmt. ¶ 587, ECF No. 219-1; Ex. 19, Clinical Record Notes dated 8/11/2006, 3.  Mr. Parks had

been upgraded to a level 4 mental health status on June 7, 2006 and was downgraded to a level 3

on August 7, 2006.  Ex. 19, Needs History, 12.  Accordingly, when the need for treatment

stopped, per Administrative Directive 9.1, Section 7(D), he was sent back to the originating

facility, MWCI.

Mr. Parks admits that mental health initiated the transfer on this date, Pl.'s Local Rule

56(a)2 Stmt. ¶¶587-88, ECF No. 234, but believes that this transfer was part of a scheme

orchestrated by Dr. Blanchette to continually transfer Mr. Parks out of MWCI to Garner for

complaining about his medical care.  Pl.'s Opp. Br. 31-32, ECF No. 232.  He believes that this

transfer shows that Dr. Blanchette's assessment of Mr. Parks's mental health need was not

credible.  *Id.*  Surrounding the date of this transfer, Mr. Parks also continued to complain about

not receiving treatment for Hepatitis C and about the frequent transfers.  Ex. C., Parks Decl.

¶¶90, 122.

### c.  August 25, 2006 Transfer from MWCI to Garner

Defendants argue that Mr. Parks was transferred on August 25, 2006 to receive mental

health treatment available only at Garner.  Defs.' Local Rule 56(a)1 Stmt. ¶¶589-93, ECF No.

219-1.  As reflected in Mr. Parks's Clinical Record, around 4 pm, it was noted that he had been placed at a level 5 mental health status on August 24, 2006. Ex. 19, Clinical Record Notes dated 8/24/2006, 4; Ex. 19, Needs History, 12.  Social worker Sara Cyr, who saw Mr. Parks later that same day, referred Mr. Parks to level 4 mental health housing. Ex. 19, Clinical Record Notes dated 8/24/2006, 4-5; Ex. 19, Needs History, 11.

Mr. Parks does not dispute the facts on which Defendants rely.  Pl.'s Local Rule 56(a)2 Stmt. ¶¶589-93, ECF No. 234.  He argues that this transfer is part of Dr. Blanchette's scheme to retaliate against him for complaining about his medical care.  Pl.'s Opp. Br. 31-32, ECF No. 232. Surrounding the date of this transfer, Mr. Parks continued to complain about not receiving treatment for Hepatitis C and about the frequent transfers.  Ex. C, Parks Decl. ¶¶ 90, 122.  The Clinical Record also reflects that Mr. Parks "seems to try [and] use the 'conspiracy' thought context in terms of threatening to sue us" and that Mr. Parks "notified the district courts."  Ex. 25, Clinical Record Notes dated 8/22/2006, 171; Ex. 19, Clinical Record Notes dated 8/24/2006, 4.

### d.  October 16, 2006 Transfer from Garner to MWCI

Defendants argue that this transfer occurred because Mr. Parks completed his mental health treatment at Garner and was transferred to the originating facility under Administrative Directive 9.1, Section 7(D).  Defs.' Local Rule 56(a)1 Stmt. ¶¶594-97, ECF No. 219-1.  Mr. Parks remained at a level 4 mental health status until October 10, when he was downgraded to a level 3 by Social Worker Hashim. Ex. 19, Needs History, 11.[31]  Mr. Parks's Inmate Transfer

---

[31] Licensed Social Worker Hashim recommended that Mr. Parks's mental health status be downgraded from level 4 to 3 on October 2, 2006, Ex. 25, Notice of Mental Health Score Change dated 10/2/2006, 0173, but this downgrade did not officially occur until October 10, 2006.  Ex. 19, Needs History, 11.  The Clinical Record notes dated the day after Mr. Hashim's recommendation indicate that there was no "overt evidence of psychosis." Ex. 19, Clinical Record Notes dated 10/3/2006, 6.

History indicates that he was transferred because he was "CLEARED BY MH FOR GP RETURN." Ex. 19, Display Inmate Transfer History, 005383.

Mr. Parks admits that mental health initiated the transfer on this date, Pl.'s Local Rule 56(a)2 Stmt. ¶¶594-97, but believes that this transfer was part of a scheme orchestrated by Dr. Blanchette to continually transfer Mr. Parks out of MWCI to Garner. Pl.'s Opp. Br. 31-32, ECF No. 232. He argues that the fact that Mr. Parks was transferred back to MWCI shows that Dr. Blanchette's assessment of Mr. Parks's mental health need was not credible. *Id.* Surrounding the date of this transfer, Mr. Parks also continued to complain about not receiving treatment for Hepatitis C and about the frequent transfers. Ex. C, Parks Decl. ¶¶ 90, 122.

### e.   January 16, 2007 Transfer from MWCI to Garner

Defendants argue that Mr. Parks was transferred on January 16, 2007 to receive mental health treatment because, in part, "he had exhibited out of control behavior such as yelling while in the Infirmary." Defs.' Local Rule 56(a)1 Stmt. at 71 & ¶271, ECF No. 219-1. Defendants also argue that the transfer was intended to place Mr. Parks in the care of Dr. O'Halloran, with whom he had a good relationship. *Id.* ¶¶277-80. Mr. Parks's Inmate Transfer History indicates that "inmate needs specific treatment at Garner." Ex. 27, Display Inmate Transfer History, 005382. Mr. Parks's Clinical Record notes from January 3 and January 6 indicate that "ID" or infectious disease doctors determined that Mr. Parks should be sent back to Garner for treatment of his psychiatric issues and Hepatitis C. Ex. 25, Clinical Record Notes dated 1/3/07 and 1/6/07, 180-81; Ex. 23, Blanchette Aff. ¶ 163.[32]

Mr. Parks denies that the transfer occurred so that he could be treated by Dr. O'Halloran and to manage his psychiatric issues. Pl.'s Local Rule 56(a)2 Stmt. ¶280, ECF No. 234. He

---

[32] The transfer occurred as soon as possible after this determination, given that Mr. Parks was injured in a scuffle with another inmate on December 27, 2006. Defs.' Local Rule 56(a)1 Stmt. ¶¶ 273-74, 279, ECF No. 219-1.

argues that this transfer is part of Dr. Blanchette's retaliatory scheme against him for complaining about his medical care.  *Id.*  Mr. Parks's transfer history indicates the transfer is "Per Dr. Blanchette, inmate needs specific treatment at Garner."  Ex. 27, Display Inmate Transfer History, 005382.  Surrounding the date of this transfer, Mr. Parks continued to complain about the frequent transfers.  Ex. C, Parks Decl. ¶122.

### f.   September 27, 2007 Transfer from Garner to MWCI

Defendants argue that Mr. Parks was transferred on September 27, 2007 because he had a separation profile with an inmate at Garner.  Defs.' Local Rule 56(a)1 Stmt. ¶¶605-608, ECF No. 219-1.  They argue that Counselor Supervisor Kim Jones requested the transfer because of this "profile," which is defined as a disagreement between two inmates that requires separation. *Id.*; Ex. 11, Inmate Transfer History, 005379 (noting the reason for the transfer as "separation from inmates"); *see also* Ex. 12, Administrative Directive 9.9, Sections 3(D), 8 (defining a "separation profile" as a "record specifying the need and reason for keeping two (2) or more individuals apart from each other" and noting that inmates may be transferred to another facility for their safety).

Mr. Parks admits that the profile caused the transfer, Pl.'s Local Rule 56(a)2 Stmt. ¶¶605-608, but believes that this transfer was part of a scheme orchestrated by Dr. Blanchette to continually transfer Mr. Parks out of MWCI to Garner and indeed shows that Dr. Blanchette's assessment of Mr. Parks's mental health need was not credible.  Pl.'s Opp. Br. 31-32, ECF No. 232.  Surrounding the date of this transfer, Mr. Parks continued to complain about the frequent transfers.  Ex. C, Parks Decl. ¶122.

### g.  October 26, 2007 Transfer from MWCI to Garner

Defendants argue Mr. Parks was transferred on October 26, 2007 to receive mental health treatment available at Garner.  Defs.' Local Rule 56(a)1 Stmt. ¶¶290-95.  Dr. Blanchette requested that Mr. Parks be held at Garner for one year because he wanted to make sure Mr. Parks stayed in one facility for one year, which is the duration of the Hepatitis C treatment.  *Id.*

Mr. Parks argues that this transfer is part of Dr. Blanchette's retaliatory scheme against him for his complaints about his medical care.  Pl.'s Local Rule 56(a)2 Stmt. ¶¶291-92, 294, ECF No 234.  Mr. Parks's Inmate Transfer History indicates, "[r]eturn to Garner per Dr. Blanchette and hold at Garner for a year."  Ex. 28, Display Inmate Transfer History, 005377.  Surrounding the date of this transfer, Mr. Parks continued to complain about the frequent transfers.  Ex. C, Parks Decl. ¶122.

### h.  August 21, 2008 Transfer from Garner to MWCI

Defendants argue that this transfer occurred because Garner's "mental health team" determined that Mr. Parks had received the mental health treatment he needed.  Defs.' Local Rule 56(a)1 Stmt. ¶¶609-14.  In accordance with DOC policy, therefore, Mr. Parks was transferred back to the originating facility.  Ex. Ex. 8, Administrative Directive 9.1, Section 7(D).  Dr. Bogdanoff (from Mental Health) determined that Mr. Parks could be placed into the general population on August 20; he was transferred to MWCI the next day.  Defs' Local Rule 56(a)1 Stmt. ¶¶ 609-13, ECF No. 219-1; Ex. 19 Clinical Record Notes dated 8/20/08, 9.

Mr. Parks does not dispute any of the facts Defendants assert justifying their explanation for the transfer.  Pl.'s Local Rule 56(a)2 Stmt. ¶¶609-14.  Surrounding the date of this transfer, Mr. Parks continued to complain about the frequent transfers.  Ex. C, Parks Decl. ¶122.

## 2.   Intra-Facility Transfers

In addition to these facility-to-facility moves, Mr. Parks also was placed on "high security status" on February 9, 2005, which required him to be moved to a new cell, but not necessarily a new facility, every 90 days.  Defs' Local Rule 56(a)1 Stmt. ¶¶ 621-31, ECF No. 219-1; Ex. 16, High Security Recommendation for Inmate Parks dated 2/9/2005, 003650.[33] Warden Simienski recommended the placement because Mr. Parks had a history of escape, attempted escape, and had written a letter, docketed in this case, listing security vulnerabilities in the Walker Building at MWCI.  *Id.*; *see also* Ex. 7, Dzurenda Aff. ¶31; Am. Compl. at 30-37, Ex. 1, Letter dated 2/7-8/2005, ECF No. 17.  High security status provides for increased supervision of inmates who pose a threat to the safety and security of the facility and requires that the inmate be housed at security level 4 or 5.  Defs' Local Rule 56(a)1 Stmt. ¶¶ 621-23, ECF No. 219-1.  Mr. Parks does not challenge this initial designation but rather argues that he should have been removed from the status earlier and that the Defendants' failure to do so was retaliation.

DOC policy in place at the time required that an inmate's high security status designation be reviewed every six months.  *Id.* ¶ 628; Ex. 15, Administrative Directive 9.4, Section 13(H). In March 2007, the Classification Committee recommended that Mr. Parks be removed from high security status, but Defendant Dzurenda rejected the request and cannot recall why.  Pl.'s Counterstmt. ¶¶170-71, ECF No. 234; Ex. J, Letter to Fred Levesque dated 3/12/2007, 004027. On February 28, 2008, during a review undertaken at Garner, the Classification Committee again

---

[33] There has been some debate as to how high security status impacted the relocation of inmates, which will be discussed further below, but discovery has demonstrated that high security status requires that an inmate be housed in a secured cell and that the inmate be transferred to a different cell "at a minimum of every 90 days."  Ex. 15, Administrative Directive 9.4, Section 13(E).  A High Security Monitoring designation also required that an inmate be housed in a level 4 or 5 facility.  *Id.* at Section 14.  As such, this designation would only require an inter-facility transfer if the inmate was housed at a level 3 or lower facility at the time of designation.

recommended that Mr. Parks be removed from high security status "based on medical illness" and noted that "frequent cell moves have exacerbated his illness." Ex. J, High Security Review Hearing Form dated 2/28/2008, 003637. Warden Dzurenda concurred with that recommendation and wrote a letter on the same date requesting Mr. Parks be removed from high security status due to his medical condition. Ex. J, Letter to Fred Levesque dated 2/28/2008, 003636.

Defendant Murphy also requested that Mr. Parks be removed from high security status in a letter dated July 8, 2009. Ex. J, Letter to Acting Director Milling dated July 8, 2009, 003621. In doing so, he noted the February 28, 2008 recommendation of removal due to his medical condition. *Id.* Classification concurred with this recommendation, Ex. J, Letter from Director of Offender Classification & Population Management dated 7/10/2009, 003622, which likely resulted in his removal from high security status shortly thereafter. Ex. G, Dzurenda Dep. 107:7-109:16; Pl.'s Counterstmt. ¶177, ECF No. 234 (indicating that Mr. Parks remained on high security status until July 22, 2009). Even after Mr. Parks was removed from high security status, he notes that his cell was moved thirteen times from September 2009 through November 2010, "or roughly once a month." Pl.'s Opp. Br. 38, ECF No. 232 (citing Ex. J at 27, List of Cell Locations for Parks as of 7/22/2009, at 2867).

Mr. Parks claims that the Defendants knew that he complained about these cell moves and their negative impact on his health, because he complained by filing inmate request forms. Ex. C, Parks Decl. ¶¶114, 122, 125. More specifically, he claims that Defendant Murphy received three complaints in August 2008 regarding the frequent prison transfers, including allegations that they were interfering with his ability to pursue grievances and that they negatively impacted his health. Pl.'s Counterstmt. ¶¶157-60, 163-65, ECF No. 234. In each instance, Defendant Murphy forwarded the complaint to the unit manager and either did not

65

follow-up or does not recall what action was taken. *Id.* ¶¶158, 164-65. Mr. Parks also complained to Warden Murphy about cell moves on June 2, 2009, a few weeks before he was removed from high security status. *Id.* ¶190; Ex. H, Murphy Dep. and Exhibits, Ex. 18, Letter to Murphy dated 6/2/2009, 004702-04.

Warden Dzurenda received a written complaint from Mr. Parks about the cell movements in February 2008, just before he recommended that Mr. Parks be removed from high security status. Ex. J, Inmate Request Form dated 2/9/2008, 004065-66. He also testified that he recalled Mr. Parks making complaints about the stress that frequent cell moves caused Mr. Parks. Ex. G, Dzurenda Dep. 88:8-14.

### 3.   Impact of the Transfers on Mr. Parks

Mr. Parks attests that the frequent transfers (both intra- and inter-facility) caused him stress and anxiety that resulted in night sweats, panic attacks, and dizziness, that they inhibited the timely administration of his medication, and that he lost certain personal items, including a box of his grievances, during the moves. Ex. C, Parks Decl. ¶¶ 111-13. He explains that, given his heightened sensitivity to germs, because of his medical conditions, he had to clean each new cell carefully when he arrived. *Id.* ¶ 112. Mr. Parks also indicates that Dr. O'Halloran told him that the transfers had a negative impact on his health and anxiety. *Id.* ¶¶ 124, 137. Dr. O'Halloran noted in Mr. Parks's medical records in February 2008, that he was experiencing stress from the moves. Ex. H, Murphy Dep. and Exhibits, Clinical Record Notes dated 2/14/2008, 004705.

Additionally, Mr. Parks found being housed in Garner to be very disruptive and upsetting, because he was surrounded by "serious mental illness that caused some to be almost comatose and others to act and scream wildly." Ex. C, Parks Decl. ¶ 120. He also indicates that

the moves inferred with his ability to pursue grievances, because they precluded him from being able to exhaust his remedies at any given facility.  *Id.* ¶ 119.

### 4.   Preclusion from Filing Grievances

Mr. Parks also claims that Defendants Dzurenda and Murphy retaliated against him by prohibiting him from filing grievances.  These prohibitions occurred on April 29, 2009, May 7, 2010, and October 6, 2010 for Warden Murphy and May 14, 2008 from Warden Dzurenda.  Ex. J, Letter from Murphy dated 4/29/2009, 004710; Ex. J, Letter from Dzurenda dated 5/14/2008, 004812; Ex. J, Letter from Murphy dated 5/7/2010, 004962; Ex. H, Murphy Dep. and Exhibits, Ex. 22, Letter from Murphy dated 10/6/2010, 004959.  Mr. Parks notes that the April 29, 2009 prohibition by Warden Murphy occurred within 20 days of him filing this lawsuit.  Pl.'s Counterstmt. ¶189, ECF No. 234.

### H.  Legal Analysis of Retaliation Claims

Mr. Parks has brought retaliation claims under 42 U.S.C. §1983 claiming that the Defendants violated the First and Fourteenth Amendments.  Am. Compl. ¶¶77-82, ECF No. 146. Mr. Parks believes that the retaliatory actions taken against him include: (1) the Defendants transferring him between and within facilities often; (2) Dr. Blanchette "inappropriately manipulat[ing] the HepCURB process to ensure" that Mr. Parks was denied treatment for his Hepatitis C; and (3) Defendants Dzurenda and Murphy "preclud[ing] Mr. Parks from filing any grievances."  Pl.'s Opp. Br. 29, ECF No. 232.  He has sued all three Defendants on this claim in their individual capacity.  Am. Compl. ¶¶ 6-8, 82, ECF No. 146.

To survive summary judgment on a claim of retaliation, Mr. Parks must demonstrate genuine issues of material fact exist regarding the following: (1) he engaged in protected speech or conduct, (2) the defendant took adverse action against him, and (3) a causal connection

existed between the protected speech and the adverse action. *See Espinal v. Goord,* 558 F.3d

119, 128 (2d Cir. 2009). The "adverse action" taken must be "meaningfully" and objectively

adverse in that it would deter a similarly situated individual of "ordinary firmness" from

exercising the constitutional right. *Gill v. Pidlypchak*, 389 F.3d 379, 380-81 (2d Cir. 2004)

(citations omitted). With respect to the last prong, Mr. Parks must show "his punishment was

motivated, in whole or in part, by his conduct – in other words, that the prison officials' actions

were substantially improper retaliation." *Graham v. Henderson*, 89 F.3d 75, 79 (2d Cir. 1996).

To prevail on his claim, he must also show by a preponderance of the evidence that the

Defendants were "personally involved—that is, [they] directly participated—in the alleged

constitutional deprivations." *Gronowski v. Spencer,* 424 F.3d 285, 293 (2d Cir. 2005); *see also*

*Wright v. Smith*, 21 F.3d 496, 501 (2d Cir. 1996).

Once a plaintiff has proved there are genuine issues of material fact on all three of the

elements of a retaliation action, the burden shifts to the defendant to prove that the plaintiff

would have received the same treatment "even in the absence of the protected conduct."

*Graham,* 89 F.3d at 79 (citing *Mount Healthy Sch. Dist. Bd. of Educ. v. Doyle,* 429 U.S. 274, 287

(1977)). "[I]f taken for both proper and improper reasons, state action may be upheld if the

action would have been taken based on the proper reasons alone." *Id.* (citations omitted). The

Second Circuit has recognized that this defense is often appropriately applied in the context of

prison administration. *Sher v. Coughlin*, 739 F.2d 77, 82 (2d Cir. 1984) (noting that a finding of

sufficient proper reasons under *Mount Healthy* "is readily drawn in the context of prison

administration where we have been cautioned to recognize that 'prison officials have broad

administrative and discretionary authority over the institutions they manage.'") (quoting *Hewitt*

*v. Helms,* 459 U.S. 460, 467 (1983), *receded from on other grounds by Sandin v. Conner,* 515 U.S. 472, 481-84 (1995).

Courts examine prisoner retaliation claims with "particular care," because they can be easily fabricated. *Colon v. Coughlin,* 58 F.3d 865, 872 (2d Cir. 1995) (citation omitted). Prisoner plaintiffs may rely on circumstantial evidence to prove their retaliation claims, such as temporal proximity of events, but in doing so, the plaintiff also must usually provide some non-conclusory evidence that raises an inference of "retaliatory animus" in order to proceed to trial. *See cf. id.* at 873 (noting that the Court would have granted summary judgment if the only evidence of retaliation had been plaintiff's good behavior and temporal proximity between the lawsuit and the disciplinary charges but plaintiff was entitled to a trial because he provided evidence that the disciplinary charge was based on false information)*; see also Faulk v. Fisher*, 545 F. App'x 56, 58-59 (2d Cir. 2013) (affirming grant of summary judgment where plaintiff failed to provide any evidence, circumstantial or otherwise, of retaliatory intent); *Bennett v. Goord,* 343 F.3d at 138-39 (2d Cir. 2003) (noting that direct evidence of retaliatory intent may not be required where the circumstantial evidence is "sufficiently compelling").

As mentioned in analyzing qualified immunity, the Court finds that Mr. Parks engaged in constitutionally protected activity by filing lawsuits and grievances and complaining about his medical care and frequent transfers. *See Gill,* 389 F.3d at 384 (the "use of the prison grievance system" is a protected activity); *Espinal,* 558 F.3d at 128-29 (filing a federal lawsuit is a protected activity) (citation omitted). Thus, its analysis will focus on the remaining factors.

### 1.  Transfers Under Consideration

As a preliminary matter, Defendants argue that Plaintiff's Second Amended Complaint inappropriately includes transfers that have already been dismissed by the Court and that only the

transfer that occurred on August 21, 2008 remains at issue.  Defs.' Br. 5 n.2, ECF No. 219-2.

The Court agrees.  Defendants correctly note that the Court dismissed Mr. Parks's retaliation

claims for all transfers that occurred before February 28, 2008, because it found that Mr. Parks

had alleged that he was on "high security status" during that time.  Ruling on First Mot. To

Dismiss 22-23, ECF No. 96.  In its ruling, the Court noted that inmates on "high security status"

are subject to prison transfers every sixty days.  *Id*.  Therefore, the Court reasoned that Mr. Parks

failed to state claims of retaliation on pre-February 28, 2008 transfers because "defendants have

demonstrated that they would have transferred the plaintiff 'even in the absence of the protected

conduct.'"  *Id.* at 23 (citing *Bennett v. Goord*, 343 F.3d 133, 137 (2d Cir. 2003)).

On June 7, 2013 (over two years after the Motion to Dismiss Ruling was issued), Mr.

Parks filed a motion for partial reconsideration of this aspect of the Court's ruling, arguing that it

was based on the false premise that inmates on high security status were required to be moved to

different prison facilities every sixty days.  Pl.'s Mot. For Partial Reconsideration 1-2, ECF Nos.

148-149.  He explained that discovery had revealed that being on high security status did not

require transfers to a different prison every 60 days.  *Id.*  Defendants did not dispute that this was

factually true.  Opp. Br. 1, ECF No. 150.  The Court denied Mr. Parks's Motion for Partial

Reconsideration "as untimely and not based on newly discovered evidence which could not, in

the exercise of due diligence, have been discovered prior."  Order dated 8/16/2013, ECF No.

162.

Mr. Parks has not squarely put before this Court a motion to reconsider its prior ruling on

this issue at this time.  Thus, the disposition of Defendants' summary judgment motion depends

only on the Court's analysis of the August 21, 2008 transfer.  However, because the parties have

addressed these additional transfers in their briefs, the Court will analyze them.

### 2.  Legal Analysis of Inter-Facility Transfers

Defendants have set out two arguments as to why summary judgment is appropriate on Mr. Parks's transfer-based retaliation claims regarding all eight transfers that Mr. Parks has put at issue.[34]  First, Defendants argue that assuming Mr. Parks has met his burden, his claim still fails because the DOC transferred Mr. Parks for "legitimate reasons."  Defs.' Br. 7-8, ECF No. 219-2 (citing *Mount Healthy Sch. Dist.,* 429 U.S. at 287).  Second, Defendants argue that since they were not personally involved in ordering the transfers, Mr. Parks cannot hold them liable under section 1983.  *Id.* at 10-11.

### a.  August 21, 2008 Transfer

On August 21, 2008, Mr. Parks was transferred from MWCI to Garner.  As indicated above, a mental health professional determined that Mr. Parks, who had been receiving mental health treatment at Garner, was no longer in need of that specialized treatment and could be placed into the general population.  Defs.' Local Rule 56(a)1 Stmt. ¶¶ 609-13, ECF No. 219-1; Ex. 19, Clinical Record Notes dated 8/20/08, 9.  Consistent with DOC policy, Mr. Parks was transferred back to MWCI, because it was the facility from which Mr. Parks originated.  Ex. 8, Administrative Directive 9.1, Section 7(D) ("Upon resolution of the medical concern, the inmate shall be returned to the sending facility as soon as possible.").  The foregoing facts are sufficient to show that Defendants would have transferred Mr. Parks on August 21, 2008, even in the absence of him engaging in constitutionally protected conduct.

Mr. Parks does not dispute any of the facts supporting Defendants' explanation for the transfer.  Pl.'s Local Rule 56(a)2 Stmt. ¶¶609-14, ECF No. 234.  Thus, he cannot defeat Defendants' summary judgment motion, because they have "proferr[ed] an alternative basis [for

---

[34] The Court has already analyzed and disposed of the Defendants' third argument regarding qualified immunity above.

the actions taken] that would apply to him even if his version of events were true." *Graham,* 89

F.3d at 81.  Accordingly, Defendants have satisfied the *Mount Healthy* test and summary

judgment must be **GRANTED** on the August 21, 2008 inter-facility transfer for all Defendants.

### b.  The Other Seven Transfers Contested by Mr. Parks

If the seven other transfers Mr. Parks puts at issue were before the Court on summary

judgment, the result would be no different.  The Court would have granted summary judgment

for the Defendants.  First, Mr. Parks has provided insufficient evidence of retaliatory intent.[35]

*Mount Healthy City Sch. Dist.,* 429 U.S. at 287 (identifying plaintiff's initial burden, before the

defendant must offer a legitimate reason justifying the action, as requiring a showing that

engaging in protected conduct was a "substantial" or "motivating factor" in the defendant's

adverse action).  The best evidence that Mr. Parks has of retaliatory intent is one discussion in

April 2006, during which Mr. Parks contends that Dr. Blanchette referred to him as being

"crazy" and "threatened" have him sent to Garner.  Ex. C, Parks Decl. ¶75.  These comments do

not show retaliatory intent, as they do not link Mr. Parks's engaging in protected activity with a

transfer.  Moreover, this lone angry discussion is simply too remote from all but the first April

2006 transfer to create a reasonable inference that Dr. Blanchette was retaliating against Mr.

Parks.   Second, the Court would have dismissed all seven transfers because Defendants have

offered evidence that they would have occurred even in the absence of the protected conduct.

Thus, under *Mount Healthy*, they would have been dismissed.

The transfers that occurred on August 11, 2006, October 16, 2006, and September 27,

2007 easily satisfy the *Mount Healthy* test.  On each of these dates, Mr. Parks was transferred

---

[35] Despite the comments allegedly made by Wardens Dzurenda and Murphy about Mr. Parks's frequent transfers, there is no evidence that either of them were directly or indirectly involved in the inter-facility transfers.  Thus, the Court need not address their comments in analyzing the claims based on the inter-facility transfers. *Wright v. Smith*, 21 F.3d 496, 501 (2d Cir. 1996) (personal involvement is required to sustain a section 1983 action)

from Garner back to MWCI, and Defendants point to documentary evidence indicating that the transfer would have occurred, even in the absence of Mr. Parks engaging in protected conduct. The August 11, 2006 and October 16, 2006 transfers both involved a downgrade in Mr. Parks's mental health level.  Once, Mr. Parks's mental health status was downgraded, per Administrative Directive 9.1, he was transferred back to the facility from which he had originally come, MWCI. Mr. Parks does not dispute any of the facts Defendants asserted that support their theory as to why these three transfers.  Pl.'s Local Rule 56(a)2 Stmt. ¶¶587-88, 594-97, ECF No. 234.  Thus, these transfers satisfy the *Mount Healthy* test for the same reasons as the August 21, 2008 transfer.

The September 27, 2007 transfer occurred because of a "profile" filed by Counselor Supervisor Kim Jones, which required the separation of Mr. Parks from another inmate under Administrative Directive 9.9.  Ex. 12, Administrative Directive 9.9, Section 3(D) (defining separation profile as "[a] record specifying the need and reason for keeping two (2) or more individuals apart from each other."); *see also* Ex. 7, Dzurenda Aff. ¶22 ("DOC does not keep inmates with profiles at the same housing unit.").  Again, Mr. Parks does not dispute any of these facts that provide a "legitimate" reason for the transfer to have occurred, Pl.'s Local Rule 56(a)2 Stmt. ¶¶605-608, ECF No. 234, thus, Defendants have satisfied the *Mount Healthy* test.

There is also no evidence that Dr. Blanchette was ever located at Garner or influenced the individuals that made the decision to transfer Mr. Parks on these three dates, other than Mr. Parks's own conjecture.  Such conjecture is insufficient to create a genuine issue of material fact on summary judgment.  *See Read v. Calabrese,* No. 9:11-cv-459 (GLS/DEP), 2015 WL 1400542, at *12 (N.D.N.Y. Mar. 26, 2015) (Report and Recommendation adopted by the District Court) (finding that plaintiff's conclusory and speculative allegations that defendant acted with

retaliatory animus, without other evidence, was insufficient to support a retaliation claim) (citing *Ayers v. Stewart,* 101 F.3d 687, 687 (2d Cir. 1996)); *Applegate v. Annucci,* No. 9:02-cv-0276(LEK/DEP), 2008 WL 2725087, at *15 (N.D.N.Y. July 10, 2008) (noting that since "the matter has progressed to the summary judgment stage, it is no longer sufficient for the plaintiff to engage in mere conjecture" regarding the nexus because the protected activity and the adverse actions taken and granting defendants' motion for summary judgment because of the absence of evidence on this issue) (citations omitted).  Accordingly, the August 11, 2006, October 16, 2006 and September 27, 2007 could not have survived a summary judgment motion with respect to any of the Defendants.

The other transfers from MWCI, where Dr. Blanchette was based, require a bit more scrutiny but two of them still meet the *Mount Healthy* test for dismissal.  The April 19, 2006 transfer was caused not by Dr. Blanchette but by Dr. Lewis, who explicitly referred Mr. Parks to level 4 mental health housing, which was only available at Garner.  Mr. Parks does not contest that Dr. Lewis analyzed Mr. Parks's mental health condition in early April 2006 nor does he dispute the content of that evaluation as represented by the Defendants.  Pl.'s Local Rule 56(a)2 Stmt. ¶¶231-32, ECF No. 234.  While there is evidence that Dr. Blanchette agreed with this result, there is no evidence, other than Mr. Parks's own speculation, that Dr. Lewis did not independently assess Mr. Parks and determine that he needed mental health treatment that could not be provided at MWCI.  Such speculation is insufficient at summary judgment to refute Defendants' showing that the transfer would have occurred even in the absence of the protected conduct.  *See Read,* 2015 WL 1400542, at *12; *Applegate,* 2008 WL 2725087, at *15.

The August 25, 2006 transfer was caused by a social worker, Sara Cyr, who saw Mr. Parks on August 24 and referred him to level 4 mental health housing.  Again, there is no

evidence that Dr. Blanchette was involved in this transfer other than Mr. Parks's speculation, which is insufficient at this stage to create a triable issue of fact. *Id.* Mr. Parks also does not deny any of the facts explaining Defendants' legitimate reason for the transfer. Pl.'s Local Rule 56(a)2 Stmt. ¶¶589-93. Thus, the April 19, 2006 and August 25, 2006 transfers would have been dismissed on summary judgment.

For the remaining transfers, which occurred on January 16, 2007 and October 26, 2007, Defendants' reason that the transfers would have occurred, even in the absence of the protected conduct, is Dr. Blanchette's medical assessment of Mr. Parks. Transferring someone to receive medical treatment is certainly a legitimate, non-retaliatory reason that satisfies Defendants' burden under *Mount Healthy*.

Because Dr. Blanchette personally recommended both of these transfers, the Court also explored whether there was any evidence of retaliatory intent. It concludes that there is none. On January 16, 2007, Dr. Blanchette wrote that Mr. Parks needed "specific treatment" at Garner. This transfer occurred nearly one year after Dr. Blanchette had expressed anger towards Mr. Parks in April 2006. There is nothing in the record close in time to or about this particular transfer to indicate that Dr. Blanchette was acting with retaliatory intent. *See Brown v. Graham,* No. 9:07-CV1353(FJS/ATB), 2010 WL 6428251, at *17-18 (N.D.N.Y. Mar. 30, 2010) (granting summary judgment for defendants on a retaliation claim where there was no "factual support" for plaintiff's "conclusory allegation" that defendants were motivated by retaliatory animus) (Report and Recommendation adopted by the District Court, 2011 WL 1213482 (N.D.N.Y. Mar. 31, 2011), *aff'd*, 470 F. App'x 11 (2d Cir. 2012)); *LeBrown v. Selsky,* No. 9:05-CV-0172 (GTS/DRH), 2010 WL 1235593, at *5 (N.D.N.Y. Mar. 31, 2010) (granting summary judgment for defendants because, among other reasons, the record was devoid of evidence of retaliatory

intent and the defendants' action was roughly three weeks after the protected activity, which was

"somewhat attenuated" in the Court's view).  Similarly, on October 26, 2007, Dr. Blanchette

requested that Mr. Parks be held at Garner for one year.  There is nothing in the record close in

time to or about this particular transfer that shows Dr. Blanchette was acting with a retaliatory

intent.  *Id.*  Moreover, there is evidence in the record that Mr. Parks was going to start Interferon

treatment soon after that date, which was known to have neuropsychiatric side effects that would

be best monitored at Garner.  Accordingly, the Court would have dismissed the claims based on

the January 16, 2007 and October 26, 2007 transfers.

Because the Court has found that all seven of the transfers are constitutionally proper, the

claims would have been dismissed against all Defendants, regardless of their level of

involvement.  Accordingly, even if the Court were to have considered the other seven transfers

not currently before it, it would have granted summary judgment on those claims as well on the

current record.

### 3.  Intra-Facility Transfers

With respect to the intra-facility transfers, Mr. Parks's claim fails because he has not met

his affirmative burden.  As with the inter-facility transfers, to meet his burden, Mr. Parks must

show that a genuine question of material fact exists as to whether the Defendants acted with

retaliatory animus.  *See Colon,* 58 F.3d at 873; *Faulk*, 545 F. App'x at 58-59 (affirming grant of

summary judgment where plaintiff had produced circumstantial evidence that the actions could

have been retaliatory but failed to provide any evidence of retaliatory intent).

Mr. Parks cites two statements as evidence of Defendants Dzurenda and Murphy

harboring retaliatory intent.  He recalls Commissioner Dzurenda asking him "something along of

the lines of 'how the bus therapy was?'"  Ex. C, Parks Decl. ¶130.  Mr. Parks defines "bus

therapy" as the transfer of a prisoner who has complained in order to make their continued complaints or the filing of grievances more difficult. *Id.* ¶131.  On another occasion, Warden Murphy asked Mr. Parks, "'Haven't you had enough of the bus?'"  *Id.* ¶132.  The Wardens both have testified that they bear no ill will toward Mr. Parks and Defendant Dzurenda specifically denies making the statements Mr. Parks attributes to him.  Ex. 7, Dzurenda Aff. ¶¶33-34; Ex. 17, Murphy Aff. ¶20.

Because neither of these comments could possibly be related to intra-facility transfer, which could not have involved a bus, no reasonable juror could conclude that they create an inference of retaliatory intent with respect to the intra-facility transfers.  Mr. Parks has cited no other evidence of such intent with respect to Defendants Murphy and Dzurenda.  Mr. Parks also has put forth no evidence that Dr. Blanchette was personally involved in his placement on high security status.  *See Wright v. Smith*, 21 F.3d 496, 501 (2d Cir. 1996) (personal involvement is required to sustain a section 1983 action).  Thus, summary judgment must also be **GRANTED** for all Defendants with respect to the intra-facility transfers.

### 4.   The Prohibition on Filing of Grievances

As mentioned above, Mr. Parks was informed by letter when he was precluded from filing grievances.  Both Wardens specifically note in their letters that they were acting under Administrative Directive 9.6.  The letters note that the Directive permits suspension of an inmate's ability to file grievances when that inmate files repetitive grievances or when he files more than seven grievances in a 60-day period.  Mr. Parks does not claim that he did not fit either of these criteria at the time he received the letters, nor does he claim that the DOC policy differs from what the letters indicate.  Accordingly, Defendants followed DOC policy as it is written.  Because they have provided a legitimate and non-retaliatory reason for their action,

Defendants have met their burden under the *Mount Healthy* test. *See Graham,* 89 F.3d at 79; *see also Jackson v. Jackson,* 15 F.Supp. 2d 341, 352 (S.D.N.Y. 1998) (granting summary judgment on a retaliation claim based on the filing of a misbehavior report, because defendant showed that he was obligated by statute to file the report which demonstrated he would have issued the misbehavior report "even in the absence of a retaliatory motive").

Mr. Parks also has produced no evidence that Dr. Blanchette was personally involved in his placement on high security status. *See Wright*, 21 F.3d at 501 (personal involvement is required to sustain a section 1983 action). Thus, summary judgment is **GRANTED** with respect to Mr. Parks's claim based on the prohibition on filling grievances as to all Defendants.

### 5.   Denial of Hepatitis C Treatment

With respect to Dr. Blanchette's denial of Hepatitis C treatment, the Court has found in its analysis of Mr. Parks's deliberate indifference claims above that, when Dr. Blanchette was treating Mr. Parks, he did not prescribe Hepatitis C treatment because of concerns about his mental health status. This reason satisfies the *Mount Healthy* test, because even if Mr. Parks had not complained, he still would not have received Hepatitis C treatment. *See Graham,* 89 F.3d at 81. Thus, Mr. Parks retaliation claim against Dr. Blanchette regarding his Hepatitis C treatment must also be dismissed. As discussed in analyzing the deliberate indifference claim, Mr. Parks also has failed to show that Dr. Blanchette was personally involved in the delay of the administration of Interferon after he was approved for treatment in December 2007. Thus, he cannot be liable on the retaliation claim during the time period when Mr. Parks was waiting for treatment that had been approved.

Moreover, the best evidence that Mr. Parks has that Dr. Blanchette was acting with retaliatory intent is when, in April 2006, Dr. Blanchette allegedly referred to him as being

"crazy" and "threatened" to have him sent to Garner.  Ex. C, Parks Decl. ¶75.  This event is close in time to the first decision made by the HepCURB to deny Hepatitis C treatment, but such temporal proximity alone cannot create a genuine issue of material fact as to whether the motivation behind Dr. Blanchette's actions was retaliation.  *See cf. Colon,* 58 F.3d at 873 (noting that it would have granted summary judgment if the only evidence of retaliation had been plaintiff's good behavior and temporal proximity between the lawsuit and the disciplinary charges, but plaintiff was entitled to a trial because he provided evidence that the disciplinary charge was based on false information); *see also Williams v. Goord,* 111 F. Supp. 2d 280, 290 (S.D.N.Y. 2000) ("Although the temporal proximity of the [protected activity] and the [adverse action] is circumstantial evidence of retaliation, such evidence, without more, is insufficient to survive summary judgment.") (citation omitted).

To the extent these claims are asserted against Defendants Dzurenda and Murphy, they must also be dismissed because there was no constitutional violation, nor is their evidence that either was directly involved.  *See Wright*, 21 F.3d at 501 (personal involvement is required to sustain a section 1983 action).  Accordingly, summary judgment is **GRANTED** on Mr. Parks's retaliation claim based on the denial of treatment for Hepatitis C.

### 6.  Conclusion

For all of the foregoing reasons, summary judgment is **GRANTED** with respect to all of Mr. Parks's retaliation claims against all Defendants.

### I.   Legal Analysis of ADA and Rehabilitation Act Claims

Mr. Parks claims that Wardens Dzurenda and Murphy violated Title II of the ADA and Section 504 of the Rehabilitation Act by failing to reasonably accommodate Mr. Parks's disability by continuing to transfer him both intra-facility inter-facility.  Am. Comp. ¶¶ 84-85,

ECF No. 146.[36]  He has sued Wardens Dzurenda and Murphy in their official capacity and

requests that the Court "enjoin[ ] them from further transferring Mr. Parks or otherwise

discriminating… against him based on disability."  *Id.* ¶¶ 7-8, 86.  At summary judgment, Mr.

Parks also requested that monetary damages and attorney's fees be awarded for violations of

both Acts.  Pl.'s Opp. Br. 80, ECF No. 232.[37]  Mr. Parks now concedes that his claim for

injunctive relief is moot, because he has been released from DOC custody.  Notice of Pl.'s

Release from DOC Custody, ECF No. 260.[38]  Thus, the only non-moot claim before the Court

under the ADA and the Rehabilitation Act is for damages and attorney's fees.

Title II of the ADA provides that "no qualified individual with a disability shall, by

reason of such disability, be excluded from participation in or be denied the benefits of the

services, programs, or activities of a public entity, or be subjected to discrimination by any such

entity."  42 U.S.C. § 12132.  Similarly, the Rehabilitation Act provides "[n]o otherwise qualified

individual with a disability in the United States… shall, solely by reason of her or his disability,

be excluded from the participation in, be denied the benefits of, or be subjected to discrimination

under any program or activity receiving Federal financial assistance…."  29 U.S.C. § 794.

---

[36] Title II of the ADA and Section 504 of the Rehabilitation Act do not provide for individual capacity suits against state officials. *Garcia v. S.U.N.Y. Health Sciences Center of Brooklyn*, 280 F.3d 98, 107 (2d Cir. 2001) (citations omitted).  The ADA authorizes lawsuits for money damages against individuals in their official capacity, provided that the plaintiff can show that the relevant conduct was caused by "discriminatory animus or ill will towards the disabled." *See id.* at 111.  To recover damages from individuals in their official capacity under the Rehabilitation Act, Mr. Parks must show that the defendants acted with "deliberate indifference" to rights secured by the Act. *See cf. Garcia,* 280 F.3d at 113-15 (holding that New York had not "in fact" waived its sovereign immunity when it accepted federal funds for SUNY but noting that claims for money damages generally have been permitted upon a showing that the violation resulted from "deliberate indifference" to rights secured the disabled by the Rehabilitation Act).

[37] Both the ADA and the Rehabilitation Act apply to inmates housed in state prisons.  *See Penn. Dep't of Corrs. v. Yeskey*, 524 U.S. 206, 210-13 (1998) (ADA); *see also e.g., Clarkson v. Coughlin*, 898 F.Supp. 1019, 1035 (S.D.N.Y. 1995) (Rehabilitation Act).

[38] Mr. Parks was sentenced for the robbery in September 2005, served his sentence, and was recently released from DOC custody while Defendants' summary judgment motion was still pending.  Pl.'s Opp. To Defs.' Mot. Seeking Extension for Filing of Joint Trial Memorandum 1-2, ECF No. 247.  After his initial release, he resided "in homeless/temporary housing arranged through the Veterans Administration." *Id.*  Just before the Court held oral argument on the summary judgment motion in March 2015, Mr. Parks was arrested again and was in DOC custody at the time of the argument.  But since then, he has been released from DOC custody.  Notice of Pl.'s Release from DOC Custody, ECF No. 260.

To establish a violation of Title II of the ADA, a plaintiff must show "(1) that he is a 'qualified individual' with a disability; (2) that he was excluded from participation in a public entity's services, programs or activities or was otherwise discriminated against by a public entity; and 3) that such exclusion or discrimination was due to his disability." *Hargrave v. Vermont,* 340 F.3d 27, 34-35 (2d Cir. 2003) (citation omitted).  A plaintiff must make the same showing under the Rehabilitation Act and must also prove that the program attacked was federally funded. *Henrietta D. v. Bloomberg,* 331 F.3d 261, 272 (2d Cir. 2003) (citation omitted).

"The purpose of both statutes is to 'eliminate discrimination on the basis of disability and to ensure evenhanded treatment between the disabled and the able-bodied.'"  *Maccharulo v. New York State Dept. of Corr. Servs.*, No. 08 CIV 301 (LTS), 2010 WL 2899751, at *2 (S.D.N.Y. July 21, 2010) (quoting *Doe v. Pfrommer*, 148 F.3d 73, 82 (2d Cir. 1998)).  As part of this mandate, both statutes may require reasonable modifications[39] to assure equal access to services for disabled individuals.  *Disabled in Action v. Bd. of Elections in New York*, 752 F.3d 189, 197 (2d Cir. 2014) (citations omitted).  A modification is reasonable if it would not "'fundamentally alter the nature of the service provided', or 'impose an undue financial or administrative burden.'"  *Id.* (citations omitted).

Defendants argue that summary judgment is warranted because Mr. Parks cannot prove he was prevented from participating in any program, service or activity due to his illness or that any member of DOC staff discriminated against him due to his illness.  Defs.' Br. 31, ECF No. 219-2.  The Court agrees.

---

[39] Technically, Title II of the ADA requires "reasonable modifications" to enable access to the public benefit or service, as opposed to "reasonable accommodation" under Title I, which applies in the employment context. *McElwee v. County of Orange*, 700 F.3d 635, 640 n.2 (2d Cir. 2012).  In evaluating a "reasonable modification" claim, the Court may look to Title I, "reasonable accommodation" case law for guidance.  *Id.*

### 1.  Failure to Show Denial of Access Based on Disability

First, Mr. Parks's claim fails because no reasonable fact-finder could conclude that in being transferred to different cells and facilities, he was treated differently from able-bodied inmates or that he was denied access to programs and services able-bodied inmates had access to, because he had HIV/AIDS.  While proof of disparate impact is not required to state a reasonable modification claim, "there must be something different about the way the plaintiff is treated 'by reason of… disability'" such that "a disability makes it difficult for a plaintiff to access benefits that are available to both those with and without disabilities."  *Henrietta D.,* 331 F.3d at 276-77 (citation omitted).

Inmates do not have a right to be housed at a specific facility or in a specific type of housing.  *See Meachum v. Fano*, 427 U.S. 215, 224-25 (1976) (holding that inmates do not have a constitutional right to avoid transfer to a less agreeable prison, even where the transfer visited a "grievous loss" upon the inmate); *Moody v. Daggett,* 429 U.S. 78, 88 n.9 (1976) (holding that inmates do not have a constitutionally protected right to rehabilitative programs or certain classifications); *accord McKinnon v. Chapdelaine*, No. CV115035454S, 2013 WL 951324, at *1 (Conn. Super. Ct. Feb. 13, 2013) ("Our courts have clearly held that a prisoner has no liberty interest in his classification or assignment within the prison system because the commissioner of correction has discretion to classify or transfer prisoners held in his custody.") (citing *Wheway v. Warden*, 215 Conn. 418, 431 (1990)).  Indeed, the decision of where to house an inmate is expressly left to DOC's discretion.  Conn. Gen. Stat. §18-86 ("The commissioner may transfer any inmate of any of the institutions or facilities of the department to any other such institution or facility… when it appears to the commissioner that the best interests of the inmate or the other inmates will be served by such action").  Thus, in being transferred to different cells and

different facilities, Mr. Parks was not being treated differently from able-bodied inmates because he had HIV/AIDS.

Moreover, Defendants have produced evidence that Mr. Parks was transferred for reasons that were entirely unrelated to his HIV/AIDS.  To survive summary judgment under the ADA and the Rehabilitation Act, a plaintiff must produce some evidence that supports an inference that the plaintiff was treated differently from non-disabled individuals because of his disability.  *See Doe v. Pfrommer*, 148 F.3d 73, 83-84 (2d Cir. 1998) (affirming a grant of summary judgment dismissing a plaintiff's ADA and Rehabilitation Act claims because he was challenging the quality of services he received rather than any discrimination against him because of his disability); *see also Flight v. Gloeckler,* 68 F.3d 61, 63-64 (2d Cir. 1995) (per curiam) (finding no liability for defendant under the ADA and Rehabilitation Act because plaintiff was not denied a benefit available to non-handicapped and was not denied the benefit because he was disabled).  As discussed above, Mr. Parks was moved between cells within facilities because he was on high security status and between facilities to provide him with mental health treatment.  He has presented no evidence indicating that these transfers occurred, because he had HIV/AIDS.  Accordingly, his ADA and Rehabilitation Act claims must fail.  *See Beckford v. Portuondo,* 151 F.Supp.2d 204, 220 (N.D.N.Y. 2001) (granting defendants' summary judgment motion on plaintiff's ADA and Rehabilitation Act claims based on his transfer to a cell that was not wheelchair equipped, because defendants provided a reason unrelated to his disability as to why the transfer had occurred and there was no evidence that defendants acted "because of an overt intent to deprive him of a service, program or activity by reason of his disability").

Mr. Parks argues that his claim should survive because the frequent transfers caused his medical condition to worsen and he suffered "more pain and punishment" because he was not treated differently from able-bodied inmates to accommodate his disability.  Pl.'s Opp. Br. 78, ECF No. 232 (citing *United States v. Georgia*, 546 U.S. 151 (2006)).  While *Georgia* stands for the proposition that an act that violates the Eighth Amendment can state a plausible claim under the ADA, *Georgia*, 546 U.S. at 156,  it does not change the fact that, under the ADA and the Rehabilitation Act, the discriminatory act (or inaction) needs to occur because of an inmate's disability.  Nor does it change the fact that to survive a summary judgment motion, a plaintiff must provide evidence that he was denied access to "the services, programs, or activities of a public entity."  42 U.S.C. § 12132.  In *Georgia,* the Court determined that because the claim involved impaired access to "such fundamentals as mobility, hygiene, medical care, and virtually all other prison programs," it satisfied this standard.  *Georgia*, 546 U.S. at 157.  The conditions were ones that would have inhibited any person from carrying out fundamental aspects of human life, including basic hygiene, and were caused by the person's need to use a wheelchair.

Here, there is no evidence that the conditions were so unhygienic or problematic that they must have denied Mr. Parks access to services, programs or activities.  Evidence of a general decrease in one's well-being without a link to an inability to participate in a service, program or activity provided by a public entity, does not survive summary judgment under the ADA or Rehabilitation Act.  *See Carrasquillo v. City of New York*, 324 F.Supp.2d 428, 443 (S.D.N.Y. 2004) (granting defendants' motion to dismiss based on claims that plaintiff was placed in a housing unit located far from prison services, requiring him to walk great distances and causing him pain, because plaintiff failed to plead denial of access to a service, program or activity); *see also Alster v. Goord,* 745 F.Supp. 2d 317, 340 (S.D.N.Y. 2010) (granting summary judgment on

plaintiff's claims based on accommodations he requested for his walking and hearing disabilities, because plaintiff failed to provide evidence that deficiencies in his prison housing denied him access to the benefits of services, programs or activities at the prison but denying summary judgment where plaintiff was unable to shower because of his disability).

### 2. Mr. Parks's Requested Modification Was Not Reasonable

Second, Mr. Parks's requested modification—that he not be transferred between or within prison facilities—was unreasonable.  "[S]tatutory rights applicable to the nation's general population [must] be considered in light of effective prison administration." *Gates v. Rowland*, 39 F.3d 1439, 1446 (9th Cir. 1994) (with respect to the Rehabilitation Act); *see also Turner v. Safley*, 482 U.S. 78, 84-85 (1987) (noting deference to prison administration regarding managing prison populations is appropriate).  In evaluating whether a given modification is reasonable in the prison context, the Court must take into account the legitimate interests of prison administrators in "'maintaining security and order'" and "'operating [an] institution in a manageable fashion.'"  *Pierce v. Cnty. of Orange*, 526 F.3d 1190, 1217 (9th Cir. 2008) (quoting *Bell v. Wolfish*, 441 U.S. 520, 540 n.23 (1979)).

As discussed above in analyzing the retaliation claims, Mr. Parks was transferred between facilities to receive mental health treatment and for other population management reasons.  Before July 2009, he was moved within a given facility because he was on high security status, meaning DOC had determined that he "pose[d] a threat to the safety and security of the facility, staff, inmates or the public."  Ex. 15, Administrative Directive 9.4, Section 3(H).  Stopping these transfers would have denied Mr. Parks mental health treatment and sacrificed the safety and security of the inmates at Garner and MWCI.

"The Second Circuit has explained that although the public entity must make 'reasonable accommodations,' it does not have to provide a disabled individual with every accommodation he requests or the accommodation of his choice." *Kearney v. N.Y.S. D.O.C.S.*, No. 9:11-CV-1281 (GTS/TWD), 2013 WL 5437372, at *8 (N.D.N.Y. Sept. 27, 2013) (citing *McElwee v. Cnty. of Orange*, 700 F.3d 635, 640 (2d Cir. 2012)) (granting summary judgment on ADA and Rehabilitation Act claims based on the denial of a request to transfer the plaintiff to a facility with a "medical infirmity unit" because the request was not a reasonable accommodation); *see also Wright v. Guiliani*, 230 F.3d 543, 548 (2d Cir. 2000) ("[T]he disabilities statutes do not require that substantively different services be provided to the disabled, no matter how great their need for the services may be.").  The Court finds that Mr. Parks's request that he not be transferred, given the reasons that those transfer were occurring, was not a reasonable modification.

Defendants' Motion for Summary Judgment, with respect to the claimed monetary relief under the ADA and the Rehabilitation Act, is hereby **GRANTED**.

## III.    CONCLUSION

For all of the foregoing reasons, Defendants' Motion to Correct Exhibits, ECF No. 255, is **DENIED AS MOOT.**  Defendants' Motion for Summary Judgment, ECF No. 219, is **GRANTED** in its entirety.  The Clerk is directed to enter judgment for the Defendants and close the case.


**SO ORDERED** at Bridgeport, Connecticut this 4th day of November 2015.


  /s/ Victor A. Bolden
VICTOR A. BOLDEN
UNITED STATES DISTRICT JUDGE